# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GIANNA WHEELER | ) | |
| c/o Washington Lawyers Committee | ) | |
| for Civil Rights & Urban Affairs | ) | |
| 700 14th St NW, Suite 400 | ) | |
| Washington, DC 20005 | ) | |
|  | ) | |
|  | ) | Civil Action No. 1:20-cv-2735 |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | |
|  | )_ | JURY TRIAL DEMANDED |
| AMERICAN UNIVERSITY, | ) | |
| 4400 Massachusetts Ave NW | ) | |
| Washington, DC 20016, | ) | |
|  | ) | |
| JEFFREY BROWN, | ) | |
| c/o American University | ) | |
| 4400 Massachusetts Ave NW | ) | |
| Washington, DC 20016, | ) | |
|  | ) | |
| KEVIN BARRETT, | ) | |
| c/o American University | ) | |
| 4400 Massachusetts Ave NW | ) | |
| Washington, DC 20016 | ) | |
|  | ) | |
| MICHAEL VENA, | ) | |
| c/o American University | ) | |
| 4400 Massachusetts Ave NW | ) | |
| Washington, DC 20016 | ) | |
|  | ) | |
| JOSEPH JOYNER, | ) | |
| c/o American University | ) | |
| 4400 Massachusetts Ave NW | ) | |
| Washington, DC 20016 | ) | |
|  | ) | |
| STEPHEN KINZER, | ) | |
| c/o Metropolitan Police Department | ) | |
| 300 Indiana Ave. NW | ) | |
| Washington, DC 20001 | ) | |
|  | ) | |

1

DEBORAH SMITH,                               )
c/o Metropolitan Police Department           )
300 Indiana Ave. NW                          )
Washington, DC 20001                         )
                                             )
RICHARD DAVID,                               )
c/o Metropolitan Police Department           )
300 Indiana Ave. NW                          )
Washington, DC 20001                         )
                                             )
AND                                          )
                                             )
DOE 1                                        )
American University                          )
4400 Massachusetts Ave NW                    )
Washington, DC 20016                         )
                                             )
                                             )
                                             )
                        Defendants.          )
_____      )

## **COMPLAINT**

Plaintiff Gianna Wheeler ("Ms. Wheeler"), for her Complaint against Defendants American University ("AU"); AU Dean of Students Jeffrey Brown ("Brown"); officers Kevin Barrett, Michael Vena, Joseph Joyner, and Doe 1 of the American University Police Department (collectively, the "AUPD Officers"); and DC Metro Police Department ("MPD") officers Stephen Kinzer, Deborah Smith, and Richard David (collectively, the "MPD Officers," and together with the AUPD officers, the "officers"); by and through counsel, alleges as follows:

## I      **INTRODUCTION**

1.      This is a civil rights action under the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*), the Rehabilitation Act of 1973 (29 U.S.C. § 794 *et seq.*), the D.C. Human Rights Act (D.C. Code § 2-1401.01 *et seq.*), the United States Constitution, 42 U.S.C. § 1983, and the common law of the District of Columbia, that arises from AU's unlawful discrimination against

Ms. Wheeler on the basis of race and disability; the unlawful entry of the AUPD Officers and the MPD Officers into Ms. Wheeler's home; and the unjustified, excessive, and forceful seizure of Ms. Wheeler by the AUPD Officers and the MPD Officers.

2.      On the night of September 26, 2019, Ms. Wheeler—a Black female undergraduate student at AU—was alone in her small off-campus apartment with her door locked, doing her schoolwork.

3.      However, unbeknownst to Ms. Wheeler, a phalanx of seven police officers—four AUPD Officers and three MPD Officers—had obtained an access key to her home from the front desk of her apartment building.  They obtained this key with the intent to enter her apartment regardless of her consent, even though the building was privately owned, its apartments were occupied by students and non-students alike, the officers had no warrant, and they did not reasonably believe that Ms. Wheeler was a danger to herself or others.

4.      Although AU, through the AUPD, employs over 60 officers, the AUPD Officers who obtained the key to Ms. Wheeler's apartment were particularly high ranking:  they included a captain of the AUPD and an AUPD lieutenant.

5.      With key in hand, the officers went to Ms. Wheeler's room and unlocked the door to let themselves in over Ms. Wheeler's objections.  Once inside, they confronted Ms. Wheeler, falsely alleging that she had assaulted a dean and would need to be evaluated at an in-patient psychiatric facility.  One of the AUPD Officers also asked Ms. Wheeler if she had been taking her medication, apparently having been informed that Ms. Wheeler had been diagnosed with major depressive disorder and anxiety.

6.      The allegations of assaulting a dean were untrue, and Ms. Wheeler was afraid.  She denied assaulting anyone and asked for more information from the officers about the allegations

against her.  As a result of her firm denial, the officers telephoned Defendant Jeffrey Brown, the Dean of Students at AU, to confirm their facts.

7.     After talking to Defendant Brown, the officers changed their story, telling Ms. Wheeler that they now believed that she had actually assaulted another *student*, although they did not provide Ms. Wheeler with the student's name or any of the supposed circumstances of the alleged assault.  The officers then reiterated that Ms. Wheeler would need to be evaluated at a psychiatric facility.

8.     AU deployed the AUPD Officers to Ms. Wheeler's apartment as a result of a report earlier that day about an encounter between Ms. Wheeler and another student at AU, where the student afterward complained that she felt threatened.  In that encounter, which had occurred approximately seven hours prior, Ms. Wheeler had walked into a computer lab and asked the student how to find the head of a department.  Ms. Wheeler was agitated about bullying on campus and was seeking the department head's contact information to report her concerns.

9.     There was no harm reported by the complaining student.  Notably, the only allegation in the report involving any physical contact at all between Ms. Wheeler and the other student was that Ms. Wheeler had briefly touched the student's shoulder.  AU entirely credited the complaining student's account without even contacting Ms. Wheeler, classified the incident as an assault, and deployed the AUPD to Ms. Wheeler's off-campus home to, among other things, forcibly apprehend Ms. Wheeler to hospitalize her at psychiatric institution.

10.     Ms. Wheeler did not want to go.  There were many reasons, including that she knew the charges were not true, that she wanted to stay home to complete her schoolwork, and that she did not have any basis to believe she needed to be hospitalized.  She was also afraid of what can— and often does—happen when Black people encounter the police.  The severe, sometimes fatal,

consequences of encounters between Black people and police were forefront in Ms. Wheeler's mind.

11.     Yet over the course of the next *three* hours, the officers and AU itself did not back down from their insistence that Ms. Wheeler "voluntarily" hospitalize herself.  Although Ms. Wheeler remained calm and reasonable, they pushed Ms. Wheeler to surrender her rights.  They told her that she had no choice, and they forbade her from leaving her home—unless she went with them to an in-patient psychiatric facility.  Although Ms. Wheeler's friends visited her during the incident to offer their emotional support, the officers isolated Ms. Wheeler by ejecting her friends from the room and not permitting them to re-enter.  After Ms. Wheeler's friends were forced to leave, however, the officers stood aside to allow a representative from AU into Ms. Wheeler's room.

12.     This AU representative was AU Director of Resident Life, Lisa Freeman.  Freedman told Ms. Wheeler that she had "no choice" but to go to an in-patient psychiatric facility.  Again, Ms. Wheeler said that she would not go.

13.     The seven officers stood guard inside Ms. Wheeler's tiny 330 square foot studio apartment and in the adjacent hallway, ensuring that Ms. Wheeler had no way to leave her apartment through the only door.  For the entire three-hour period, they did not allow Ms. Wheeler to leave; they physically blocked her with their bodies, and they verbally denied her requests to go to another off-campus location, even when confronted with evidence that Ms. Wheeler had another place to stay.

14.     Ms. Wheeler is young and slight of build.  She is a 5'4", 115-pound Black woman, who is 21 years old.  On information and belief, all of the AUPD and MPD Officers were white,

and all of the AUPD Officers were male.  The physical contrast between Ms. Wheeler and the seven officers who blocked her exit was pronounced.

15.     As the evening progressed, Ms. Wheeler remained steadfast in insisting upon her rights:  she did not give consent for the officers to enter, she insisted that officers leave her room, and she asked that she be allowed to leave herself.  However, the officers did not leave or permit Ms. Wheeler to leave.

16.     Eventually, the MPD Officers called EMTs to examine Ms. Wheeler, and the EMTs' reports revealed that there was no valid basis to detain or hospitalize her.  Specifically, the EMTs' reports noted that Ms. Wheeler's "mental status" and "neurological status" were both "normal baseline for patient"; that she was "alert and oriented"; and that her pulse was 64 bpm. On information and belief, these findings were communicated in substance to AU itself and to the officers on the scene, who then tried unsuccessfully to persuade the EMTs to take Ms. Wheeler to a psychiatric facility.

17.     However, even after the EMTs made those findings and rejected the officers' requests, the officers did not release Ms. Wheeler.  AUPD Officers called Defendant Brown—who had neither spoken to nor observed Ms. Wheeler at any time that day—for instructions.  and asked him "what should we do now?"

18.     Brown's precise instructions are unknown.  However, immediately after Brown answered the officers' question, the officers shut Ms. Wheeler's door, handcuffed her, and bundled her into a blanket.  MPD Officers either stood by or assisted AUPD Officers as they carried Ms. Wheeler out of her home—literally kicking and screaming—in full view of the students and non-students who also rented rooms at her apartment complex.  Multiple videos of the incident exist and were posted on-line, causing severe embarrassment for Ms. Wheeler.

19.     Officers transported Ms. Wheeler to Washington Hospital Center.  At that facility, Ms. Wheeler was subjected to extreme trauma.  She was placed into "four-point" restraints that immobilized her limbs and prevented her from accomplishing basic tasks, even scratching her nose without assistance.  While in that helpless state, Ms. Wheeler was also forcibly medicated with multiple drugs.  Her cries and pleas went unanswered, and she could do nothing more than watch as the medications were administered. Ms. Wheeler was forced to remain at the facility for six days.  Upon information and belief, the psychiatrist in charge of the decision to release Ms. Wheeler did so because, among other things, Ms. Wheeler did not present as violent during her stay.

20.     Even after Ms. Wheeler secured her release from Washington Hospital Center, she was not allowed to return to campus and resume her study.  In addition to forcibly hospitalizing her, AU and Brown had placed Ms. Wheeler on an interim suspension for the same alleged incident that caused them to seek her involuntarily hospitalization.  The suspension took effect immediately and before any hearing to determine Ms. Wheeler's involvement, and before Ms. Wheeler was even contacted.  By the terms of this interim suspension and as the suspension was enforced, Ms. Wheeler had to see a particular psychologist selected by AU (Dr. Michael Hendricks, an AU alumnus), waive certain of her privacy rights over her past medical history, and allow Brown and AU access to detailed, private medical information before being allowed to resume classes and return to campus or her apartment.

21.     Ms. Wheeler met AU's requirements.  She then wholly debunked AU's allegations against her and was *cleared* of all disciplinary charges.  Specifically, at a disciplinary hearing held by AU in October 2019—in which Ms. Wheeler was not permitted counsel—an AU-appointed

panel considered the evidence against Ms. Wheeler and found her "not responsible" for any violations of the AU Code of Conduct.

22.     The determination of "not responsible" in AU's own disciplinary proceeding is particularly striking not only because AU was able to select the panel and deprive Ms. Wheeler of counsel, but also because AU's hearings hold AU to a very modest preponderance-of-the-evidence standard to prove its claims against students.  AU could not even meet that burden.

23.     Since returning to campus, Ms. Wheeler has continued to pursue her studies, has had no encounters with the police, and has caused no harm to anyone.

24.     The egregious and unlawful conduct by Defendants, described above, arises from three ongoing and serious problems that put students like Ms. Wheeler at unnecessary risk.

25.     First police encounters with Black people pose an unduly high and unacceptable risk that—even if Black people conduct themselves in accordance with the law, as Ms. Wheeler did—they will be wrongfully arrested, brutalized, and even killed.

26.     Moreover, the systemic racism that animates these encounters often results in the police failing to respect and credit the testimony of Black people.  Ms. Wheeler's case illustrates exactly that point.  Aside from talking with the student who made a complaint against Ms. Wheeler and that student's mother, Defendants did not make any effort to investigate further.  Indeed, the AUPD Officers failed to investigate further even when it became clear that they had misunderstood the events leading them to Ms. Wheeler's home.  There was also no further investigation when it became obvious that Ms. Wheeler's calm demeanor when the officers arrived on the scene was inconsistent with a decision to seek her involuntarily hospitalization to an in-patient psychiatric facility, nor when EMTs on the scene saw no issues that required their intervention.  Ms. Wheeler's denial of the allegations against her and utter confusion about the assertion that she had assaulted

*anyone* should have at least prompted further questioning.  However, Defendants never solicited Ms. Wheeler's side of the story or asked her a single follow-up question about the alleged incident. Instead, AU and Brown continued to unflinchingly seek Ms. Wheeler's involuntary hospitalization, the AUPD Officers proceeded after seeking and obtaining guidance from Brown, and the MPD Officers either stood by or actively assisted the AUPD Officers in so doing.

27.     Second, citizens diagnosed with mental health disabilities, like Ms. Wheeler, are at yet even greater risk during police encounters, principally because such persons are incorrectly stigmatized as dangerous even when their illnesses pose no threat of violence to themselves or others.  Studies confirm that those diagnosed with mental illnesses are at especially high risk when encountering police, who typically lack necessary training in how to interface with this vulnerable population, and statements made by those diagnosed with mental illnesses are also less likely to be believed and credited.

28.     The danger to persons with mental health disabilities is particularly acute at AU, where the administration has a history of blaming students diagnosed with mental health disabilities for the difficulties they face and treating them as undesirables. Ms. Wheeler's case illustrates this point:  Defendants took it as a given that Ms. Wheeler posed a danger to herself and others, despite the overwhelming evidence to the contrary that she posed no threat to herself or others.

29.     Third, the officers of the AUPD are so-called "special police officers."  Special police are not part of the DC MPD.  Rather, special police are a poorly understood, effectively unsupervised, and all but an unaccountable confederacy of private police forces consisting of over

7,500 officers in Washington, D.C.[1]  Special police officers are authorized to make arrests and can be authorized to carry firearms on their private employers' property, all without the direct supervision or control of MPD.  As a result, special police brutality routinely goes unrecorded, unnoticed, and unpunished.

30.     Once again, Ms. Wheeler's case is illustrative.  Following the instructions they sought and received from Brown, the AUPD Officers made an unnecessary showing and use of force at Ms. Wheeler's home and gratuitously pressured her for hours to go to an in-patient psychiatric facility.  Before taking the extreme step of forcibly transporting Ms. Wheeler for involuntary hospitalization to an in-patient psychiatric facility, the AUPD Officers should have solicited and considered Ms. Wheeler's side of the story, accounted for her demeanor and the circumstances in which they found her, and considered the conclusions of the EMTs on the scene.

31.     In this case, Defendants had ample opportunity to treat Ms. Wheeler with basic human dignity—and in accordance with her rights.  Their failure to do so necessitates this suit.  Accordingly, this action seeks monetary damages and injunctive relief to repair the harm caused by the violations of Ms. Wheeler's rights and ensure that Ms. Wheeler and other students do not have to suffer such violations again.

## II      JURISDICTION AND VENUE

32.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this suit asserts claims pursuant to the ADA, the Rehabilitation Act of 1973, and the United States Constitution.

---

[1] Jodie Fleicher et al., *DC Residents say MPD Ignored Complaints Against Special Police Officer*, NBC Washington (Apr. 1, 2019), https://www.nbcwashington.com/news/local/dc-residents-say-mpd-ignored-complaints-against-special-police-officer/138304/.

33.     This court has supplemental jurisdiction over Ms. Wheeler's related claims asserted under the laws of Washington, D.C. pursuant to 28 U.S.C. § 1367.

34.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant AU resides in this district, Defendants Brown, the AUPD Officers and the MPD Officers at all relevant times were employed in this district, and because the events giving rise to Ms. Wheeler's claims occurred in this district.

## III    THE PARTIES

35.     Defendant American University is a private research university in Washington, DC, originally chartered by an 1893 Act of Congress.  Its current, revised charter has been in effect since 1996.  AU's student body numbers over 13,000, and its main campus is located at 4400 Massachusetts Ave., NW, in Washington DC, within MPD's Second District.

36.     AU, through AUPD, employs more than 60 special police officers.

37.     American University includes the American University Police Department.  On information and belief, the AUPD is a subdivision of AU that is wholly controlled by AU.  AU, through AUPD, employs individuals who are licensed as special police officers in the District of Columbia.  These special police are able to carry weapons and wear uniforms.

38.     AUPD officers are required—as employees—to follow the directions of AU and its officials.

39.     Defendant Jeffrey Brown is the Dean of Students at AU.  At all relevant times, Jeffrey Brown had authority by virtue of his position at AU to make final policy determinations on behalf of AU with respect to Ms. Wheeler's interim suspension, the decision to seek Ms. Wheeler's involuntary hospitalization, and the conduct of the AUPD Officers in all of their interactions with Ms. Wheeler on September 26, 2019.

40. Defendant Kevin Barrett is an employee of AU and a special police officer and a captain of the AUPD.

41. Defendant Michael Vena is an employee of AU and a special police officer and a lieutenant of the AUPD.

42. Defendant Joseph Joyner is an employee of AU and a special police officer of the AUPD.

43. Defendant Doe 1 is, on information and belief, an employee of AU and a special police officer of the AUPD.

44. Defendant Stephen Kinzer is an officer of the MPD, Second District.

45. Defendant Deborah Smith is an officer of the MPD, Second District.

46. Defendant Richard David is a sergeant of the MPD, Second District.

47. Plaintiff Gianna Wheeler is a resident of the District of Columbia. At all times relevant to this Complaint, Ms. Wheeler resided either on-campus in AU's residence halls, or off-campus at the Frequency Apartments at 4000 Brandywine St. NW, Washington, DC, which are owned by 4000 Brandywine Street NW Ground Owner LLC. Ms. Wheeler is currently enrolled full time at AU in its undergraduate program. She is 21 years old, Black, female, and identifies as LGBTQ. She has been diagnosed with major depressive disorder and anxiety.

## IV THREE INTERRELATED FACTORS UNDERLYING THE VIOLATION OF MS. WHEELER'S RIGHTS

48. Defendants stormed Ms. Wheeler's apartment, entered without consent, harassed her for over three hours, and eventually dragged her out of her room in handcuffs to seek her involuntary hospitalization to a psychiatric facility, despite the fact that Ms. Wheeler clearly not a threat to herself or others. Defendants' actions were influenced by prejudice against Black people, people with disabilities, and the utter lack of accountability for special police. These three

problems are pervasive and provide context for what is otherwise a wholly perplexing and inexplicable series of violations of Ms. Wheeler's rights.

### A.      The Danger Police Encounters Pose to Black, Female Citizens and AU's Continuing Problems with Race Relations

49.     Racial discrepancies in policing, as well as notable instances of overt racism in individual police encounters, are issues that plague jurisdictions across the nation.

50.     As a specific example, law enforcement disproportionately deploys lethal force against Black people: one study found that victims of lethal force by police were "disproportionately Black (32%) with a fatality rate 2.8 times higher among blacks than whites."[2]

51.     Recent high-profile uses of lethal force, including the killings of Breonna Taylor, George Floyd, and Rayshard Brooks at the hands of police in the Spring of 2020, and the police shooting of Jacob Blake in the Summer of 2020, have reignited a nationwide examination of racial inequities that pervade the policing and criminal systems in America.  The facts of these cases again reveal how Black people face grossly disproportionate outcomes during police encounters.

52.     Even when police encounters are instigated for the supposed benefit of Black people, Black people nevertheless face the real prospect of death at the hands of police.  For instance, in October 2019, Atatiana Jefferson, a Black woman, died at the hands of a Fort Worth police officer who was conducting a welfare check in response to a call about Atatiana's door being open.  She was playing video games with her nephew before the officer fired a single bullet through her window—killing her.

53.     Police encounters involving Black people often begin with "racialized police communication": the practice of reporting Black persons who are *not* engaged in criminal behavior

---

[2] Sarah DeGue et al., *Deaths Due to Use of Lethal Force by Law Enforcement*, Am. J. Prev. Med., (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6080222/.

to the police.[3]  Racialized police communication may take different forms, and "[r]acially motivated police reporting, involves calls, reports, or complaints to law enforcement made against Black individuals engaged in activities that would not be read as aggressive, suspicious, or otherwise worthy of police involvement, had the actor been white.  This description mostly captures reports that are made based on implicit or unconscious biases which cause the reporter to view the victim's innocuous actions as worthy of scrutiny."[4]  Other racialized police communication may be based on explicit bias.[5]In recent years and months, there has been increased media attention to the frequency of racialized police communication and the wide-spread impact it has on Black people.[6]

54.    Another common problem that Black people, and particularly Black women, face in encounters with the legal system is that their testimony and description of events—even as victims—is often discounted or dismissed outright.[7]

55.    AU in particular has manifested a culture replete with implicit and explicit biases against Black people, which AU seems either unable or unwilling to change.  AU's failure to

---

[3] Chan T. McNamarah, *White Caller Crime: Racialized Police Communication and Existing While Black*, 24 MICH. J. RACE & L. 335, 342 (2019), https://repository.law.umich.edu/mjrl/vol24/iss2/5.

[4] Id. at 349.

[5] Id.

[6] Id. at 346.

[7] *See, e.g.,* Deborah Epstein & Lisa A. Goodman*, Discounting Women: Doubting Domestic Violence Survivors' Credibility and Dismissing Their Experiences,* 167 U. PA. L. REV. 399, 436 (2019) ("As many legal scholars have noted, American courts have a long history of discrediting African American witnesses on the basis of their blackness. Such discrediting can occur based on stereotypes that African Americans are less intelligent than are whites, or that they are untrustworthy and dishonest. Based on all of the above, it stands to reason that black women risk being doubly disbelieved."); Leigh Goodmark, *When Is a Battered Woman Not a Battered Woman?: When She Fights Back*, 20 YALE J.L. & FEMINISM 75, 98-102 (2008).

successfully remediate its larger cultural problems and to effectively combat racist stereotypes provides context for the events and decision-making that led to the perplexing violations of Ms. Wheeler's rights:

    i.    In September 2016, two Black students at AU reported being targeted in their dorm rooms by white students with bananas, which are sometimes used to invoke a racist cliché comparing apes to Black people.  One student reported having a banana thrown into her room, while another reported finding a rotten banana left outside her door.  AU commented publicly that it was investigating the incident, but neither the results of that purported investigation, nor any remedial or restorative steps were ever disclosed.

    ii.    In May 2017, not long after Ms. Wheeler first arrived at AU, AU elected its first Black female student government President, Taylor Dumpson.  Ms. Dumpson and Black students in general were then the target of hateful displays, including an incident in which vandals again used bananas.  This time, the bananas were hung from nooses on campus in an apparent reference to the lynching of Black people. There were also accompanying messages, including "Harambe bait" (a reference to the Cincinnati Zoo gorilla killed the prior year), and "AKA Free," (a reference to AKA, the African-American sorority of which Ms. Dumpson is a member), again invoking racist comparisons between apes and Black people, and suggesting that the bananas were provided for Ms. Dumpson's sorority.  Once again, AU stated that it was investigating, but it is not clear if or how those involved were punished or whether any steps were taken to address the deeper attitudinal problems the incident revealed.

iii. In September 2017, ten Confederate flag posters—with an accompanying cotton stalk (a likely reference to slave labor in the South)—were found displayed at several locations on AU's campus. The posters were placed where they would likely have maximum impact, e.g., on top of a "visiting writers series" poster featuring African American women.

iv. In April 2019, a video was posted to Twitter that showed an AU student, who was not Black, using a racist slur targeted at Black people.[8] AU responded that the university "do[es] not condone the use of racist language" but then noted that the slur was used "in the context of a discussion among students about language and freedom of expression."[9] Students and professors, at AU and elsewhere, expressed disappointment at AU's equivocal response.[10]

56. Her knowledge that there had been multiple racist incidents on AU's campus made her particularly fearful when AUPD and MPD entered her apartment on September 26, 2019 and have increased Ms. Wheeler's anxiety and fear at AU since that time.

---

[8] *See* Jeremy Bauer-Wolf, *Anger Over N-Word at American University*, Inside Higher Ed (Apr. 9, 2019), https://www.insidehighered.com/news/2019/04/09/video-american-university-student-using-racial-slur-goes-viral.

[9] Letter from Fanta Aw, Vice President of Campus Life & Inclusive Excellence, Am. Univ., *Use of Racist Language*, American University (Apr. 7, 2019), https://www.american.edu/ocl/20190407-use-of-racist-language.cfm.

[10] *See* Jenni Fink, *American University Student Filmed Saying N-Word, Viral Video Not Surprising to Some Students*, Newsweek (Apr. 8, 2019), https://www.newsweek.com/american-university-student-n-word-viral-video-1388739.

**B.**  **The Danger Police Encounters Pose to People Struggling with Mental Health Disabilities and AU's Mistreatment of Its Students with Mental Health Disabilities**

57.     The likelihood of police brutality against Black people is often compounded when the Black person involved is a person with a disability, especially a mental health disability.[11]  The recent high-profile killing of Daniel Prude is just one example.[12]  Additionally, in several other high-profile cases, including those of Tanisha Anderson, Michelle Cusseaux, Shereese Francis, Pearlie Golden, and Kayla Moore, Black women in the midst of mental health crises have been killed by police.

58.     Data also indicate that individuals with disabilities have more interactions with police than individuals without disabilities, and at least 25 percent of all police killings are people in a mental health crisis.[13]

59.     Indeed, according to a *Washington Post* article tracking fatal police shootings (which are just one type of lethal force used by police), approximately 20% of those shot and killed suffered from mental illness.[14]  And a White Paper authored by David Perry and disability expert Lawrence Carter-Long noted that "[d]isabled individuals," including those with mental illness, "make up a third to half of all people killed by law enforcement," and "[d]isablity intersects with

---

[11] See Abagail Adams, Black, Disabled and at Risk: The Overlooked Problem of Police Violence Against Americans with Disabilities, TIME (June 25, 2020), https://time.com/5857438/police-violence-black-disabled/.

[12] Taylor Romine et al.,  *7 Rochester Police Officers Suspended Over Daniel Prude's Death, Mayor Says*, CNN (Sept. 4, 2020), https://www.cnn.com/2020/09/03/us/rochester-police-daniel-prude-death/index.html.

[13] Mizner, Susan, "*Police 'Command and Control' Culture Is Often Lethal — Especially for People With Disabilities*," ACLU (May 10, 2018), https://www.aclu.org/blog/criminal-law-reform/reforming-police/police-command-and-control-culture-often-lethal-especially.

[14] *Fatal Force 999 People were Shot and Killed by Police in 2019*, Washington Post (Aug. 10, 2020), https://www.washingtonpost.com/graphics/2019/national/police-shootings-2019/.

other factors, such as race, gender and sexuality, to magnify degrees of marginalization and increase the risk of violence."[15]

60.     Harmful stereotypes and social stigma concerning people with mental health disabilities contribute to their mistreatment.  Such disabilities are often—incorrectly—conflated with dangerousness,[16] and the media exacerbates and strengthens these stereotypes by sensationalizing violent crimes committed by individuals who are perceived as having mental health disabilities.[17]  Commentators have long noted that such harmful stereotypes have informed efforts to coerce individuals with mental health disabilities and jeopardize their fundamental human rights to bodily autonomy.[18]

61.     Any supposed link between mental health disabilities and dangerousness is simply not supported by scientific literature.  Instead, the medical community has reached the opposite consensus:  people with mental health disabilities are much more likely to be the *victims* of violent

---

[15] David M. Perry & Lawrence Carter-Long, *Media Coverage of Law Enforcement Use of Force and Disability*, Ruderman Family Foundation (Mar. 2016), https://rudermanfoundation.org/white_papers/media-coverage-of-law-enforcement-use-of-force-and-disability/.

[16] Mohit Varshney et al., *Violence and mental illness: what is the true story?*, 70 J. Epidemiol Community Health 223-225 (2016), https://jech.bmj.com/content/jech/70/3/223.full.pdf.

[17] Aaron Levin, *Media Cling to Stigmatizing Portrayals of Mental Illness*, Psychiatric News (Dec. 16, 2011), https://psychnews.psychiatryonline.org/doi/full/10.1176/pn.46.24.psychnews_46_24_16-a.

[18] *E.g.*, Bernice A. Pescosolido et al., *The Public's View of the Competence, Dangerousness, and Need for Legal Coercion of Persons with Mental Health Problems*, 89 Am. J. Pub. Health 1339-1345 (Sept. 1999), https://ajph.aphapublications.org/doi/pdfplus/10.2105/AJPH.89.9.1339; Dainius Puras & Piers Gooding, *Mental Health and Human Rights in the 21st Century*, World Psychiatry 18:1 (Jan. 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6313250/pdf/WPS-18-42.pdf.

crime than they are to be perpetrators, and the vast majority of people with mental health disabilities are no more likely to be violent than any other person.[19]

62.     As more students with disabilities are going to college than ever before—indeed, the National Council on Disability reports that, in 2017, 35 percent of students met the criteria for at least one mental disorder[20]—college campuses are becoming the crucibles for national problems involving mental health and law enforcement.  Many universities have failed to keep pace with the needs of these students, especially university police, who may lack necessary training and harbor biases against those with mental health diagnoses.

63.     When students receive reasonable accommodations and sufficient mental health support, they are more likely to stay in school and to graduate.  Yet, only half of college students experiencing a mental health crisis seek help, largely due to the fear of stigma and negative consequences associated with admitting to a mental health disability.[21]

64.     Too often, universities respond to disability-related behavior by amplifying the problems that prevent students from seeking help in the first place:  that is, with exclusion, blame, and draconian measures such as forced leaves of absence, disciplinary action, and psychological evaluation requirements.  These measures are discriminatory, serve to perpetuate the stigma of mental illness on college campuses, and undermine students' efforts to seek needed assistance.

---

[19] U.S. Dep't of Health and Human Servs., *Mental Health Myths and Facts* (Aug. 29, 2017), https://www.mentalhealth.gov/basics/mental-health-myths-facts; American Psychiatric Association, *APA Condemns Loss of Life from Gun Violence, Disputes Link to Mental Illness* (Aug. 5, 2019), https://www.psychiatry.org/newsroom/news-releases/apa-condemns-loss-of-life-from-gun-violence-disputes-link-to-mental-illness.

[20] National Council on Disability, *Mental Health on College Campuses: Investments, Accommodations Needed to Address Student Needs* (July 21, 2017), https://ncd.gov/publications/2017/mental-health-college-campuses-investments-accommodations-needed-address-student.

[21]Id.

65.     AU has a history of failing to appreciate and respond appropriately to the needs of students with mental illness, of developing policies and taking action based on inaccurate stereotypes of persons with mental illness, and of directing students with mental illness to seek their education elsewhere:

i.    Since at least 2014, AU students have publicly complained of long wait times for appointments at the Counseling Center, which is particularly problematic for students struggling acutely.[22]  Others have expressed that AU's counselors are not prepared to help students struggling with mental health issues that are more serious than routine stress concerning academics and adjusting to college.[23]

ii.   In 2018, Sylvia Burwell, AU's President, wrote an article that was published in *Foreign Affairs* about her observations of mental health issues and stress on the AU campus, stating that "today's young adults seem to arrive at college with less resiliency and a lower appetite for risk and failure."[24]  The article was criticized as out-of-touch, uninformed, and insensitive.  One AU student noted that the article

---

[22] Kate Magill, *AU Counseling Center Stretched Thin*, The Eagle (Dec. 18, 2014), https://www.theeagleonline.com/article/2014/12/counseling-center-stretched-thin; *see also* Deanna Mudry, *Mental Health at AU*, The Eagle (Mar. 8, 2016), https://www.theeagleonline.com/article/2016/03/au-mental-health-snapsho; Kelsey Carolan, *Burwell Sparks Conversation on Mental Health at AU with Foreign Affairs Essay*, The Eagle (Dec. 4, 2018), https://www.theeagleonline.com/article/2018/12/burwell-generation-stress.

[23] Deanna Mudry, *Mental Health at AU*, The Eagle (Mar. 8, 2016), https://www.theeagleonline.com/article/2016/03/au-mental-health-snapsho.

[24] Sylvia Mathews Burwell, *General Stress: The Mental Health Crisis on Campus*, Foreign Affairs (November/December 2018), https://www.foreignaffairs.com/articles/united-states/2018-10-11/generation-stress.

was insensitive and pointed out that "[co]llege students like myself do not arrive with a lower drive. We arrive with no other option but success."[25]

    iii. The AU Counseling Center has publicly chided students for not keeping their appointment.  On January 26, 2020, the AU Counseling Center sent a message to the student body complaining that: "Both the Counseling Center and the Student Health Center are experiencing a significant rate of unkept mental health appointments."[26]  In response, the AU newspaper explained that this appeared to place blame squarely on students, while avoiding addressing real problems: "The email, masquerading as an attempt to reach out to students searching for support, had an accusatory tone and was punctuated by statistics that functioned to place blame on students for the state of counseling services on campus.  It seemed that rather than taking steps to address students' requests concerning these resources, the administration chose to place that burden back on the struggling students asking for help.  Belittling students . . . is an admission that the administration simply does not recognize mental illness to be the tangible problem that it is."[27]

66.    Ms. Wheeler's own experience with AU's treatment of students with mental health disabilities, coupled with contemporaneous and high-profile assaults and killings of persons with

---

[25] Sonikka Loganathan, *Opinion: Burwell's "Generation Stress" Essay Demonstrates Out-of-Touch, Idealistic View of a Campus-Wide Epidemic*, The Eagle (Nov. 1, 2018), https://www.theeagleonline.com/article/2018/11/burwell-generation-stress-response.

[26] Letter from Fanta Aw, Vice President of Campus Life & Inclusive Excellence, Am. Univ., *Access to Mental Healthcare Resources*, American University (Jan. 26, 2020), https://www.american.edu/ocl/s2020-mental-health.cfm.

[27] The Eagle, *Staff Editorial: Email on Mental Health aid Reveals Out-of-Touch View of Administration* (Feb. 6, 2020), https://www.theeagleonline.com/article/2020/02/staff-editorial-email-on-mental-health-aid-reveals-out-of-touch-view-of-administration.

mental health disabilities, caused her to fear and distrust the officers and AU officials who ordered

her to hospitalize herself at in-patient psychiatric facility on September 26, 2019.

### C.   The Danger Posed by "Special Police" and the Lack of Accountability for Special Police

67.     Washington, D.C. has more police per capita than any other U.S. city.

Washington's Metropolitan Police Department reports that it employs 3,982 sworn officers and

another 430 full-time civilians to police the city of about 630,000.[28]

68.     In addition to the MPD, there are another 7,500 individuals working in Washington,

D.C. as Special Police Officers ("SPOs").[29]   SPOs are private citizens and are typically engaged

by private entities, either as contractors or employees.   Nevertheless, they are given extraordinary

powers ordinarily preserved for sworn police or the state itself, including the power to carry

weapons on duty, make arrests, and use force or deadly force in their jurisdictions.

69.     Despite the weighty powers conferred on SPOs, the District of Columbia engages

in almost no oversight of these private guards.   Indeed, the MPD does not even keep a record of

complaints against SPOs.[30]   In introducing a bill (not yet enacted) to provide greater oversight of

Special Police, Ward Six Councilman Charles Allen, who chairs the Committee on the Judiciary

---

[28] Mike Maciag, *Which Cities Have the Biggest Police Presence?*, Governing Magazine (May 9, 2014), https://www.governing.com/topics/public-justice-safety/gov-cities-with-the-greatest-police-presence-most-officers-per-capita.html.

[29] Jodie Fleischer et al., *DC Residents Say MPD Ignored Complaints Against Special Police Officer*, NBC Washington (Apr. 1, 2019), https://www.nbcwashington.com/news/local/dc-residents-say-mpd-ignored-complaints-against-special-police-officer/138304/.

[30] Natalie Delgadillo, *MPD Doesn't Keep Records Of Complaints Against The City's 7,500 Special Police Officers*, DCist (June 4, 2019), https://dcist.com/story/19/06/04/mpd-doesnt-keep-records-of-complaints-against-the-citys-7500-special-police-officers/; Jodie Fleischer et al., *New Legislation Would Increase Scrutiny of Special Police After I-Team Exposes MPD Failure to Investigate, Keep Records*, NBC Washington (June 4, 2019), https://www.nbcwashington.com/news/local/new-legislation-would-increase-scrutiny-of-special-police-after-i-team-exposes-mpd-failure-to-investigate-keep-records/148841/.

and Public Safety, highlighted certain problems with SPOs by noting that, "[w]hen we trust someone with the powers to arrest and carry a firearm, there has to be a strong and independent process for residents to file complaints when that power is abused.  Right now, for alleged misconduct by Special Police Officers, there seems to be no guarantee of an investigation."[31]

70.     The lack of oversight is especially troubling because SPOs are subject to dramatically-reduced training requirements as compared to MPD officers.  SPOs are required to undergo just 40 hours of training before they are empowered to make arrests and use lethal force. The bulk of training and oversight of these SPOs is typically left to their employers, or to the private security companies that engage or hire them.  This means that complaints of SPO brutality and excessive use of force are ineffective, as employers have little incentive to respond to such complaints and are frequently dismissive, allowing SPO misconduct to continue unchecked.[32]

71.     SPOs have been involved in multiple high-profile killings of Black people in the District of Columbia.  For instance, both James McBride and Alonzo Smith were killed by SPOs. In what sadly is an all-too-familiar pattern, James McBride, a 74-year-old Black male, died in 2015 after SPOs broke a vertebra near the base of his neck.[33]  Similarly, Alonzo Smith, a 27-year-old

---

[31] Press Release, *Allen introduces bill moving complaints and investigations of Special Police Officers to Office of Police Complaints*, The DC Line (June 4, 2019), https://thedcline.org/2019/06/04/allen-introduces-bill-moving-complaints-and-investigations-of-special-police-officers-to-office-of-police-complaints/.

[32] See, e.g., Jodie Fleischer et al., New Legislation Would Increase Scrutiny of Special Police After I-Team Exposes MPD Failure to Investigate, Keep Records, NBC Washington (June 4, 2019), https://www.nbcwashington.com/news/local/new-legislation-would-increase-scrutiny-of-special-police-after-i-team-exposes-mpd-failure-to-investigate-keep-records/148841/.

[33] Peter Hermann, *Broken Vertebra On Man Who Died After Struggling with Hospital Guards*, The Washington Post (Oct. 6, 2015), https://www.washingtonpost.com/local/public-safety/man-who-died-after-struggling-with-hospital-guards-broke-vertebrae/2015/10/06/e6a00c26-6c57-11e5-9bfe-e59f5e244f92_story.html.

Black male, died after an SPO pressed his knee to Mr. Smith's back while Mr. Smith was handcuffed.[34]

72.     By law, campus SPOs have limited jurisdiction.  Specifically, under the laws of the District of Columbia, "Campus and university special police officers may be appointed . . . to protect the campus property of an academic institution of higher education. The term 'campus' shall include any building or property owned or controlled by the academic institution of higher education."[35]  Campus police officers are "strictly confined in their authority to the particular place or property they are commissioned to protect."[36]

73.     AU employs its SPOs through AUPD, which is a subdivision of AU that is wholly controlled by AU.  Through AUPD, AU employs more than 60 SPOs who are required, as employees, to follow directions from AU and its officials.

74.     Despite the fact that the AUPD are not subject to the same requirements, the MPD Officers who were also present at Ms. Wheeler's Frequency Apartments studio on September 26, 2016, deferred to the decisions of the AUPD, notwithstanding the fact that those special police officers throughout the incident, and in their "official capacity," acted completely outside of their lawful jurisdiction while at the Frequency Apartments and flagrantly violated Ms. Wheeler's constitutional rights.

75.     The unlawful entry into Ms. Wheeler's home, as well as her unlawful detention, seizure, and arrest by Defendants, occurred because it was carried out by insufficiently trained and

---

[34] USA Today, *New Body Worn Camera Video from Alonzo Smith Death Released* (Dec. 18, 2015), https://www.usatoday.com/story/news/local/dc/2015/12/18/second-body-camera-video-alonzo-smith-death-released/77590012/

[35] D.C. Mun. Regs. tit. 6-A, § 1201.2.

[36] D.C. Mun. Regs. tit. 6-A, § 1200.2.

largely unaccountable special police, under orders from their employer, against a Black woman with disabilities.

## V   GIANNA WHEELER

### A.   The Path to American University

76.     Ms. Wheeler is a 21-year-old Black student who identifies as LGBTQ, enrolled full time at AU on a scholarship awarded based on a combination of academics and need.  She has been diagnosed with major depressive disorder and anxiety.

77.     Ms. Wheeler's path to AU was not easy.  In addition to managing the care of her mental health, Ms. Wheeler is a sexual assault survivor who has experienced multiple racist attacks during and prior to high school.  However, through her own hard work, positive attitude, and the support of her family, Ms. Wheeler has overcome many challenges and continues to persevere.

78.     Before starting at AU, Ms. Wheeler was a high school honor roll student and a member of the National Honor Society.  She participated in a variety of after-school programs in high school, including social clubs with a focus on international cultures and diversity.  These included the French National Club, the Italian Club, and the International Club.  She also played a variety of sports, including volleyball and tennis.

79.     Ms. Wheeler tragically lost her mother while in high school.  Nevertheless, she persisted in her studies with invaluable support from her family and, in her senior year of high school, applied to numerous respected universities.  Impressively, Ms. Wheeler secured admission to ten universities, including AU, the University of San Francisco, University of San Diego, and the George Washington University.  Most of these universities, including AU, offered Ms. Wheeler full scholarships.

80.     Ms. Wheeler chose American University because it presented itself as a diverse school located in the global hub of Washington, DC.  Ms. Wheeler was particularly drawn to AU's

School of International Service and its Peace Corps program.  Having suffered personal hardships in her own life, Ms. Wheeler wanted to help others by pursuing a career in international aid.

**B.      Ms. Wheeler's American University Experience.**

81.      Ms. Wheeler began coursework at AU in the fall of 2017, at age 18.  She initially lived on campus at AU in its residence halls.  Building on her high school record of academic achievement, Ms. Wheeler earned high grades in the fall of 2017, her first semester as a freshman at American University.

82.      However, Ms. Wheeler also encountered systemic racism at AU, and experienced firsthand prejudice against Black students and students with mental health disabilities, as well as the dangerous inadequacies of the AUPD "special police."

83.      Among other things, Ms. Wheeler was verbally bullied by other students and at least one professor, who routinely called Ms. Wheeler by the name of another Black student.  Ms. Wheeler was also subjected to procedures for entry into on-campus residences (including the requirement that guests be escorted by residents of a particular building), which she saw routinely waived for white guests and students.  She noticed that some of her answers in class were criticized, but nearly-identical answers by white students were praised.  She was treated differently from her white peers.  Indeed, on one occasion, Ms. Wheeler sought to bring some of her concerns to the attention of AU officials and scheduled a meeting with Defendant Brown, the Dean of Students at AU.  However, although Ms. Wheeler arrived early for her meeting and was in the waiting room at the scheduled time, her appointment was unceremoniously cancelled in favor of a white student who had arrived with a parent.

84.      Ms. Wheeler also experienced firsthand AU's prejudice against students with mental health disabilities.  As a specific example, in February 2019, Ms. Wheeler had a panic attack that prevented her from taking an exam.  As AU knew, Ms. Wheeler has been diagnosed

with major depressive disorder and anxiety.  After her panic attack, Ms. Wheeler visited the Office

of the Dean of Students at AU to seek a reasonable accommodation that would allow her to retake

the exam.  However, though the Office of the Dean of Students confirmed that the circumstances

would justify allowing her to retake the exam, Ms. Wheeler was also advised that her professor

had discretion whether to allow it.  Ms. Wheeler then visited AU's academic support center

("ASAC"), which is responsible for disability accommodations for AU students, to again seek a

reasonable accommodation.  However, ASAC staff told Ms. Wheeler that ASAC could not provide

her with a medical excuse for the exam.

85.     As a direct result of AU's failure to provide Ms. Wheeler with a reasonable

accommodation, Ms. Wheeler received a failing grade in that class.  In addition to Ms. Wheeler's

unsuccessful attempts to obtain reasonable accommodations, Ms. Wheeler's aunt, Loretha Lott,

also sought to solicit a reasonable accommodation from AU on Ms. Wheeler's behalf.

Specifically, on March 5, 2019, Ms. Lott wrote an email to Jaris Williams, AU's Assistant Dean

of Students, with the subject line "Disability Advocates for Gianna Wheeler."  In that email, Ms.

Lott expressed her disappointment at how AU had failed to accommodate Ms. Wheeler's

disabilities, and asked whether Ms. Wheeler's professors were "trained to deal with students with

anxiety and/or depression?"  Ms. Lott further described how AU's failure to accommodate Ms.

Wheeler had *increased* Ms. Wheeler's anxiety.  Nevertheless, AU did not change its position, and

months later, in August 2019, ASAC advised that AU had still not granted Ms. Wheeler's request

for reasonable accommodation, despite AU's awareness of Ms. Wheeler's disability and her

previous attempts to obtain assistance.  Subsequently, Ms. Wheeler reached out to ASAC by email

and noted that she feared retaliation if she were to share further, extensive medical information to

AU, and that she felt she needed disability-related accommodations.  The incident further emphasized for Ms. Wheeler that AU could not be relied upon to accommodate her mental health.

86.     Separately, Ms. Wheeler also faced challenges due to inadequate and improper policing by AU's "special police."  Most notably, in February 2019, Ms. Wheeler was a victim of a home invasion when an uninvited man snuck into Ms. Wheeler's campus housing at AU's Constitution Hall, without permission, and locked the door behind him.  The desk receptionist at the hall called AUPD, but it took AUPD officers over 20 minutes to arrive on the scene (by contrast, MPD's average response time in "District 2"—an area that contains the AU campus and is significantly larger than the AU campus—is approximately 7 minutes).  Although Ms. Wheeler was not harmed and the intruder left before AUPD arrived, the incident terrified Ms. Wheeler. Moreover, when AUPD finally did arrive, officers were far from sympathetic:  though Ms. Wheeler was the victim of a home invasion, the officers did not focus on protecting Ms. Wheeler or searching for the intruder.  Instead, their first question to Ms. Wheeler was about what *she* could have done differently to avoid the situation altogether.

87.     This incident is particularly troubling because it comes in the context of a campus already struggling to contain violence against its female students.  In March of 2019, AU became the only university in the country—public or private—with five open federal investigations into potential sexual violence violations of Title IX, the federal law that protects against sex discrimination in education.

88.     Because she felt that they had bungled the response to the home invasion, Ms. Wheeler arranged a meeting with AUPD to (i) establish a productive, non-adversarial relationship with the officers charged with protecting the students at AU and (ii) highlight broader concerns about sexual violence against women on AU's campus.  At this meeting, Ms. Wheeler led a

collaborative discussion around how AUPD officers could best support women and survivors of sexual assault on campus. She also specifically mentioned her mental health disabilities. AUPD Chief Kevin Barrett attended this meeting, and he had the opportunity to observe how Ms. Wheeler conducted herself in general, and in stressful situations.

89.     In August or September 2019, Ms. Wheeler relocated from on-campus housing in AU's residence halls to a new home off campus, at the privately-owned Frequency Apartments. While Ms. Wheeler lived at the Frequency Apartments, its tenants included a mix of AU students and non-students who had no connection to AU. Additionally, on information and belief, the units leased by students and non-students were intermixed, and were not segregated to separate areas or floors of the Frequency Apartments.

## VI     THE EVENTS OF SEPTEMBER 26, 2019

90.     On September 26, 2019, AU and its administrators, including Brown, the AUPD Officers, and the MPD Officers made a series of decisions that were divorced from the facts and instead consistent with prejudices against Black women and people with mental health disabilities. These decisions culminated in officers tackling Ms. Wheeler off of her bed and onto the ground, handcuffing Ms. Wheeler while naked, and carrying Ms. Wheeler out of her home against her will—all without a reasonable belief that she was a danger to herself or others—Ms. Wheeler's suspension from AU without cause, and Ms. Wheeler's involuntary hospitalization at an in-patient psychiatric facility.

### A.     Hurst Hall

91.     September 26, 2019 was one day after the anniversary of Ms. Wheeler's mother's funeral, and Ms. Wheeler was upset. That morning, Ms. Wheeler sought to speak with one of her professors, the head of the Environmental Sciences Department, who had previously helped Ms. Wheeler switch from one lab section to another so that she could avoid students who had been

29

bullying her.  In an effort to locate her professor, at 12:03 PM, Ms. Wheeler went to the biology department in Hurst Hall.  At the time, Ms. Wheeler was wearing heels and was drinking and carrying a strawberry banana smoothie.  Ms. Wheeler could not move quickly, and one of her hands was full.

92.     While in Hurst Hall, Ms. Wheeler asked a white, female fellow student for assistance in locating the Environmental Sciences Department in general, and Ms. Wheeler's professor in particular.  In response to Ms. Wheeler's request for assistance, the student used a computer to look up information for Ms. Wheeler, and Ms. Wheeler photographed the information. At some point during this interaction, Ms. Wheeler briefly placed her hand on the student's shoulder.  Ms. Wheeler left Hurst Hall at 12:19 PM, a mere sixteen minutes after entering.

93.     At approximately 1:17 PM, the mother of the student—apparently upset upon learning of her daughter's interaction with Ms. Wheeler—contacted AUPD and reported the interaction as an assault.  The student's mother was not present in Hurst Hall at any time during the interaction.  Shortly after the call from the student's mother, between 1:17 PM and 2:20 PM, the student herself spoke with AUPD as well.  The student told AUPD that Ms. Wheeler had touched the student's shoulder while asking the student to look up the location of Ms. Wheeler's professor.  The student also said that Ms. Wheeler was loud and emotional about the bullying that Ms. Wheeler had encountered from other students, and about how AU administrators had treated her.  However, the student clarified that Ms. Wheeler did not injure the student, did not threaten the student with violence, and did not show any weapon.  The only physical contact reported between Ms. Wheeler and the student was that Ms. Wheeler had touched the student's shoulder.

94.     The student, in reporting the brief, sixteen-minute interaction with Ms. Wheeler to AUPD also noted that the interaction went unnoticed by others in the area, and that during the

interaction, the student left Ms. Wheeler for a period of time to assist another student with a lab project, after which the student voluntarily returned to speak to Ms. Wheeler further.  The student told AUPD that she was not yet sure if she wanted to press any charges.  Ultimately, the student did not.

95.     After leaving Hurst Hall, Ms. Wheeler visited her professor's office.  She did not find him there, but she did speak to one of his colleagues on the faculty, Karen Knee.  Ms. Wheeler and Professor Knee had a brief conversation.  After speaking with Ms. Wheeler, at approximately 1:45 PM, Professor Knee sent a short, one-paragraph email to an AU administrator about that conversation.  In this email, Professor Knee made multiple observations about her conversation with Ms. Wheeler.

96.     Specifically, Professor Knee stated that Ms. Wheeler had appeared to be "in the midst of a manic episode or some sort of mental health issue," but she clarified that she was "not trained in mental health at all" and so could not make a determination.  Professor Knee also explained that she had based her assessment simply on the fact that Ms. Wheeler appeared to be "talking quickly" and "rambling" and that her speech was "repetitive[.]"  As a result, Professor Knee labeled Ms. Wheeler's manner of speaking as—in the professor's view—"not normal[.]"

97.     Professor Knee's observations also suggested scant cause for concern.  Among other things, the professor noted that Ms. Wheeler "mostly made sense" and that, from the professor's observation, "it didn't seem like [Ms. Wheeler] was suicidal right now[.]"

98.     Professor Knee did not mention anything about the encounter between Ms. Wheeler and the other student at Hurst Hall earlier that day, nor did she raise *any* concern that Ms. Wheeler might be dangerous to herself or others.  However, Professor Knee did warn that Ms. Wheeler was considering legal action against AU for its failure to respond to Ms. Wheeler's concerns about

discrimination and other issues.  Specifically, she alerted AU that Ms. Wheeler had told her that

the Office of the Dean of Students, and Defendant Brown in particular, "has not been responsive

to her concerns" about bullying and discrimination based on Ms. Wheeler's race and sex, and that

Ms. Wheeler "was considering filing some sort of complaint against the university[.]"

      **B.**     **AU's Administrative Decisions**

99.     At 3:45, approximately ninety minutes after learning about the incident in Hurst

Hall, and sixty minutes after Professor Knee's warning about potential legal action by Ms.

Wheeler, and before contacting, interviewing, or observing Ms. Wheeler, AU administrators,

including Brown, abruptly placed Ms. Wheeler on an interim suspension.

100.    At the same meeting in which AU administrators decided to suspend Ms. Wheeler,

those administrators—including Defendant Brown; Michelle Espinosa, J.D., Associate Dean of

Students; Phillip Morse, Assistant Vice President, University Police and Management Services;

Daniel Nichols, Associated Vice President, Risk, Safety and Transportation Programs; and Traci

Callandrillo, Assistant Vice President—also decided to direct AU's special police officers to

apprehend Ms. Wheeler and seek her involuntary hospitalization at an in-patient psychiatric

facility.

101.    In making those decisions, the AU administrators did not have a reasonable belief

that Ms. Wheeler was a danger to herself or others.  Nor did they seek any input into the events in

Hurst Hall from Ms. Wheeler (or from any other person aside from the reporting student and her

mother) that could inform that assessment.  They did not interview Ms. Wheeler or observe her,

and they did not ask any person—much less a person with training in mental health disabilities—

to assess Ms. Wheeler before deciding to suspend Ms. Wheeler and seek her hospitalization.

102.    The AU administrators did not contact Professor Knee, who had reported her

interaction with Ms. Wheeler immediately after the events at Hurst Hall.

103.    In short, although there were many possible avenues for investigation, the AU administrators refused to undertake *any* further investigation before making their decision.

104.    Assuming, *arguendo,* that AU had a reason to check on Ms. Wheeler, AU chose not to proceed with a *bona fide* health and welfare check:   AU did not send anyone to make observations about Ms. Wheeler's health and welfare or to develop an appropriate response based upon those objective observations—let alone someone who was trained and qualified to make those observations.   Instead, AU instructed armed officers to seek Ms. Wheeler's involuntary hospitalization, by force if necessary, and notwithstanding any on-the-scene observations about Ms. Wheeler's health or welfare.

105.    In so doing, AU rejected a plethora of less harmful approaches that are considered by experts in the field to be far superior and productive methods of interacting with individuals with mental health disabilities.   For instance, among other things, the AU administrators could have sent a single staff or faculty member to speak with Ms. Wheeler and assess her behavior, could have asked a staff member with training in mental health to assess Ms. Wheeler's mental state using objective criteria, or could have engaged the District of Columbia's Department of Behavioral Health Access HelpLine or mobile crisis team to assess Ms. Wheeler's mental health needs.

106.    Following the meeting of the AU administrators, AU decided to call Ms. Wheeler to inform her that she had been suspended.   However, AU called the wrong number, and left a message intended for Ms. Wheeler on another student's voicemail.   Ms. Wheeler, therefore, had no notice that she had been suspended, no opportunity to leave campus voluntarily, and no opportunity to make any statement or otherwise respond to AU's decision before its special police arrived at her home.

107.    In contrast, on the same day as the suspension, AU emailed a letter to Ms. Wheeler's professors, informing them that Ms. Wheeler could not be present on campus, and that her return to the campus was predicated on disciplinary proceedings.

108.    The interim suspension of Ms. Wheeler was memorialized in a memorandum dated September 26, 2019, which was addressed from Defendant Brown to Ms. Wheeler ("Interim Suspension Memo").   However, Ms. Wheeler was not given an opportunity to view the memorandum that day:  Brown did not email the memo to Ms. Wheeler until 9:20 PM—well after deploying the AUPD and MPD Officers to Ms. Wheeler's apartment.

109.    The Interim Suspension Memo stated that, because of the interim suspension, Ms. Wheeler was "subsequently barred from campus and may not be on campus for any reason . . ."  It also stated that "[d]uring your period of interim suspension, you may not be physically present on campus nor may you engage in your academic program or participate in any campus activities."

110.    The memorandum forbid Ms. Wheeler from returning to campus until she: (i) underwent a psychological evaluation by a psychologist selected by AU, (ii) provided her medical records to that psychologist, and (iii) authorized that psychologist to share the results with the Executive Director of the AU counseling center and Defendant Brown.  The memorandum also noted that Ms. Wheeler's return to campus was "contingent" upon the findings of AU's chosen psychologist.  The Interim Suspension Memo did not include any discussion of possible reasonable accommodations or acknowledge any protections for student with disabilities.

### C.    Unlawful Warrantless Entry

111.    At around 6:30 PM on September 26, 2019, AUPD received the message from AU directing them to remove Ms. Wheeler from her apartment and to take her to a hospital.

112.    Four AUPD special police officers—AUPD Chief Kevin Barret, Lieutenant Michael Vena, Joseph Joyner, and Doe 1—on information and belief, all white males—gathered

at the Frequency Apartments, where Ms. Wheeler lived.  There, the AUPD Officers were met by an additional three MPD officers, all of whom were also white.  AUPD Officers had requested that the MPD be present in case any actions took place within the jurisdiction of the MPD.  In fact, all actions at the Frequency Apartments were in MPD's jurisdiction.

113.    Specifically, AU does not own the Frequency Apartments.  Instead, the apartments are owned by 4000 Brandywine Street NW Ground Owner LLC.  AU is not a general or limited partner of 4000 Brandywine Street NW Ground Owner LLC.

114.    AU also disclaims control over the Frequency Apartments for police purposes.  As explained in the American University Annual Security Report for 2019, "[a]ll criminal activities at these locations should be reported to local police . . . .  The Frequency Apartments are in the Washington, DC, Metropolitan Police Department's (MPD) Second Police District.  Residents of The Frequency Apartments can call MPD at 311 for non-emergencies and 911 for emergencies.  To help ensure timely notifications and accurate statistics, we encourage individuals to contact the AU Police Department after filing a report with MPD."[37]

115.    Nevertheless, at around 7:00 PM, AUPD Officers acted outside of their legal jurisdiction and obtained the access key to Ms. Wheeler's apartment from a front desk clerk at the Frequency Apartments.  Captain Barret then proceeded to the fourth floor of the Frequency Apartments, where he unlocked Ms. Wheeler's door and entered her apartment along with another officer.  At the time Barrett entered Ms. Wheeler's home, she was laying down on her bed, wearing only a t-shirt, and studying with her laptop open.  Officers did not have Ms. Wheeler's permission to enter, a warrant, or a reasonable belief that Ms. Wheeler was a danger to herself or others.

---

[37] American University Annual Security Report for 2019, (Sept. 30, 2019), https://www.american.edu/finance/publicsafety/upload/au-annual-security-report.pdf.

116.     When officers entered Ms. Wheeler's apartment without her consent, there were no exigent circumstances.   The intrusion into Ms. Wheeler's home was based on the Hurst Hall incident, in which the reporting student was not injured and was not pressing charges.   Indeed, the student did not even report any physical contact other than a hand on the student's shoulder. Moreover, around 7 hours had passed since the incident in Hurst Hall.

117.     When the officers entered Ms. Wheeler's apartment without her consent, they had no reasonable belief that Ms. Wheeler was a danger to herself or others.   Ms. Wheeler had no history of violence, and her mental health diagnoses do not present a heightened risk factor for injuring other persons.   The AUPD and MPD Officers did not inquire about Ms. Wheeler's mental health, assess her mental health, or give any indication that they entered her apartment for any other reason than to arrest her or seek her hospitalization in a psychiatric institution.

118.     Although Ms. Wheeler was alarmed and frightened by the police suddenly entering her home, she remained seated on the bed, kept calm and collected, and did not stand up to confront the police.   This is reflected clearly in the video from the body worn cameras of the MPD Officers. The AUPD Officers were also wearing body worn cameras, which AUPD stated were in operation at Ms. Wheeler's apartment on the night of September 26, 2019.

119.     Ms. Wheeler's anxiety and fear due to the police entering her home without her permission was exacerbated when AUPD Officers, shortly after coming in, accused Ms. Wheeler of having assaulted an AU dean.   In response, Ms. Wheeler denied assaulting *anyone* and asked which dean the AUPD Officers were talking about.   Defendant Barrett then called Defendant Brown, who said that the AUPD Officers were mistaken:  Ms. Wheeler had not assaulted a dean, but rather AU was alleging that Ms. Wheeler had assaulted a student.

120.    Neither Ms. Wheeler's calm reaction, nor the AUPD Officers' inaccurate information about what Ms. Wheeler had supposedly done, caused the AUPD Officers to reconsider their instructions from AU and Brown to seek Ms. Wheeler's involuntary hospitalization to an in-patient psychiatric facility.  Instead, after speaking with Brown, the AUPD Officers simply revised their accusation, now telling Ms. Wheeler that she had assaulted a student, which Ms. Wheeler also denied.

121.    Despite her firm denial, the AUPD Officers told Ms. Wheeler that she had to go to an in-patient psychiatric facility, which Ms. Wheeler did not consent to do.  In refusing, Ms. Wheeler was not in any way threatening or aggressive toward the officers.  Instead, Ms. Wheeler offered to leave the Frequency Apartments and stay elsewhere in the city.  AUPD and MPD Officers refused to allow her to leave.

### D.    Unlawful Continued Presence in Ms. Wheeler's Home

122.    Assuming *arguendo* that the AUPD and MPD Officers had any reasonable belief that Ms. Wheeler was a danger to herself or others at the moment they entered her home, the reasonableness of that belief would have quickly disappeared upon observing Ms. Wheeler's even-keeled demeanor.  After police ascertained that Ms. Wheeler was calmly working on her schoolwork alone in her room, they could not have reasonably believed that Ms. Wheeler was a danger to herself or others, and there was no reason for them to remain in Ms. Wheeler's apartment.

123.    The officers did not have Ms. Wheeler's consent to remain in her apartment.  Throughout the encounter, Ms. Wheeler repeatedly asked the police to leave her home, and they consistently refused. Ms. Wheeler also attempted to resume doing her schoolwork with officers in her room, but she was told by officers to stop and put her laptop away.  This also prevented Ms. Wheeler from being able to view the Interim Suspension Memo, which was sent during the time that officers were in her room.

124.    During their time in Ms. Wheeler's apartment, the AUPD Officers had multiple phone calls with Defendant Brown.  At some point during the evening, during one of these calls, Brown told Ms. Wheeler over speakerphone about the fact of her interim suspension.

125.    Ms. Wheeler maintained her steadfast refusal to hospitalize herself at an in-patient psychiatric facility over the hours that followed.  However, for three hours—from approximately 7:00 PM to around 10:00 PM—officers did not leave.  Instead, the AUPD Officers repeatedly sought without success to pressure Ms. Wheeler into surrendering her rights by agreeing to hospitalize herself at a psychiatric institution, and the MPD Officers stood by in support of the AUPD Officers.  The officers also struggled to no avail in an effort to find support for AU's decision to involuntarily hospitalize Ms. Wheeler.

126.    At 7:29 PM, Ms. Wheeler texted her friend to say that "AU called the cops to my room," and to ask her friend to ask another friend to come to Ms. Wheeler's room at the Frequency Apartments.

127.    At 7:39 PM and 7:44 PM, Ms. Wheeler sent two videos that she had shot on her cell phone to her aunt, showing Chief Barret in her home.

128.    At 7:46 PM, another one of Ms. Wheeler's friends texted Ms. Wheeler, stating "I'm outside the room."  Ms. Wheeler responded "come in please," and her friend replied "They won't let me."  Ms. Wheeler then added, "they said I attacked someone on campus."

129.    At 8:03 PM, another of Ms. Wheeler's friends arrived at the Frequency Apartments and texted "I'm sitting outside."  Ms. Wheeler replied "They won't let me leave."  That friend offered Ms. Wheeler a place to stay elsewhere in the city, but officers did not allow Ms. Wheeler to accept the offer.

130.    At 8:37 PM, Ms. Wheeler sent a text to another friend, stating "they are forcing me to go to the hospital without my consent."  At the same time, Ms. Wheeler sent her friend another short video clip that Ms. Wheeler had recorded from her cell phone.  The video shows a high-ranking AU official—AU Director of Residence Life, Lisa Freeman—who had joined the police in Ms. Wheeler's residence.  Freeman was seeking to persuade Ms. Wheeler to hospitalize herself at a psychiatric institution.  In the video, she can be heard saying that Ms. Wheeler had "no choice."

131.    Ms. Wheeler declined Ms. Freeman's instruction to hospitalize herself in a psychiatric institution, and Ms. Wheeler is shown telling Ms. Freeman that she had not assaulted anyone and asking for the name of the person she allegedly assaulted, which Ms. Freeman did not provide.  Ms. Freeman then left the room, but remained nearby.  On information and belief, Ms. Freeman was present in the immediate vicinity of Ms. Wheeler's room up to and until officers took Ms. Wheeler from the building.

132.    At 9:19 PM, in response to a call from one of the MPD Officers on the scene, EMTs were dispatched to Ms. Wheeler's apartment for a "psych" (i.e., a psychological) evaluation of Ms. Wheeler.  They arrived on the scene at 9:24 PM and evaluated Ms. Wheeler at 9:56 PM.  Ms. Wheeler was given the opportunity to refuse this evaluation, but she cooperated voluntarily with the EMTs.  The two EMTs on the scene completed reports of their evaluations of Ms. Wheeler.  In the first report, the EMT stated that he "arrived at the scene to find a young lady sitting on the bed," and that Ms. Wheeler mentioned that "she was writing a paper for tomorrow."  The EMT concluded "After evaluation . . . the patient is alert and oriented."  The report also specifically noted that Ms. Wheeler's "mental status" and "neurological" status were both "normal baseline for patient," and that her pulse rate was 64 bpm.

133.    In the second report, the other EMT confirmed the conclusions described above. The narrative of that report further explained that the EMTs "arrived on the scene to find 21yrs old female sitting on the bed" and that "[p]atient stated she was doing her homework when campus police and MPD" arrived . . . Patient stated police want to take her to the hospital."

134.    On information and belief, the EMTs at the scene communicated their findings in substance to the AUPD and MPD Officers.  Although Defendant Barrett and the other officers had no reasonable belief that Ms. Wheeler was a danger to herself or others, Defendant Barrett nevertheless attempted to convince the EMTs to take Ms. Wheeler to a psychiatric hospital.  The EMTs refused to do so.

135.    Having determined that Ms. Wheeler's mental state was "normal baseline" and that she was not in need of medical care, the EMTs left the scene.  However, AUPD and MPD Officers still refused to leave Ms. Wheeler's apartment.  They also declined to, even at the very least, allow Ms. Wheeler to leave the apartment herself and stay elsewhere.

### E.    Unlawful Arrest

136.    After the EMTs left, the pressure of the situation began to overwhelm Ms. Wheeler. Her demands that the officers leave became louder and were occasioned by cursing.  Further, in an effort to dissuade the police from transporting her to an in-patient psychiatric facility against her will, she disrobed.

137.    By this time, the event had caused a commotion at the Frequency Apartments.  Four police cars had been parked outside the apartments since the AUPD and MPD Officers had arrived, and the approach of the EMTs in an ambulance had drawn further attention.

138.    After all of this, and instead of leaving Ms. Wheeler's apartment—as they should have done—AUPD Officers called Brown to ask for further instructions.  Specifically, they asked "what should we do now?"

139.    After Brown responded to that question, at approximately 10:00 PM, the AUPD Officers ended their call with Brown and closed Ms. Wheeler's door.  Next, a total of five officers, from both AUPD and MPD, tackled Ms. Wheeler from her bed to the floor, while she was naked, and handcuffed her.  AUPD Officers then bundled Ms. Wheeler into a blanket, and four officers (on information and belief, three from AUPD and one from MPD) carried Ms. Wheeler to the elevator.  On a video of the incident, Ms. Wheeler, clearly distraught, can be seen struggling in the air, flailing, and yelling.  Officers carried Ms. Wheeler out of her apartment complex in full view of her peers and neighbors, and multiple—highly embarrassing—videos of the incident were taken, published online, and reported by news sources.  Even today, Ms. Wheeler is still approached by people she does not know who remember her name or recognize her as the student in those videos.

140.    Upon carrying Ms. Wheeler out of the Frequency Apartments, AUPD Officers forced her into an AUDP vehicle and, at approximately 10:15 PM, transported her to Washington Hospital Center.

**F.    Forced Hospitalization at an In-Patient Psychiatric Facility**

141.    At Washington Hospital Center, Ms. Wheeler was bound in "four-point" restraints that completely immobilized her body.  Individuals in four-point restraints are subject to some of the most severe restrictions on human movement allowable under modern law—significantly greater than restrictions on movement that are considered severe in prisons or military detention centers.  Individuals in four-point restraints are barely able to move their arms or legs, and are rendered incapable of even basic tasks:  a person so restrained would, for instance, typically be required to ask for assistance in order to scratch his or her own nose.

142.    While so restrained, Ms. Wheeler was forcibly medicated with a cocktail of drugs including Geodon (known generically as Ziprasidone) and Ativan (known generically as

41

Lorazepam).  Because of the severe restraints on her movement, Ms. Wheeler had no choice but to watch—helpless and afraid—as drugs were injected into her body.

143.    Ziprasidone is used to treat schizophrenia and bipolar disorder.  Side effects of Ziprasidone can be severe and include tardive dyskinesia (a movement disorder), increased blood sugar, risk of infection, and difficulty controlling body movements.

144.    Lorazepam is a potent central nervous system depressant that is frequently used before surgery to induce sleep.  Lorazepam is also associated with high instances of chemical dependency.

145.    Ms. Wheeler was forced to remain at Washington Hospital Center for six days, and was not released until October 2, 2019.  She was not able to secure her release until she was appointed a public defender, who advocated on her behalf.

**G.    Post-Incident Response**

146.    Following Ms. Wheeler's involuntary hospitalization at and release from Washington Hospital Center, AU continued to enforce its interim suspension against Ms. Wheeler by barring Ms. Wheeler from the AU campus for approximately one month, from September 26, 2019, until a disciplinary hearing was held on October 28, 2019.  During this time, Ms. Wheeler was not allowed to participate in her classes or on-campus events, either in person or remotely.

147.    On October 28, 2019, AU held a disciplinary hearing against Ms. Wheeler concerning the events at Hurst Hall on September 26, 2019.  AU again made a series of decisions that had no apparent rational basis, that were intimidating and isolating, and that conformed with biases that Black women and people with mental health disabilities are threatening or dangerous. First, after students  community members had shown up to support her at the hearing, AU changed the location of the hearing at the very last minute, and had an escort waiting at the appointed location to instead take Ms. Wheeler across campus to an entirely different building that is not

42

typically used for student disciplinary hearings.  Second, at this new building, AU had covered every window—even the small windows of the interior doors—with black paper, which obscured any view, either inside or outside.  Third, security officers guarded the doors to and the hallway outside of the hearing room.

148.     These actions severely distracted and intimidated Ms. Wheeler as she prepared to defend herself against AU's allegations.  AU does not permit students counsel at disciplinary hearings, and AU specifically denied Ms. Wheeler's request to be represented by counsel, or even to have her attorneys present in the same room.  Ms. Wheeler was instead required to defend herself.

149.     Nevertheless, at the hearing, it became abundantly clear that Ms. Wheeler had done absolutely nothing wrong.  Ms. Wheeler was ultimately adjudicated "not responsible" for *all* of the Student Conduct Code violations alleged against her.  Unlike a finding of "not guilty" in a criminal proceeding, it is significantly more difficult for a student to obtain a finding of "not responsible" in an AU hearing because the standard of proof against students is much lower.

150.     As described by AU on its website, "Because the hearing panel members are trying to determine if the respondent met the expectations of AU's community, the standard of proof is a preponderance of the evidence, meaning a measure of proof that a reasonable person would accept as 'more likely than not' (51%) that a fact is true or an incident occurred."[38]

---

[38] American University Student Conduct Resources (last visited September 24, 2020), https://www.american.edu/ocl/sccrs/student-conduct-resources.cfm#:~:text=Because%20the%20hearing%20panel%20members,true%20or%20an%20incident%20occurred (emphasis omitted).

151.    Even so—and notwithstanding Ms. Wheeler's success in entirely clearing her name—at the conclusion of the hearing Ms. Wheeler was *again* instructed to leave campus and remain off-campus until she received a formal letter confirming that her suspension had been lifted.

## VII    AU RESPONSE TO OTHER ALLEGED STUDENT MISCONDUCT

152.    In a similar case involving an AU student accused of an assault who did not have a mental health disability, AU issued an interim suspension that permitted the accused student to continue to attend classes, and only barred the student from the portion of campus where her accuser lived.  AU also did not order the AUPD to visit the accused student's home or seek to involuntarily hospitalize the student.  AU did not involve AUPD or MPD in connection with the incident.

153.    AU's policies allow it to exercise discretion in determining whether a student accused of violating the Student Conduct Code should be barred from campus pending the outcome of a disciplinary hearing.

154.    Upon information and belief, when responding to non-disabled individuals for conduct similar to that which was alleged against Ms. Wheeler, Defendants AU and Brown do not deploy AUPD or MPD officers in the manner alleged herein.

155.    Upon information and belief, when suspending non-disabled students, Defendants AU and Brown do not enforce interim suspensions in the same manner in which the interim suspension was enforced against Ms. Wheeler, including that Defendants do not bar them from campus until hearings are convened and further condition their return upon psychological evaluations by AU-selected psychologists and the sharing of private medical information with AU and its administrators.

156.    When they took the actions alleged herein, Defendants treated Ms. Wheeler differently than her non-disabled peers.

## COUNT I:  VIOLATION OF TITLE III
## OF THE AMERICANS WITH DISABILITIES ACT - 42 U.S.C. § 12101 ET SEQ.
### Against AU

157.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

158.    Title III of the Americans with Disabilities Act ("ADA") and its implementing regulations entitle individuals with disabilities to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation, and prohibit any owner, lessee, or operator of a place of public accommodation from denying an opportunity to participate, affording an unequal opportunity to participate, or unnecessarily requiring separate participation to benefit from a good, service, facility, privilege, advantage, or accommodation.  42 U.S.C. § 12182(a); 28 C.F.R.  § 36.201(a).

159.    Title III prohibits public accommodations from affording an unequal opportunity to an individual, on the basis of a disability, to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the entity or otherwise discriminating against them on the basis of disability.  42 U.S.C. § 12182(b)(1)(A)(i)-(ii); 28 C.F.R. § 36.202(a)-(b).

160.    Title III further provides that an individual or entity shall not utilize standards or criteria of methods of administration that screen out, tend to screen out, or have the effect of discriminating on the basis of disability such that persons with disability cannot fully and equally enjoy any goods, services, facilities, privileges, advantages, or accommodations.  42 U.S.C § 12182(b)(1)(D(i) and §12182(b)(2)(A)(i); 28 C.F.R. §§ 36.204, 36.301(a).

161.    Title III defines discrimination to include the failure of a public accommodation to make reasonable modifications in policies, practices, or procedures, when such modifications are

necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities.  42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302(a).

162.    At all times relevant to this action, Ms. Wheeler was and is a student at AU who has a disability (major depressive disorder and anxiety), and thus was and is a qualified individual with a disability within the meaning of the ADA.  42 U.S.C. § 12102.

163.    As an admitted student approved for on-campus and AU-managed housing, Ms. Wheeler was and is qualified to participate in AU's services, programs, and activities. 34 C.F.R. § 104.3(l)(3).

164.    Ms. Wheeler has a record of her disability and Defendants knew that Ms. Wheeler had a disability.  42 U.S.C. § 12102(B), (C).

165.    Ms. Wheeler's disability substantially limits the major life activities of learning, concentrating, and thinking. 42 U.S.C. § 12102(2)(A).

166.    Because her disability substantially limits these major life activities, Ms. Wheeler is afforded protection by the ADA. 42 U.S.C. § 12102(1)(A).

167.    At all times relevant to this action, AU, as an undergraduate and postgraduate educational institution, has been and is a "place of public accommodation" within the meaning of Title III of the ADA. 42 U.S.C. § 12181(7)(J).

168.    On information and belief, AU's decision to place Ms. Wheeler on interim suspension and enforce that suspension as described herein, deploy the AUPD Officers to her home, remove her from her off-campus apartment against her will, and forcibly seek her admission to an in-patient psychiatric facility was on the basis of her disability.  This deprived Ms. Wheeler of the rights, privileges, advantages, and opportunities enjoyed by other students.

169.     AU's exclusion of Ms. Wheeler from campus and conditioning of Ms. Wheeler's ability to fully and equally enjoy her status as a student at AU on her willingness to obtain a psychological evaluation from a psychologist of AU's choosing, waive her right to medical privacy by authorizing that psychologist to obtain information from her past treatment providers, and further waive her rights to privacy by allowing all findings to be shared with Defendant Brown, is a criteria or method of administration that has the effect of substantially impairing Ms. Wheeler's accomplishment of her academic program objectives and is in violation of Title III of the ADA.

170.     Accordingly, AU violated Title III of the ADA by denying Ms. Wheeler the benefits of its programs, facilities, privileges, advantages, services, and accommodations on the basis of her disability.  42 U.S.C. § 1218(b)(1)(A)(i).

171.     AU's use of policies and practices that utilize criteria and methods of administration that have the effect of discriminating against students with disabilities, including Ms. Wheeler, by making it more onerous for them to access AU's goods, services, facilities, privileges, advantages, and accommodations violates Title III of the ADA.   42 U.S.C §§ 12182(b)(1)(D)(i), 12182(b)(2)(A)(i).

172.     AU's failure to make reasonable modifications to its policies and practices to ensure that students with disabilities, including Ms. Wheeler, have equal access to the benefits of AU's goods, services, facilities, privileges, advantages, and accommodations violates Title III of the ADA.

173.     As a proximate result of AU's violations of the ADA, Ms. Wheeler has been injured as set forth herein.

174.    AU's conduct constitutes ongoing and continuous violations of the ADA, and unless restrained from doing so, AU will continue to violate the ADA and inflict injuries for which there is no adequate remedy at law.

## COUNT II: VIOLATIONS OF SECTION 504
## OF THE REHABILITATION ACT OF 1973 – 29 U.S.C. § 794 ET SEQ.
### Against AU

175.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

176.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that otherwise qualified individuals with disabilities shall not, solely by reason of their disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a).

177.    Regulations implementing Section 504 promulgated by the Department of Education ("DOE regulations") provide that recipients of federal financial assistance, in providing any aid, benefit, or service, may not, on the basis of disability, discriminate against a qualified person with a disability by denying them an opportunity to participate in or benefit from that aid, benefit, or service.  Nor may such recipients of federal financial assistance provide an unequal, different, or separate benefit to such qualified persons.  34 C.F.R. § 104.4(b)(1).

178.    DOE regulations further prohibit recipients of federal financial assistance from utilizing criteria or methods of administration that have the effect of substantially impairing the accomplishment of the recipient's program or activity objectives with respect to qualified persons with disabilities, have an adverse effect on persons with disabilities, or have the purpose or effect of substantially impairing the accomplishment of the recipient's program or activity objectives with respect to qualified persons, and from excluding such qualified persons from participating in

or benefitting from certain postsecondary education aid, benefits, or services.   34 C.F.R. § 104.43(a); 34 C.F.R. § 104.4(b)(4).

179.    DOE regulations provide that no qualified student with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subject to discrimination under any academic, research, housing, health insurance, counseling, financial aid, athletics, recreation, other extracurricular, or other postsecondary education aid, benefits, or services.   34 C.F.R. §§ 104.43(a), 104.43(c), 104.52(a)(1).   Covered entities must operate their programs or activities in the most appropriate integrated settings.   34 C.F.R. § 104.43(d).

180.    At all times relevant to this action, Ms. Wheeler was and is a student at AU who has a disability (major depressive disorder and anxiety), and thus was and is a qualified individual with a disability within the meaning of Section 504.   29 U.S.C. §§ 794(a); 705(20); 42 U.S.C. § 12102.

181.    Additionally, as an admitted student approved for on-campus and AU-managed housing, Ms. Wheeler was and is qualified to participate in AU's services, programs, and activities. 34 C.F.R. § 104.3(l)(3).

182.    Ms. Wheeler has a record of her disability and Defendants knew that Ms. Wheeler had a disability.

183.    Ms. Wheeler's disability substantially limits the major life activities of learning, concentrating, and thinking.

184.    Because her disability substantially limits these major life activities, Ms. Wheeler is afforded protection by Section 504.   29 U.S.C. § 705(20).

185.    As an educational institution which permits and has at all times relevant to this action permitted students to pay education-related costs with the assistance of federal grants and loans, and on information and belief receives federal funding for research and other activities, AU's operations are qualified programs or activities within the meaning of Section 504. 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. §§ 104.3(k)(2)(i), 104.3(h), 104.41.

186.    On information and belief, AU's decision to place Ms. Wheeler on interim suspension and enforce that suspension as described herein, deploy the AUPD Officers to her home, remove her from her off-campus apartment against her will, and forcibly seek her admission to an in-patient psychiatric facility was solely because of her disability. This deprived Ms. Wheeler of the rights, privileges, advantages, and opportunities enjoyed by other students.

187.    AU's exclusion of Ms. Wheeler from campus and conditioning of Ms. Wheeler's ability to fully and equally enjoy her status as a student at AU on her willingness to obtain a psychological evaluation from a psychologist of AU's choosing, waive her right to medical privacy by authorizing that psychologist to obtain information from her past treatment providers, and further waive her rights to privacy by allowing all findings to be shared with Defendant Brown, is a criteria or method of administration that has the effect of substantially impairing Ms. Wheeler's accomplishment of her academic program objectives and is in violation of Section 504.

188.    Accordingly, AU violated Section 504 by denying Ms. Wheeler the benefits of its programs, services, and activities solely on the basis of her disability.

189.    AU's use of policies and practices that utilize criteria and methods of administration that have the effect of discriminating against students with disabilities, including Ms. Wheeler, by making it more onerous for them to access AU's goods, services, facilities, privileges, advantages, and accommodations violates Section 504.

190.    AU's failure to make reasonable modifications to its policies and practices to ensure that students with disabilities, including Ms. Wheeler, have equal access to the benefits of AU's goods, services, facilities, privileges, advantages, and accommodations violates Section 504.

191.    As a proximate result of AU's violations of Section 504, Ms. Wheeler has been injured as set forth herein.

192.    AU's conduct constitutes ongoing and continuous violations of Section 504, and unless restrained from doing so, AU will continue to violate Section 504 and inflict injuries for which there is no adequate remedy at law.

**COUNT III:  VIOLATIONS OF
D.C. HUMAN RIGHTS ACT – D.C. CODE § 2-1401.01 ET SEQ.
Against AU**

193.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

194.    The D.C. Human Rights Act ("DCHRA") provides that an educational institution shall not deny, restrict, abridge, or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially for a discriminatory reason, based on the disability of any individual.  D.C. Code § 2-1401.41.

195.    At all times relevant to this action, AU, as a college or university, is an educational institution within the meaning of the DCHRA. D.C. Code § 2-1401.02(8).

196.    At all times relevant to this action, Ms. Wheeler was and is a student at AU who has a disability and has a record of such disability, and thus she was and is an individual with a disability under the DCHRA.  D.C. Code § 2-1401.02(5A).

197.     As a student of AU who was approved for on-campus and campus-managed housing, Ms. Wheeler was qualified to have use of or access to AU's facilities, services, programs, and benefits of AU's programs or activities.

198.     On information and belief, AU's decision to place Ms. Wheeler on interim suspension and enforce that suspension as described herein, deploy the AUPD Officers to her home, remove her from her off-campus apartment against her will, and forcibly seek her admission to an in-patient psychiatric facility was based on her disability.  This denied, restricted, abridged, or conditioned Ms. Wheeler's use and access to AU's facilities, services, programs, and the benefits of such programs or activities.

199.     By requiring Ms. Wheeler to obtain a psychological evaluation from an AU-selected psychologist, waive her right to medical privacy by allowing that psychologist to obtain Ms. Wheeler's information from her past treatment providers, and further waive her right to medical privacy by authorizing all findings to be shared with Defendant Brown, AU denied, restricted, abridged, or conditioned Ms. Wheeler's use and access to, AU's facilities, services, programs, and the benefits of such programs or activities.

200.     As a proximate result of AU's violations of the DCHRA, Ms. Wheeler has been injured as set forth herein.

201.     AU's conduct constitutes ongoing and continuous violations of the DCHRA, and unless restrained from doing so, AU will continue to violate the DCHRA and inflict injuries for which there is no adequate remedy at law.

## COUNT IV:  VIOLATION OF THE FOURTH AMENDMENT – UNLAWFUL ENTRY
### Against All Defendants

202.     Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

203.     Plaintiff asserts this count under 42 U.S.C. § 1983 against all Defendants.

204.     AUPD Officers Barrett, Vena, Joyner, and Doe 1 were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law within the meaning of Section 1983 because they are commissioned by the D.C. government to exercise police powers.

205.     MPD Officers Kinzer, Smith, and David were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law.

206.     Defendant AU and Defendant Brown were, all times relevant to the actions alleged herein, state actors and persons acting color of state law within the meaning of Section 1983 because they directed, and had the authority to direct, persons acting under color of state law.

207.     AU is a person within the meaning of Section 1983, *see Monell v. Department of Social Services,* 436 U.S. 658 (1978), because Defendant Brown had the authority to make policy, and made policy, on behalf of AU when he directed Defendant Officers to enter Ms. Wheeler's apartment.

208.     On September 26, 2019, the AUPD and MPD Officers entered Ms. Wheeler's home at the Frequency apartments under color of law, without a warrant, without her consent, and without a reasonable belief that she was a danger to herself or others.

209.     At no time did Ms. Wheeler indicate to anyone that she consented to the entry of the AUPD and MPD Officers into her apartment.  Instead, she repeatedly asked the AUPD and MPD Officers to leave.

210.     Immediately before officers entered Ms. Wheeler's apartment, there were no signs outside the apartment of any danger or emergency within, or of any other reason for officers to enter.

211.    On information and belief, the AUPD Officers effected this entry in order to, among other things, take custody of Ms. Wheeler and transport her—involuntarily, if necessary—to an in-patient psychiatric facility.  The AUPD Officers undertook this action under instructions from AU and Brown, even though no Defendant reasonably believed that Ms. Wheeler was a danger to herself or others.

212.    The MPD Officers accompanied the AUPD Officers at the request of the AUPD Officers or of AU and Brown.

213.    Defendants' conduct occurred under color of law and constituted callous indifference to and reckless disregard of Ms. Wheeler's rights under the Fourth Amendment.

## COUNT V:  VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE SEIZURE
### Against All Defendants

214.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

215.    Plaintiff asserts this count under 42 U.S.C. § 1983 against all Defendants.

216.    AUPD Officers Barrett, Vena, Joyner, and Doe 1 were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law within the meaning of Section 1983 because they are commissioned by the D.C. government to exercise police powers.

217.    MPD Officers Kinzer, Smith, and David were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law.

218.    Defendant AU and Defendant Brown were, all times relevant to the actions alleged herein, state actors and persons acting color of state law within the meaning of Section 1983 because they directed, and had the authority to direct, persons acting under color of state law.

54

219.    AU is a person within the meaning of Section 1983, *see Monell v. Department of Social Services,* 436 U.S. 658 (1978), because Defendant Brown had the authority to make policy, and made policy, on behalf of AU when he directed Defendant Officers to seize Ms. Wheeler.

220.    When the AUPD and MPD Officers decided to remain in Ms. Wheeler's room on September 26, 2019 and restrict Ms. Wheeler to that room, they effectively seized Ms. Wheeler under color of law.

221.    The officers repeatedly told Ms. Wheeler she could not leave her 330 square foot apartment, ejected her friends, and physically blocked Ms. Wheeler from accessing the only door to the apartment.  They also limited Ms. Wheeler's activity while confined to her room by telling her, among other things, that she could not use her laptop to do her schoolwork.  On information and belief, the majority of the officers wore uniforms and carried weapons.

222.    The MPD Officers remained with and actively supported the AUPD Officers.

223.    The seizure occurred under instructions from and with the full knowledge of AU and Brown, as evidenced by multiple phone calls made by the AUPD Officers to Brown during the seizure, and the presence of AU Director of Residence Life, Lisa Freeman, in her official capacity, who told Ms. Wheeler that she had "no choice" but to further surrender her rights.

224.    The officers did not seize Ms. Wheeler for the purpose of any investigation, ask investigative questions, or use the seizure of Ms. Wheeler to pursue further investigation.

225.    At no time did the AUPD and MPD Officers have a warrant or probable cause to arrest or detain Ms. Wheeler, nor did they have a reasonable belief that Ms. Wheeler was a danger to herself or others.

226.    Additionally, the AUPD and MPD Officers did not have reasonable suspicion to support any seizure of Ms. Wheeler for purposes of a further investigation—particularly for the protracted length of time for which Ms. Wheeler was seized.

227.    There was no indication of any trouble, hazards, or illegal activity in Ms. Wheeler's room, and nothing observed by the officers while in Ms. Wheeler's room provided any basis to suspect that Ms. Wheeler had committed a crime, was otherwise dangerous to herself or others, or needed to be hospitalized at an in-patient psychiatric facility.

228.    Defendants' conduct occurred under color of law and constituted callous indifference to and reckless disregard of Ms. Wheeler's rights under the Fourth Amendment.

## COUNT VI:  VIOLATION OF THE FOURTH AMENDMENT – FALSE ARREST
### Against All Defendants

229.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

230.    Plaintiff asserts this count under 42 U.S.C. § 1983 against all Defendants.

231.    AUPD Officers Barrett, Vena, Joyner, and Doe 1 were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law within the meaning of Section 1983 because they are commissioned by the D.C. government to exercise police powers.

232.    MPD Officers Kinzer, Smith, and David were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law.

233.    Defendant AU and Defendant Brown were, all times relevant to the actions alleged herein, state actors and persons acting color of state law within the meaning of Section 1983 because they directed, and had the authority to direct, persons acting under color of state law.

234.    AU is a person within the meaning of Section 1983, *see Monell v. Department of Social Services,* 436 U.S. 658 (1978), because Defendant Brown had the authority to make policy,

and made policy, on behalf of AU when he directed Defendant Officers to enter Ms. Wheeler's apartment to arrest Ms. Wheeler.

235.     AUPD and MPD Officers, acting under color of law, arrested Ms. Wheeler without a warrant or probable cause.  Specifically, the AUPD and MPD Officers forcibly took custody of Ms. Wheeler and transported her to an in-patient psychiatric facility to seek her involuntary hospitalization, even though they did not reasonably believe that Ms. Wheeler posed a danger to herself or others.  In so doing, the officers tackled Ms. Wheeler off of her bed, placed her into handcuffs while naked, and carried through the halls of her apartment building in front of her neighbors and fellow students.

236.     The AUPD and MPD Officers took these actions under direction from Defendant Brown, who also did not reasonably believe that Ms. Wheeler was a danger to herself or others.

237.     By calling Defendant Brown—who had not personally observed Ms. Wheeler at all on September 26, 2019—to ask what to do before taking physical custody of Ms. Wheeler, AUPD and MPD Officers abdicated their independent judgment, did not act upon their independent determination of probable cause, and did not properly take into account what they had learned and observed in the three hours at Ms. Wheeler's apartment to decide whether to take physical custody of Ms. Wheeler.

238.     Defendants' conduct occurred under color of law and constituted callous indifference to and reckless disregard of Ms. Wheeler's rights under the Fourth Amendment.

## COUNT VII:  FALSE IMPRISONMENT – DISTRICT OF COLUMBIA COMMON LAW
### Against All Defendants

239.     Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

240.    Plaintiff asserts this count under District of Columbia common law against all Defendants.

241.    AUPD and MPD Officers falsely imprisoned Ms. Wheeler by restricting her movement to her 330 square foot apartment for approximately three hours against her will, with no valid basis or warrant.

242.    AUPD and MPD Officers further falsely imprisoned Ms. Wheeler by forcibly restraining her in handcuffs and carrying her out of her apartment against her will, with no valid basis or warrant.

243.    The lengthy imprisonment of Ms. Wheeler in her room, coupled with the forcible manner in which she was tackled, handcuffed while naked, and carried out of her apartment—all without any valid basis—was an outrageous and willful violation of law.

244.    At all relevant times, the AUPD Officers were employees of AU acting within the scope of their employment.

245.    At all relevant times, AUPD Officers acted on instructions from Defendants AU and Brown and subject to the influence and persuasion of AU and Brown.

246.    By calling Brown multiple times during the three-hour imprisonment of Ms. Wheeler and by asking for Brown's instructions before further imprisoning Ms. Wheeler in handcuffs and carrying her out of her apartment, the AUPD Officers abdicated the decision to imprison Ms. Wheeler to AU and Brown.

247.    At all relevant times, MPD Officers deferred to and supported the AUPD Officers. Accordingly, they also acted on the instructions, influence, and persuasion of AU and Brown and abdicated the decision to imprison Ms. Wheeler to AU and Brown.

248.    The instructions, influence, and persuasion of AU and Brown proximately caused the AUPD and MPD Officers' conduct and Ms. Wheeler's false imprisonment.

249.    As a result of this false imprisonment, Ms. Wheeler suffered substantial harm including, but not limited to, mental and emotional distress.

250.    Defendants' conduct was willful and outrageous.

## COUNT VIII:  ASSAULT – DISTRICT OF COLUMBIA COMMON LAW
### Against All Defendants

251.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

252.    Plaintiff asserts this count under District of Columbia common law against all Defendants.

253.    The AUPD and MPD Officers intentionally attempted to and threatened to do physical harm to Ms. Wheeler when they closed the only door out of her apartment and approached her to tackle her off of her bed and handcuff her.

254.    The attempted and threatened use of force was not warranted during Ms. Wheeler's interactions with the officers.

255.    At all relevant times, the AUPD Officers were employees of AU acting within the scope of their employment.

256.    At all relevant times, the AUPD Officers acted on instructions from Defendants AU and Brown and subject to the influence and persuasion of AU and Brown.

257.    The instructions from, and influence and persuasion of, AU and Brown proximately caused the assault on Ms. Wheeler.

258.    As a result of this assault, Ms. Wheeler suffered substantial harm including, but not limited to, mental and emotional distress.

259.    Defendants' conduct was willful and outrageous.

### COUNT IX:  TRESPASS – DISTRICT OF COLUMBIA COMMON LAW
### Against All Defendants

260.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

261.    Plaintiff asserts this count under District of Columbia common law against all Defendants.

262.    The AUPD and MPD Officers purposefully intruded upon Ms. Wheeler's apartment by remaining in her apartment for approximately three hours for the sole purpose of coercing Ms. Wheeler to hospitalize herself at a psychiatric institution, all without her authorization as the only resident of her apartment.

263.    At all relevant times, the AUPD Officers were employees of AU acting within the scope of their employment.

264.    At all relevant times, the AUPD Officers acted on instructions from Defendants AU and Brown and subject to the influence and persuasion of AU and Brown.

265.    The instructions from, and influence and persuasion of, AU and Brown proximately caused the trespass upon Ms. Wheeler's home.

266.    As a result of this trespass, Ms. Wheeler suffered substantial harm including, but not limited to, mental and emotional distress.

267.    Defendants' conduct was willful and outrageous.

### RELIEF REQUESTED

268.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and grant the following:

269.     Declare that Defendant AU violated Plaintiff's rights under the ADA, Section 504 of the Rehabilitation Act, and the DCHRA, to be free from disability discrimination.

270.     Declare that all Defendants violated Plaintiff's rights under the Fourth Amendment to be free from unlawful entry, unlawful seizures, and unlawful arrests.

271.     Declare that all Defendants violated Plaintiff's rights under District of Columbia law to be free from false imprisonment, assault, and trespass.

272.     Enjoin Defendant AU and its employees, agents, and any and all other persons acting on Defendant AU's behalf from further violations of the ADA, Section 504 of the Rehabilitation Act, the DCHRA, and the Fourth Amendment.

273.     Award such further injunctive relief as is sufficient to (i) restore Ms. Wheeler to her prior status absent AU's violations, including but not limited to removing any consequences of AU's violations to Ms. Wheeler's student and academic records, and (ii) ensure future compliance with the law by Defendant AU and its employees, agents, and any and all other persons acting on AU's behalf, including but not limited to any necessary changes to AU's existing policies and training.

274.     Award to Plaintiff her reasonable actual damages as compensation for injuries sustained as a result of (i) Defendant AU's violations of Section 504 of the Rehabilitation Act and the DCHRA, and (ii) all Defendants' violations of Plaintiff's rights under the Fourth Amendment and District of Columbia law.

275.     Award to Plaintiff reasonable damages to compensate for Plaintiff's pain and suffering sustained as a result of (i) Defendant AU's violations of Section 504 of the Rehabilitation Act and the DCHRA, and (ii) all Defendants' violations of Plaintiff's rights under the Fourth Amendment and District of Columbia law.

276.    Award to Plaintiff punitive damages for all Defendants' callous indifference to and reckless disregard of Plaintiff's rights under the Fourth Amendment, and all Defendants' willful and outrageous conduct under District of Columbia law.

277.    Award to Plaintiff her costs and reasonable attorneys' fees.

278.    Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

279.    Plaintiff requests a trial by jury on any and all issues raised by this Complaint which are so triable as of right.


September 25, 2020                                         Respectfully submitted,


                                                          */s/ Kaitlin R. Banner*
                                                          Kaitlin R. Banner (D.C. Bar No. 1000436)
                                                          Tristin Brown (D.C. Bar No. 1671642)
                                                          Dennis Corkery (D.C. Bar No. 1016991)
                                                          Margaret Hart (D.C. Bar No. 1030528)
                                                          Hannah Lieberman (D.C. Bar No. 336776)
                                                          WASHINGTON LAWYERS' COMMITTEE
                                                          FOR CIVIL RIGHTS AND URBAN AFFAIRS
                                                          700 14th Street, N.W., Suite 400
                                                          Washington, DC 20005
                                                          Phone: (202) 319-1000
                                                          Fax: (203) 319-1010
                                                          *kaitlin_banner@washlaw.org*
                                                          *tristin_brown@washlaw.org*
                                                          *dennis_corkery@washlaw.org*
                                                          *margaret_hart@washlaw.org*
                                                          *hannah_lieberman@washlaw.org*

                                                          *Counsel for Plaintiff Gianna Wheeler*