**Filed Under Seal**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GIANNA WHEELER | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-2735-CRC |
| | ) | |
| AMERICAN UNIVERSITY, | ) | |
| JEFFREY BROWN, | ) | |
| KEVIN BARRETT, | ) | |
| MICHAEL VENA, | ) | |
| JOSEPH JOYNER, | ) | JURY TRIAL DEMANDED |
| STEPHEN KINZER, | ) | |
| DEBORAH SMITH, | ) | |
| RICHARD DAVIS, III, | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| MATTHEW GOMEZ | ) | |
| c/o American University | ) | |
| 4400 Massachusetts Ave NW | ) | |
| Washington, DC 20016 | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiff Gianna Wheeler ("Ms. Wheeler"), for her Complaint against Defendants American University ("AU" or "University"); AU Dean of Students Jeffrey Brown ("Brown"); officers Kevin Barrett, Michael Vena, Joseph Joyner, and Matthew Gomez of the American University Police Department (collectively, the "AUPD Officers"); and DC Metro Police Department ("MPD") officers Stephen Kinzer, Deborah Smith, and Richard Davis, III (collectively, the "MPD Officers," and together with the AUPD officers, the "Officers"); by and through counsel, alleges as follows:

1

**Filed Under Seal**

# I       INTRODUCTION

1.       Ms. Wheeler is a Black female undergraduate student at AU.  She has been diagnosed with major depressive disorder and anxiety.  On the night of September 26, 2019, she was alone doing her schoolwork in her small off-campus apartment when seven police officers— all of whom were white, and six of whom were male—obtained an access key to Ms. Wheeler's apartment from the front desk of her apartment building; unlocked the door; and entered over her objections.  They did not have a warrant, nor could they reasonably have believed that Ms. Wheeler was a danger to herself or others.

2.       Nevertheless, over the course of *three hours*, the Officers occupied Ms. Wheeler's apartment and insisted that she "voluntarily" surrender for evaluation at an in-patient psychiatric facility.  The Officers refused to leave—and would not permit Ms. Wheeler to leave—even after EMTs called to the scene found that Ms. Wheeler's "mental status" was "normal" and refused to take her to the hospital.  The Officers were communicating with—and acting at the behest of— AU officials, who had decided to suspend Ms. Wheeler and seek her hospitalization based primarily on another student's allegations that she had felt threatened during an encounter with Ms. Wheeler earlier that day.

3.       Eventually, the Officers tackled Ms. Wheeler onto the ground from her bed, handcuffed her, bundled her into a blanket, and carried her kicking and screaming through the halls of her apartment building.  Multiple videos of the incident were posted and circulated online, severely embarrassing Ms. Wheeler.  Ms. Wheeler was then forcibly taken to a hospital, where she remained for six days, and where her treating physician assigned her a working diagnosis of "bipolar disorder type 1."  Even after her release from Washington Hospital Center, Ms. Wheeler was not allowed to return to campus and resume her studies because the University had preemptively placed her on an interim suspension.

4.      In October 2019, AU held a disciplinary hearing at which Ms. Wheeler was not permitted counsel.  An AU-appointed panel considered the evidence against Ms. Wheeler and determined she was "not responsible" for the alleged assault she was accused of by the other student nor had she committed any other violation of AU's code of conduct.

5.      As detailed herein, Defendants unlawfully discriminated against Ms. Wheeler on the basis of her disability, unlawfully entered her home, and unlawfully seized and detained her in violation of her rights under the Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 et seq.), the Rehabilitation Act of 1973 (29 U.S.C. § 794 et seq.), the D.C. Human Rights Act (D.C. Code § 2-1401.01 et seq.), the United States Constitution, and the common law of the District of Columbia.  This action seeks monetary damages and injunctive relief to repair the harm caused by the violations of Ms. Wheeler's rights and ensure that Ms. Wheeler and other students do not have to suffer such violations again.

II      **JURISDICTION AND VENUE**

6.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this suit asserts claims pursuant to the ADA, the Rehabilitation Act of 1973, and the United States Constitution.

7.      This court has supplemental jurisdiction over Ms. Wheeler's related claims asserted under the laws of Washington, D.C. pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant AU resides in this district and because the events giving rise to Ms. Wheeler's claims occurred in this district.

**Filed Under Seal**

### III   THE PARTIES

9.      Defendant American University is a private research university in Washington, DC, originally chartered by an 1893 Act of Congress.  AU's student body numbers over 13,000, and its main campus is located at 4400 Massachusetts Ave., NW, in Washington DC.

10.      American University includes the American University Police Department.  On information and belief, the AUPD is a subdivision of AU that is wholly controlled by AU.  AU, through AUPD, employs more than 60 individuals who are licensed as special police officers in the District of Columbia.  These special police are able to carry weapons and wear uniforms.  As employees, they are required to follow the directions of AU and its officials.

11.      Defendant Jeffrey Brown is the Dean of Students at AU.  At all relevant times, Jeffrey Brown had authority to make final policy determinations on behalf of AU with respect to Ms. Wheeler's interim suspension, Ms. Wheeler's involuntary hospitalization, and the conduct of the AUPD Officers in their interactions with Ms. Wheeler.

12.      Defendant Kevin Barrett is an employee of AU, a special police officer, and a captain of the AUPD.

13.      Defendant Michael Vena is an employee of AU, a special police officer, and a lieutenant of the AUPD.

14.      Defendant Joseph Joyner is an employee of AU and a special police officer of the AUPD.

15.      Defendant Matthew Gomez was, on information and belief, an employee of AU and a special police officer of the AUPD at all times relevant to this Amended Complaint.

16.      Defendant Stephen Kinzer is an officer of the MPD, Second District.

17.      Defendant Deborah Smith was an officer of the MPD, Second District, at all times relevant to this Amended Complaint.

Filed Under Seal

18.     Defendant Richard Davis, III[1] was a sergeant of the MPD, Second District, at all times relevant to this Amended Complaint.

19.     Plaintiff Gianna Wheeler is a resident of the District of Columbia.  At all times relevant to this Complaint, Ms. Wheeler resided either on-campus in AU's residence halls, or off-campus at the Frequency Apartments at 4000 Brandywine St. NW, Washington, DC, which are owned by 4000 Brandywine Street NW Ground Owner LLC.  Ms. Wheeler is currently enrolled full time at AU in its undergraduate program.

## IV     MS. WHEELER'S BACKGROUND AND EXPERIENCE AT AU

20.     Ms. Wheeler is a 21-year-old Black, queer student.  She is enrolled full time at AU on a scholarship awarded based on a combination of academics and need.  She has been diagnosed with major depressive disorder and anxiety.

21.     Ms. Wheeler's path to AU was not easy.  In addition to managing the care of her mental health, Ms. Wheeler is a sexual assault survivor who experienced multiple racist attacks during and prior to high school.  Ms. Wheeler also lost her mother while in high school. Nevertheless, she persisted in her studies and, with invaluable support from her family, secured admission to ten universities, including AU.  Most of these universities, including AU, offered Ms. Wheeler full scholarships.

22.     Ms. Wheeler chose American University because it presented itself as a diverse school located in the global hub of Washington, DC. Ms. Wheeler was particularly drawn to AU's School of International Service and its close ties with the Peace Corps program.  Having suffered

---

[1] In the original Complaint, Defendant Richard Davis, III was incorrectly identified as Richard David.

Filed Under Seal

hardships in her own life, Ms. Wheeler wanted to help others by pursuing a career in international aid.

23.     Ms. Wheeler began coursework at AU in the fall of 2017, when she was 18.  She initially lived on campus at AU in its residence halls.  Building on her high school record of academic success, Ms. Wheeler earned high grades in her first semester at AU.

24.     However, Ms. Wheeler also encountered systemic racism at AU, and she experienced firsthand prejudice against Black students.  Among other things, Ms. Wheeler was verbally bullied by other students, and at least one professor, who routinely called Ms. Wheeler by the name of another Black student.  Ms. Wheeler was subjected to procedures for entry into on-campus residences (including the requirement that guests be escorted by residents), which she saw routinely waived for white students and their guests.  And Ms. Wheeler noticed that some of her answers in class were criticized while nearly identical answers by white students were praised.

25.     On at least one occasion, Ms. Wheeler sought to bring some of her concerns to the attention of AU officials and scheduled a meeting with Defendant Brown, the Dean of Students at AU.  Although Ms. Wheeler arrived early for her meeting and was in the waiting room at the scheduled time, her appointment was unceremoniously cancelled in favor of a white student who had arrived with a parent.

26.     Ms. Wheeler also experienced firsthand AU's prejudice against students with mental health disabilities.  For example, in February 2019, Ms. Wheeler had a panic attack that prevented her from taking an exam.  AU knew that Ms. Wheeler had been diagnosed with major depressive disorder and anxiety, and after the panic attack, Ms. Wheeler visited the Office of the Dean of Students to seek a reasonable accommodation that would allow her to retake the exam.  Although the Office of the Dean of Students confirmed that the circumstances would justify

allowing her to retake the exam, Ms. Wheeler was also advised that her professor had discretion whether to allow it.  Ms. Wheeler then visited AU's Academic Support and Access Center ("ASAC"), which is responsible for disability accommodations for AU students, to again seek a reasonable accommodation.  However, ASAC staff told Ms. Wheeler that ASAC could not provide her with a medical excuse for the exam.  Because AU failed to provide Ms. Wheeler with a reasonable accommodation, Ms. Wheeler failed that class.

27.   Ms. Wheeler's aunt and legal guardian throughout her childhood, Loretha Lott, also sought a reasonable accommodation from AU on Ms. Wheeler's behalf.  On March 5, 2019, Ms. Lott wrote an email to Jaris Williams, AU's Assistant Dean of Students, with the subject line "Disability Advocates for Gianna Wheeler."  In that email, Ms. Lott expressed her disappointment at how AU had failed to accommodate Ms. Wheeler's disabilities, and asked whether Ms. Wheeler's professors were "trained to deal with students with anxiety and/or depression?"  She further described how AU's failure to accommodate Ms. Wheeler had *increased* Ms. Wheeler's anxiety.

28.   Ms. Wheeler also faced challenges due to inadequate training and oversight of AU's "special police."  In February 2019, Ms. Wheeler was a victim of a home invasion when an uninvited man snuck into Ms. Wheeler's campus housing at AU's Constitution Hall without permission and locked the door behind him.  The desk receptionist at the hall called AUPD, but it took AUPD officers over 20 minutes to arrive on the scene.  Ms. Wheeler was not harmed and the intruder left before AUPD arrived, but the incident terrified Ms. Wheeler.  When AUPD finally arrived, officers were unsympathetic.  They focused on what Ms. Wheeler could have done differently to avoid the situation rather than on protecting her or finding the intruder.

**Filed Under Seal**

29.     This incident was particularly troubling against the backdrop of the University's broader struggles to contain violence against its female students.  Indeed, in March 2019, AU became the only university in the country—public or private—with five open Title IX investigations into potential sexual violence violations.

30.     Because she felt that they had bungled the response to the home invasion, Ms. Wheeler arranged a meeting with AUPD to (i) establish a productive, non-adversarial relationship with the officers charged with protecting the students at AU and (ii) highlight broader concerns about sexual violence against women on AU's campus.  At this meeting, Ms. Wheeler led a collaborative discussion around how AUPD officers could best support women and survivors of sexual assault on campus.  She also specifically mentioned her mental health disabilities. Defendant Barrett, the AUPD Captain, attended this meeting, and had the opportunity to observe how Ms. Wheeler conducted herself in general, and in stressful situations.

31.     In August or September 2019, Ms. Wheeler relocated from on-campus housing in AU's residence halls to the privately owned Frequency Apartments.  Though Ms. Wheeler leased her unit at the Frequency Apartments through AU, the building's tenants included a mix of AU students and residents who had no connection to AU.

## V       THE EVENTS OF SEPTEMBER 26, 2019

### A.      Ms. Wheeler's Visit to Hurst Hall

32.     September 26, 2019, was one day after the anniversary of Ms. Wheeler's mother's funeral, and Ms. Wheeler was emotionally vulnerable.  That morning, Ms. Wheeler sought to speak with Stephen McAvoy, the head of the Environmental Sciences Department, who had previously helped Ms. Wheeler switch from one lab section to another so that she could avoid students who had been bullying her.  At 12:03 PM, Ms. Wheeler went to the biology department in Hurst Hall.

Ms. Wheeler was wearing heels and carrying a smoothie, so she could not move quickly and one of her hands was full.

33.     While in Hurst Hall, Ms. Wheeler asked a white, female student for help finding the Environmental Sciences Department and Professor McAvoy.  The other student used a computer to look up information for Ms. Wheeler, and Ms. Wheeler photographed the information.

34.     At the time, Ms. Wheeler was upset about the bullying she had experienced on campus and she expressed some of this to the other student.  To Ms. Wheeler, this bullying was only the latest in a pattern of mistreatment she had experienced at AU because of her race and her disability.  She was understandably distressed.

35.     Ms. Wheeler explained to the student assisting her that other students treated her as though she had "a sharp" in her bag and, at some point during this interaction, Ms. Wheeler briefly placed her hand on the student's shoulder.  Ms. Wheeler left Hurst Hall at 12:19 PM, a mere sixteen minutes after entering.

36.     At approximately 1:17 PM, the mother of the student—apparently upset upon learning of her daughter's interaction with Ms. Wheeler—contacted AUPD and reported the interaction as an assault.  The student's mother was not present in Hurst Hall at any time during the interaction.  Between 1:17 PM and 2:20 PM, the student also spoke with AUPD.  She told AUPD that Ms. Wheeler had touched her shoulder while asking her to look up Professor McAvoy's location.  She claimed that Ms. Wheeler was loud and emotional about the bullying that Ms. Wheeler had experienced at AU.

37.     Apparently misunderstanding Ms. Wheeler's words, the student reported that Ms. Wheeler *claimed to have* "a sharp" in her bag—rather than that she was treated *as if* she had "a sharp" in her bag.  The student clarified, though, that Ms. Wheeler did not injure her and she never

saw any sharp object.  The only physical contact reported between Ms. Wheeler and the student was that Ms. Wheeler had touched the student's shoulder.  The student also noted that she left Ms. Wheeler for a period of time to assist another student with a lab project, after which she voluntarily returned to speak to Ms. Wheeler further.  The student did not press charges.

38.     When Ms. Wheeler left Hurst Hall, she visited Professor McAvoy's office.  She did not find him there, but she did speak to one of his colleagues on the faculty, Karen Knee.  Ms. Wheeler and Professor Knee had a brief conversation.  At approximately 1:45 PM, Professor Knee sent a one-paragraph email to an AU administrator about that conversation.  In the email, Professor Knee stated that Ms. Wheeler appeared to be "in the midst of a manic episode or some sort of mental health issue," but Professor Knee qualified that she was "not trained in mental health at all."  Professor Knee explained that her assessment was based merely on Ms. Wheeler's "talking quickly," and her "rambling" and "repetitive" speech.  Though she labeled Ms. Wheeler's manner of speaking "not normal," Professor Knee noted that Ms. Wheeler "mostly made sense" and that, from the professor's observations, "it didn't seem like [Ms. Wheeler] was suicidal right now[.]"

39.     Professor Knee did not mention anything about the encounter between Ms. Wheeler and the other student at Hurst Hall earlier that day.  Professor Knee did relay Ms. Wheeler's concern that the Office of the Dean of Students, and Defendant Brown in particular, "has not been responsive to her concerns" about bullying and discrimination based on Ms. Wheeler's race and sex, and that Ms. Wheeler "was considering filing some sort of complaint against the university[.]"

### B.     AU's Discriminatory Preliminary Administrative Decisions

40.     At 3:45 PM, approximately ninety minutes after learning about the interaction in Hurst Hall, and sixty minutes after Professor Knee's email, AU administrators, including Brown, abruptly made the decision to immediately suspend Ms. Wheeler based on their knowledge of her mental health diagnoses and the unsubstantiated allegation that she assaulted another student.  The

**Filed Under Seal**

interim suspension took effect immediately without any individualized determination that Ms. Wheeler presented a threat to herself or others and without any determination of Gianna's guilt with respect to the accusations against her.

41.     At the same meeting, those administrators (including Defendant Brown) also decided to direct AU's special police officers—who receive little to no training on how to handle individuals with mental health disabilities—to apprehend Ms. Wheeler and seek her involuntary hospitalization at an in-patient psychiatric facility.  This decision was also made without any individualized determination that Ms. Wheeler presented a threat to herself or others and without any determination of Gianna's guilt with respect to the accusations against her.

42.     Indeed, based on the limited information they had, the AU administrators could not possibly have formed a reasonable belief that Ms. Wheeler was a danger to herself or others.  The AU administrators did not interview Ms. Wheeler or observe her.  They did not ask any person— much less a person with training in mental health disabilities—to assess Ms. Wheeler.  They did not engage the District of Columbia's Department of Behavioral Health Access HelpLine or mobile crisis team to assess Ms. Wheeler's mental health needs.  Instead, AU instructed armed officers to enter Ms. Wheeler's apartment and seek her involuntary, emergency hospitalization, by force if necessary, based on their knowledge of her mental health diagnosis and an unsubstantiated allegation.

43.     AU did decide to call Ms. Wheeler to inform her that she had been suspended.  But AU called the wrong number, and left a message intended for Ms. Wheeler on another student's voicemail.  Ms. Wheeler, therefore, had no notice that she had been suspended, no opportunity to leave campus voluntarily, and no opportunity to respond to AU's decision before AUPD and MPD Officers arrived at her home.

Filed Under Seal

44.     The interim suspension of Ms. Wheeler was memorialized in a memorandum dated September 26, 2019, addressed from Defendant Brown to Ms. Wheeler ("Interim Suspension Memo").  But Ms. Wheeler had no opportunity to view the memorandum that day and was not given a chance to voluntarily leave her apartment: Brown did not email the memo to Ms. Wheeler until 9:20 PM—well after deploying the AUPD and MPD Officers to Ms. Wheeler's apartment.

45.     The Interim Suspension Memo stated that Ms. Wheeler was "barred from campus and [could] not be on campus for any reason . . ."  It also stated that "[d]uring [her] period of interim suspension, [she could] not be physically present on campus nor [could she] engage in [her] academic program or participate in any campus activities."

46.     The memorandum forbade Ms. Wheeler from returning to campus until she: (i) completed an evaluation by a psychologist AU selected, (ii) provided her medical records to that psychologist, and (iii) authorized that psychologist to share the results with the Executive Director of the AU counseling center and Defendant Brown.  Further, Ms. Wheeler's return to campus was "contingent" upon the findings of AU's chosen psychologist.  Upon information and belief, these requirements in the Interim Suspension Memo were based on AU's knowledge of Ms. Wheeler's mental health diagnosis and not based on any individualized determination that Ms. Wheeler presented a threat to herself or others or any determination of Gianna's guilt with respect to the accusations against her.  Upon information and belief, students without mental health disabilities are not subject to such requirements.

C.     **Unlawful Warrantless Entry and Further Discriminatory Actions**

47.     Around 6:30 PM on September 26, 2019, AU sent a message to the AUPD directing them to remove Ms. Wheeler from her apartment and to take her to a hospital.

48.     Four AUPD special police officers, Captain Kevin Barrett, Lieutenant Michael Vena, Officer Joseph Joyner, and Officer Matthew Gomez, (all white males), gathered at the

Filed Under Seal

Frequency Apartments, where Ms. Wheeler lived.  There, the AUPD Officers met up with three MPD officers, all of whom were also white.  AUPD Officers had requested that the MPD be present in case any actions took place within the jurisdiction of the MPD.  In fact, all actions at the Frequency Apartments were in MPD's jurisdiction.

49.     MPD Officer Kinzer, specifically, was requested at the scene because of his training as part of MPD's Crisis Intervention Team ("CIT").  Indeed, while in the lobby of the Frequency Apartments, one of the AUPD officers referred to Officer Kinzer as "an impressive CIT guy," and Defendant Barrett suggested inviting Kinzer to help train AUPD officers.

50.     AU does not own the Frequency Apartments. The apartments are owned by 4000 Brandywine Street NW Ground Owner LLC.  AU is not a general or limited partner of 4000 Brandywine Street NW Ground Owner LLC.

51.     AU also disclaims control over the Frequency Apartments for police purposes.  As explained in the American University Annual Security Report for 2019, "[a]ll criminal activities at these locations should be reported to local police . . . .  The Frequency Apartments are in the Washington, DC, Metropolitan Police Department's (MPD) Second Police District.  Residents of The Frequency Apartments can call MPD at 311 for non-emergencies and 911 for emergencies. To help ensure timely notifications and accurate statistics, we encourage individuals to contact the AU Police Department after filing a report with MPD."[2]

52.     At around 7:00 PM, AUPD Officers obtained the access key to Ms. Wheeler's apartment from a front desk clerk at the Frequency Apartments.

---

[2]   American University Annual Security Report for 2019, (Sept. 30, 2019), https://www.american.edu/finance/publicsafety/upload/au-annual-security-report.pdf.

**Filed Under Seal**

53.     Captain Barrett and MPD Officer Smith went to the fourth floor of the Frequency Apartments, where Barrett unlocked Ms. Wheeler's door.  Ms. Wheeler was laying down on her bed, wearing only a t-shirt, studying with her laptop open, and talking to her aunt on the phone. Officers did not have Ms. Wheeler's permission to enter or a warrant.

54.     When officers entered Ms. Wheeler's apartment without her consent, there were no exigent circumstances.  The intrusion into Ms. Wheeler's home was based on the Hurst Hall incident, which had occurred approximately seven hours earlier and in which the reporting student was not injured and was not pressing charges.

55.     The officers also had no reasonable belief that Ms. Wheeler was a danger to herself or others.  Ms. Wheeler had no history of physical violence towards others, and nothing about her interactions with the student in Hurst Hall or with Professor Knee indicated that she was currently a danger to herself or others.  The AUPD Officers never inquired about Ms. Wheeler's mental health, assessed her mental health, or gave any indication that they entered her apartment for any other reason than to arrest her or seek her hospitalization in a psychiatric institution.  For their part, the MPD Officers failed to inquire about Ms. Wheeler's mental health until nearly an hour after they arrived.

56.     None of the MPD officers who interacted with Ms. Wheeler were adequately trained in how to respond to individuals with mental health disabilities.

57.     None of the AUPD officers who interacted with Ms. Wheeler were adequately trained in how to respond to individuals with mental health disabilities.

58.     Although the Officers suddenly entering her home alarmed and frightened Ms. Wheeler, she remained seated on the bed, kept calm and collected, and did not stand up to confront the police.  This is reflected clearly in the video from the body-worn cameras of the MPD Officers.

**Filed Under Seal**

59.     Ms. Wheeler's anxiety and fear was exacerbated when AUPD Officers, shortly after coming in, accused Ms. Wheeler of having assaulted an individual on campus earlier that day. Ms. Wheeler denied assaulting anyone and asked what the AUPD Officers were talking about. Defendant Barrett then called Defendant Brown to confirm AU's story about the assault.

60.     Despite her firm denial of the assault accusations and her insistence that she did not need emergency psychiatric treatment, the AUPD Officers told Ms. Wheeler that she had to go to an in-patient psychiatric facility.  Ms. Wheeler refused adamantly but was not in any way threatening or aggressive toward the officers.  Instead, Ms. Wheeler offered to leave the Frequency Apartments and stay with friends who could look after her elsewhere in the city.  AUPD and MPD Officers refused and would not allow her to leave.

61.     Even assuming the AUPD and MPD Officers had any reasonable belief that Ms. Wheeler was a danger to herself or others before interacting with her, they could not have continued to reasonably hold that belief after observing Ms. Wheeler.  Indeed, Officer Smith explicitly asked Ms. Wheeler if she had "any intention of harming" herself or others, and Ms. Wheeler responded "No" to both questions.  Officer Smith reported this to Sergeant Davis and Officer Kinzer, and said that Ms. Wheeler seemed "of sound mind to say that."  At several points throughout the night, the MPD Officers agreed that AU's justification for involuntarily hospitalizing Ms. Wheeler was inadequate.

62.     Throughout the encounter, Ms. Wheeler repeatedly asked the police to leave her home, and they consistently refused.  Ms. Wheeler also attempted to resume her schoolwork with officers present, but they told her to stop and put her laptop away.

**Filed Under Seal**

63.     During their time in Ms. Wheeler's apartment, the AUPD Officers had multiple phone calls with Defendant Brown.  At some point, Brown told Ms. Wheeler over speakerphone about the fact of her interim suspension.

64.     Ms. Wheeler steadfastly refused to hospitalize herself at an in-patient psychiatric facility over the hours that followed.  However, for the three hours from approximately 7:00 PM to 10:00 PM, most of the Officers did not leave.  Instead, the AUPD Officers persistently pressured Ms. Wheeler into surrendering her rights by agreeing to hospitalize herself at a psychiatric institution, and for most of the evening, MPD Officers stood by in support of the AUPD Officers.

65.     At 7:29 PM, Ms. Wheeler began texting her friends to tell them what was happening and ask them to come to her room.  Officer Kinzer stopped Ms. Wheeler's friends from entering her room, thus keeping Ms. Wheeler isolated and alone with the AUPD officers.  One of Ms. Wheeler's friends offered her a place to stay elsewhere in the city, but officers did not allow Ms. Wheeler to accept the offer.

66.     At 8:37 PM, Ms. Wheeler sent a text to another friend, stating **"they are forcing me to go to the hospital without my consent."**  At the same time, Ms. Wheeler sent her friend another short video clip that Ms. Wheeler had recorded from her cell phone.  The video shows AU Director of Residence Life, Lisa Freeman, who had joined the police in Ms. Wheeler's residence.

67.     On information and belief, Freeman has no training or expertise in dealing with individuals with mental health disabilities.  Nonetheless, Freeman tried to persuade Ms. Wheeler to hospitalize herself at a psychiatric institution.  In the video, she can be heard saying that Ms. Wheeler had **"no choice."**  Freeman was present in the immediate vicinity of Ms. Wheeler's room until officers took Ms. Wheeler from the building.

**Filed Under Seal**

68.     Shortly before 9:00 PM, the pressure of the situation began to overwhelm Ms.

Wheeler.  Feeling like she had exhausted polite options, her demands that the officers leave became

louder and more panicked.  In an act of desperation to prevent police from transporting her to an

in-patient psychiatric facility against her will, she disrobed. At 8:57 PM, Captain Barrett told

Officer Kinzer, who had just returned to the Frequency Apartments, about this development.

Captain Barrett announced his plan to wrap Ms. Wheeler in a blanket and forcibly remove her

from her home.

69.     Officer Kinzer, recognizing the brutality of Captain Barrett's plan, confided in

Officer Smith, **"**they were gonna take her out in a towel.  We can't do that.  Right?  (Right.)  I've

never done that.  Have you?  (No.).**"**  But rather than put a stop to Defendant Barrett's plan, Kinzer

further prolonged the traumatic incident by calling EMTs in hopes that they would take Ms.

Wheeler to a hospital strapped to a **"**board.**"**

70.     EMTs arrived at 9:24 PM and evaluated Ms. Wheeler at 9:56 PM.  Ms. Wheeler

was given the opportunity to refuse this evaluation, but she cooperated voluntarily with the EMTs.

The two EMTs on the scene completed reports of their evaluations of Ms. Wheeler.  In the first

report, the EMT stated that he **"**arrived at the scene to find a young lady sitting on the bed,**"** and

that Ms. Wheeler mentioned that **"**she was writing a paper for tomorrow.**"**  The EMT concluded,

**"**After evaluation . . . the patient is alert and oriented.**"**  The report also specifically noted that Ms.

Wheeler's **"**mental status**"** and **"**neurological**"** status were both **"**normal baseline for patient,**"** and

that her pulse rate was 64 bpm.

71.     The second report, written at the same time by the other EMT, confirmed the

conclusions described above.  The narrative of that report further explained that the EMTs **"**arrived

on the scene to find 21yrs old female sitting on the bed**"** and that **"**[p]atient stated she was doing

**Filed Under Seal**

her homework when campus police and MPD arrived . . . Patient stated police want to take her to the hospital.**"**

72.     Although Defendant Barrett and the other officers had no reasonable belief that Ms. Wheeler was a danger to herself or others, Defendant Barrett attempted to convince the EMTs to take Ms. Wheeler to a psychiatric hospital.  On information and belief, the EMTs at the scene communicated their findings in substance to the AUPD and MPD Officers. The EMTs refused to transport Ms. Wheeler.

73.     Having determined that Ms. Wheeler was not in need of medical care, the EMTs left the scene.  The AUPD and MPD Officers, however, did not.  They continued to insist that Ms. Wheeler go with them to the hospital, and they prevented her from leaving to stay with friends elsewhere.

74.     At all times, the MPD Officers knew that AU's basis for forcibly seeking Ms. Wheeler's hospitalization was nonexistent.  At one point, Sergeant Davis asked Officer Kinzer, apparently because of his CIT training, if the criteria for an FD(12) had been met.  Kinzer responded **"**No, I don't see it. Myself, I don't see it. just cause she's screamin'?  No.**"** Sergeant Davis and Officer Kinzer voiced their objections to the subordinate AUPD Officers.  For example, Officer Kinzer explained to an AUPD officer, **"**I think we need more before we can deny her her freedom.**"**  Sergeant Davis, who was standing nearby, agreed. Later, Davis told a junior AUPD officer, **"**A lot of times they tend to overuse the FD(12),**"** and warned, **"**tak[ing] her involuntarily from her apartment, which could lead to a fight, which is then a use of force, **…** is not going to look good. **…** you just can't drag people out of their room.**"**

75.     In response to these objections, the subordinate AUPD officers also agreed.  One stated, **"**I completely agree with you, but the captain's the one pushing it, so . . . .**"**  He then asked,

Filed Under Seal

"Hey, have you guys expressed that concern to [Captain Barrett] yet?" Later, he suggested, "you might be able to make [Captain Barrett] see reason if you go talk to him."

76.     Despite understanding that Ms. Wheeler did not meet the criteria for an involuntary hospitalization, none of the MPD Officers, including Officer Kinzer, intervened to prevent Captain Barrett from, in Officer Kinzer's words, "wrap[ping] her in a blanket and drag[ging] her out."

77.     After the EMTs left, AUPD Officers called Defendant Brown for further instructions. At approximately 10:00 PM, the AUPD Officers ended their call with Brown and closed Ms. Wheeler's door. Next, a total of five officers, from both AUPD and MPD, tackled Ms. Wheeler, while she was naked, from her bed to the floor, and handcuffed her. MPD Officer Smith called for Ms. Wheeler to be handcuffed, shouted instructions on how to subdue her, and held her feet to prevent her from standing. AUPD Officers then bundled Ms. Wheeler into a blanket, and at least four officers (three from AUPD and at least one from MPD) carried Ms. Wheeler to the elevator.

78.     Meanwhile, Officer Kinzer ushered Ms. Wheeler's friends away from her apartment door. He kept them contained in the hallway opposite the elevator, and warned them not to intervene, thus making it easier for the other officers to carry Ms. Wheeler out of the building.

79.     On a video of the incident, Ms. Wheeler, clearly distraught, can be seen struggling in the air, flailing, and yelling. Officers carried Ms. Wheeler out of her apartment complex in full view of her peers and neighbors, and multiple highly embarrassing videos of the incident were taken and published online. Some were broadcasted by media outlets. Even today, Ms. Wheeler is approached by people she does not know who remember her name or recognize her as the student in those videos.

80.     Upon carrying Ms. Wheeler out of the Frequency Apartments, AUPD Officers forced her into an AUPD vehicle.

81.     Once Ms. Wheeler was locked in AUPD's police car, Defendant Barrett thanked Officer Kinzer for his assistance and took his business card. On information and belief, Defendant Barrett intended to invite Officer Kinzer to train AUPD officers on crisis intervention.

82.     At approximately 10:15 PM, AUPD transported Ms. Wheeler to Washington Hospital Center.

**D.     Forced Hospitalization at an In-Patient Psychiatric Facility**

83.     At Washington Hospital Center, Ms. Wheeler was bound in a "four-point" restraint that completely immobilized her body.  Ms. Wheeler was barely able to move her arms or legs; she could not so much as scratch her own nose.

84.     While so restrained, Ms. Wheeler could only watch, helpless and afraid, as she was injected with a powerful cocktail of drugs including Geodon (known generically as Ziprasidone) and Ativan (known generically as Lorazepam).

85.     Ms. Wheeler was forced to remain at Washington Hospital Center for six days, and was not released until October 2, 2019.  She was not able to secure her release until she was appointed a public defender, who advocated on her behalf.

**E.     AU's Discriminatory Post-Incident Response**

86.     Following Ms. Wheeler's release from Washington Hospital Center, AU continued to enforce its interim suspension against Ms. Wheeler by barring her from the AU campus until a disciplinary hearing was held on October 28, 2019.  During this time, Ms. Wheeler was not allowed to participate in her classes or on-campus events, either in person or remotely.

87.     On October 28, 2019, AU held a disciplinary hearing against Ms. Wheeler concerning the events at Hurst Hall on September 26, 2019.  AU does not permit students counsel

Filed Under Seal

at disciplinary hearings, and AU specifically denied Ms. Wheeler's request to be represented by counsel, or even to have her attorneys present in the same room.  In addition, the setting for the hearing was atypical and especially intimidating and isolating; it conformed with biases that Black women and people with mental health disabilities are threatening or dangerous. When students and community members showed up to support Ms. Wheeler at the hearing, AU abruptly changed the location of the hearing. AU had an escort waiting at the original location to shuttle Ms. Wheeler across campus to an entirely different building that is not typically used for student disciplinary hearings.  At this new building, security officers guarded the doors to the hearing room and the hallway outside it, and AU had covered every window—even the small windows of interior doors—with black paper, which obscured any view, either inside or outside.

88.     At the hearing, it became abundantly clear that Ms. Wheeler had done absolutely nothing wrong.  The student who reported the incident did not testify or even attend the hearing. Ms. Wheeler was ultimately adjudicated "not responsible" for *all* of the Student Conduct Code violations alleged against her.  As compared to a finding of "not guilty" in a criminal proceeding, it is significantly more difficult for a student to obtain a finding of "not responsible" in an AU hearing because the standard of proof is much lower.

89.     Even so—and notwithstanding Ms. Wheeler's success in entirely clearing her name—at the end of the hearing, Ms. Wheeler was *again* instructed to leave campus and remain off-campus until she received a formal letter confirming that her suspension had been lifted.

90.     Upon information and belief, when suspending non-disabled students, Defendants AU and Brown do not enforce interim suspensions in the same manner in which the interim suspension was enforced against Ms. Wheeler. For example, Defendants do not bar non-disabled students from campus until hearings are convened or further condition their return upon

**Filed Under Seal**

psychological evaluations by AU-selected psychologists and the sharing of private medical information with AU and its administrators.

## VI   LACK OF TRAINING AND OVERSIGHT OF MPD AND AUPD CONTRIBUTED TO THE UNLAWFUL ACTIONS AGAINST MS. WHEELER

91.     MPD and AUPD officers lack the necessary training to appropriately respond to incidents involving persons with mental illnesses.

92.     Washington, DC has more police per capita than any other US city.  Washington's Metropolitan Police Department reports that it employs 3,982 sworn officers and another 430 full-time civilians to police the city of about 630,000.[3]

93.     In addition to the MPD, another 7,500 individuals work in the District of Columbia as Special Police Officers ("SPOs").[4]  SPOs are private citizens who are typically engaged by private entities, either as contractors or employees.  They are given extraordinary powers ordinarily reserved for sworn police or the state itself, including the power to carry weapons on duty, make arrests, and use force or deadly force in their jurisdictions.

94.     Despite these broad powers, the District of Columbia engages in almost no oversight of SPOs.  Indeed, the MPD does not even keep a record of complaints against SPOs.[5]

---

[3] Mike Maciag, *Which Cities Have the Biggest Police Presence?*, Governing Magazine (May 9, 2014),      https://www.governing.com/topics/public-justice-safety/gov-cities-with-the-greatest-police-presence-most-officers-per-capita.html.

[4] Jodie Fleischer et al., *DC Residents Say MPD Ignored Complaints Against Special Police Officer*, NBC Washington (Apr. 1, 2019), https://www.nbcwashington.com/news/local/dc-residents-say-mpd-ignored-complaints-against-special-police-officer/138304/.

[5] Natalie Delgadillo, *MPD Doesn't Keep Records Of Complaints Against The City's 7,500 Special Police Officers*, DCist (June 4, 2019), https://dcist.com/story/19/06/04/mpd-doesnt-keep-records-of-complaints-against-the-citys-7500-special-police-officers/; Jodie Fleischer et al., *New Legislation Would Increase Scrutiny of Special Police After I-Team Exposes MPD Failure to Investigate, Keep Records*, NBC Washington (June 4, 2019), https://www.nbcwashington.com/news/local/new-legislation-would-increase-scrutiny-of-special-police-after-i-team-exposes-mpd-failure-to-investigate-keep-records/148841/.

**Filed Under Seal**

95.     In addition, SPOs lack even the modest training—including on mental health issues—that MPD officers receive.  SPOs are required to undergo just 40 hours of training before they are empowered to make arrests and use lethal force.

96.     Training and oversight of SPOs is typically left to their employers, or to the private security companies that engage or hire them.  Employers lack political incentives to respond appropriately to complaints of SPO brutality and excessive use of force, allowing SPO misconduct to continue unchecked.[6]

97.     By law, campus SPOs have limited jurisdiction.  They are **"**strictly confined in their authority to the particular place or property they are commissioned to protect.**"**[7]

98.     The MPD Officers who reported to Ms. Wheeler's apartment building on September 26, 2019, ultimately deferred to the decisions of the AUPD despite knowing, and explicitly stating, that AUPD's actions were inappropriate and unlawful; despite the fact that AUPD is not subject to the same oversight or training as MPD Officers; and notwithstanding that AUPD acted outside of its lawful jurisdiction while at the Frequency Apartments.

99.     The unlawful entry into Ms. Wheeler's home, as well as her unlawful detention, seizure, and arrest by Defendants, occurred because it was carried out by insufficiently trained and largely unaccountable special police, under orders from their employer, against a Black woman with disabilities.

100.    People diagnosed with mental health disabilities, like Ms. Wheeler, are at greater risk during police encounters because they are incorrectly stigmatized as dangerous even when their illnesses pose no threat of violence to themselves or others.  Police typically lack necessary

---

[6] *See, e.g.*, Fleischer, *supra* note 4; Fleischer, *supra* note 5.

[7] D.C. Mun. Regs. tit. 6-A, § 1200.2.

**Filed Under Seal**

training in how to interact with this vulnerable population, and statements made by those diagnosed with mental illnesses are less likely to be believed and credited.

101.    AU has a history of failing to appreciate and respond appropriately to the needs of students with mental illness, developing policies and taking action based on inaccurate stereotypes of persons with mental illness, and directing students with mental illness to seek their educations elsewhere.

102.    Upon information and belief, when responding to non-disabled individuals for conduct similar to that which was alleged against Ms. Wheeler, Defendants AU and Brown do not deploy AUPD or MPD officers to undertake involuntary hospitalizations.

<u>COUNT I:  VIOLATION OF TITLE III</u>
<u>OF THE AMERICANS WITH DISABILITIES ACT - 42 U.S.C. § 12101 ET SEQ.</u>
**Against AU**

103.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

104.    At all times relevant to this action, Ms. Wheeler was and is a student at AU who has a disability (major depressive disorder and anxiety), and thus was and is a qualified individual with a disability within the meaning of the ADA.  42 U.S.C. § 12102.

105.    As an admitted student approved for on-campus and AU-managed housing, Ms. Wheeler was and is qualified to participate in AU's services, programs, and activities. 28 C.F.R. § 36.202(d).

106.    Ms. Wheeler has a record of her disability and Defendants knew that Ms. Wheeler had a disability.  42 U.S.C. § 12102(B), (C).

107.    Ms. Wheeler's disability substantially limits the major life activities of learning, concentrating, and thinking. 42 U.S.C. § 12102(2)(A).

**Filed Under Seal**

108.    Because her disability substantially limits these major life activities, Ms. Wheeler is afforded protection by the ADA. 42 U.S.C. § 12102(1)(A).

109.    At all times relevant to this action, AU, as an undergraduate and postgraduate educational institution, has been and is a "place of public accommodation" within the meaning of Title III of the ADA. 42 U.S.C. § 12181(7)(J).

110.    Title III of the ADA prohibits public accommodations from affording an unequal opportunity to an individual, on the basis of a disability, to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the entity or otherwise discriminating against them on the basis of disability.  42 U.S.C. § 12182(b)(1)(A)(i)-(ii); 28 C.F.R. § 36.202(a)-(b).

111.    Title III further provides that an individual or entity shall not utilize standards or criteria of methods of administration that screen out, tend to screen out, or have the effect of discriminating on the basis of disability such that persons with disabilities cannot fully and equally enjoy any goods, services, facilities, privileges, advantages, or accommodations.  42 U.S.C § 12182(b)(1)(D(i) and § 12182(b)(2)(A)(i); 28 C.F.R. §§ 36.204, 36.301(a).

112.    Title III further states that a public accommodation may impose legitimate safety requirements that are necessary for safe operation but those safety requirements must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities. 28 C.F.R. § 36.301(b).

113.    Title III defines discrimination to include the failure of a public accommodation to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities.  42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302(a).

Filed Under Seal

114.    AU's decision to place Ms. Wheeler on interim suspension and enforce that suspension as described herein, deploy untrained or inadequately trained AUPD Officers to her home, remove her from her off-campus apartment against her will, and forcibly seek her admission to an in-patient psychiatric facility, without conducting any individualized assessment whatsoever and despite knowing that she did not meet the criteria for involuntary hospitalization, was on the basis of her disability.  The method by which AU deployed AUPD deprived Ms. Wheeler of the rights, privileges, advantages, and opportunities enjoyed by other students, was not based on actual risks, and was instead based on mere speculation, stereotypes, or generalizations about individuals with disabilities and thus had the effect of discriminating against Ms. Wheeler. These actions violate Title III of the ADA.  42 U.S.C. § 12182(b)(1)(A); 28 C.F.R. §§ 36.203(a), 36.203(b).

115.    AU's exclusion of Ms. Wheeler from campus and conditioning of Ms. Wheeler's ability to fully and equally enjoy her status as a student at AU on her willingness to obtain a psychological evaluation from a psychologist of AU's choosing and waive her right to medical privacy is a criteria or method of administration that has the effect of discriminating against Ms. Wheeler by tending to screen her out—and make it more onerous for her to regain access to— campus services, facilities, privileges, advantages, and accommodations, on the basis of her disability. The requirement to obtain a psychological evaluation from a psychologist of AU's choosing and waive her right to medical privacy was not based on actual risks, and was instead based on mere speculation, stereotypes, or generalizations about individuals with disabilities. AU's method of administering its disciplinary policy and procedure in this manner violates Title III of the ADA.   42 U.S.C. §§ 12182(b)(1)(D)(i), 12182(b)(2)(A)(i); 28 C.F.R. §§ 36.204, 36.301(a), 36.203(b).

**Filed Under Seal**

116.     On information and belief, AU does not adequately train AUPD Officers about how to interact with students experiencing mental health crises, nor do AU's policies address how the university or the AUPD should interact with, and treat, students with mental health disabilities. This has the effect of denying persons with mental health disabilities the rights, privileges, advantages, and opportunities enjoyed by other students.

117.     As a proximate result of AU's violations of the ADA, Ms. Wheeler has been injured as set forth herein.

118.     AU's conduct constitutes ongoing and continuous violations of the ADA, and unless restrained from doing so, AU will continue to violate the ADA and inflict injuries for which there is no adequate remedy at law.

<u>**COUNT II: VIOLATIONS OF SECTION 504**</u>
<u>**OF THE REHABILITATION ACT OF 1973 – 29 U.S.C. § 794 ET SEQ.**</u>
**Against AU**

119.     Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

120.     Section 504 of the Rehabilitation Act of 1973 (**"Section 504"**) provides that otherwise qualified individuals with disabilities shall not, solely by reason of their disabilities, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a).

121.     Regulations implementing Section 504 promulgated by the Department of Education (**"DOE regulations"**) provide that recipients of federal financial assistance, in providing any aid, benefit, or service, may not, on the basis of disability, discriminate against a qualified person with a disability by denying them an opportunity to participate in or benefit from that aid,

Filed Under Seal

benefit, or service.  Nor may such recipients of federal financial assistance provide an unequal, different, or separate benefit to such qualified persons.  34 C.F.R. § 104.4(b)(1).

122.    DOE regulations further prohibit recipients of federal financial assistance from utilizing criteria or methods of administration that have the effect of substantially impairing the accomplishment of the recipient's program or activity objectives with respect to qualified persons with disabilities, have an adverse effect on persons with disabilities, or have the purpose or effect of substantially impairing the accomplishment of the recipient's program or activity objectives with respect to qualified persons, and from excluding such qualified persons from participating in or benefitting from certain postsecondary education aid, benefits, or services.  34 C.F.R. § 104.43(a); 34 C.F.R. § 104.4(b)(4).

123.    DOE regulations provide that no qualified student with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subject to discrimination under any academic, research, housing, health insurance, counseling, financial aid, athletics, recreation, other extracurricular, or other postsecondary education aid, benefits, or services.  34 C.F.R. §§ 104.43(a), 104.43(c), 104.52(a)(1).  Covered entities must operate their programs or activities in the most appropriate integrated settings.  34 C.F.R. § 104.43(d).

124.    At all times relevant to this action, Ms. Wheeler was and is a student at AU who has a disability (major depressive disorder and anxiety), and thus was and is a qualified individual with a disability within the meaning of Section 504.  29 U.S.C. §§ 794(a); 705(20); 42 U.S.C. § 12102.

**Filed Under Seal**

125.     Additionally, as an admitted student approved for on-campus and AU-managed housing, Ms. Wheeler was and is qualified to participate in AU's services, programs, and activities. 34 C.F.R. § 104.3(l)(3).

126.     Ms. Wheeler has a record of her disability and Defendants knew that Ms. Wheeler had a disability.

127.     Ms. Wheeler's disability substantially limits the major life activities of learning, concentrating, and thinking.

128.     Because her disability substantially limits these major life activities, Ms. Wheeler is afforded protection by Section 504.  29 U.S.C. § 705(20).

129.     As an educational institution which permits and has at all times relevant to this action permitted students to pay education-related costs with the assistance of federal grants and loans, and on information and belief receives federal funding for research and other activities, AU's operations are qualified programs or activities within the meaning of Section 504.  29 U.S.C. § 794(b)(2)(A); 34 C.F.R. §§ 104.3(k)(2)(i), 104.3(h), 104.41.

130.     On information and belief, AU's decision to place Ms. Wheeler on interim suspension and enforce that suspension as described herein, deploy the untrained or inadequately trained AUPD Officers to her home, remove her from her off-campus apartment against her will, and forcibly seek her admission to an in-patient psychiatric facility, without any individualized assessment and despite knowing that Ms. Wheeler did not meet the criteria for involuntary hospitalization, was solely because of her disability.  This deprived Ms. Wheeler of the rights, privileges, advantages, and opportunities enjoyed by other students.

131.     AU's exclusion of Ms. Wheeler from campus and conditioning of Ms. Wheeler's ability to fully and equally enjoy her status as a student at AU on her willingness to obtain a

Filed Under Seal

psychological evaluation from a psychologist of AU's choosing and waive her right to medical privacy is a criteria or method of administration that has the effect of substantially impairing Ms. Wheeler's accomplishment of her academic program objectives and is in violation of Section 504.

132.   Accordingly, AU violated Section 504 by denying Ms. Wheeler the benefits of its programs, services, and activities solely on the basis of her disability.

133.   AU's use of policies and practices that utilize criteria and methods of administration that have the effect of discriminating against students with disabilities, including Ms. Wheeler, by making it more onerous for them to access AU's goods, services, facilities, privileges, advantages, and accommodations violates Section 504.

134.   As a proximate result of AU's violations of Section 504, Ms. Wheeler has been injured as set forth herein.

135.   AU's conduct constitutes ongoing and continuous violations of Section 504, and unless restrained from doing so, AU will continue to violate Section 504 and inflict injuries for which there is no adequate remedy at law.

## COUNT III:  VIOLATIONS OF
## D.C. HUMAN RIGHTS ACT – D.C. CODE § 2-1401.01 ET SEQ.
### Against AU

136.   Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

137.   The D.C. Human Rights Act ("DCHRA") provides that an educational institution shall not deny, restrict, abridge, or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially for a discriminatory reason, based on the disability of any individual.  D.C. Code § 2-1401.41.

Filed Under Seal

138.    At all times relevant to this action, AU, as a college or university, is an educational institution within the meaning of the DCHRA. D.C. Code § 2-1401.02(8).

139.    At all times relevant to this action, Ms. Wheeler was and is a student at AU who has a disability and has a record of such disability, and thus she was and is an individual with a disability under the DCHRA.  D.C. Code § 2-1401.02(5A).

140.    As a student of AU who was approved for on-campus and campus-managed housing, Ms. Wheeler was qualified to have use of or access to AU's facilities, services, programs, and the benefits of AU's programs or activities.

141.    On information and belief, AU's decision to place Ms. Wheeler on interim suspension and enforce that suspension as described herein, deploy the AUPD Officers to her home, remove her from her off-campus apartment against her will, and forcibly seek her admission to an in-patient psychiatric facility was based on her disability.  This denied, restricted, abridged, or conditioned Ms. Wheeler's use and access to AU's facilities, services, programs, and the benefits of such programs or activities.

142.    By requiring Ms. Wheeler to obtain a psychological evaluation from an AU-selected psychologist and waive her right to medical privacy, AU denied, restricted, abridged, or conditioned Ms. Wheeler's use and access to, AU's facilities, services, programs, and the benefits of such programs or activities.

143.    As a proximate result of AU's violations of the DCHRA, Ms. Wheeler has been injured as set forth herein.

144.    AU's conduct constitutes ongoing and continuous violations of the DCHRA, and unless restrained from doing so, AU will continue to violate the DCHRA and inflict injuries for which there is no adequate remedy at law.

**Filed Under Seal**

## COUNT IV:  VIOLATION OF THE FOURTH AMENDMENT – UNLAWFUL ENTRY
### Against All Defendants

145.   Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

146.   Plaintiff asserts this count under 42 U.S.C. § 1983 against all Defendants.

147.   AUPD Officers Barrett, Vena, Joyner, and Gomez were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law within the meaning of Section 1983 because they are commissioned by the D.C. government to exercise police powers.

148.   MPD Officers Kinzer, Smith, and Davis were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law.

149.   Defendant AU and Defendant Brown were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law within the meaning of Section 1983 because they directed, and had the authority to direct, persons acting under color of state law.

150.   AU is a person within the meaning of Section 1983, *see Monell v. Department of Social Services,* 436 U.S. 658 (1978), and Defendant Brown had the authority to make policy, and made policy, on behalf of AU when he directed Defendant Officers to enter Ms. Wheeler's apartment.

151.   On September 26, 2019, the AUPD and MPD Officers entered Ms. Wheeler's home at the Frequency apartments under color of law, without a warrant, without her consent, and without a reasonable belief that she was a danger to herself or others.

152.   At no time did Ms. Wheeler consent to the entry of the AUPD and MPD Officers into her apartment.  Instead, she repeatedly asked the AUPD and MPD Officers to leave.

Filed Under Seal

153.    Before officers entered Ms. Wheeler's apartment, there were no signs outside the apartment of any danger or emergency within.

154.    On information and belief, the Officers effected this entry in order to, among other things, take custody of Ms. Wheeler and transport her—involuntarily, if necessary—to an in-patient psychiatric facility.  The Officers undertook this action under instructions from AU and Brown, even though no Defendant reasonably believed that Ms. Wheeler was a danger to herself or others.

155.    The MPD Officers accompanied the AUPD Officers at the request of the AUPD Officers or of AU and Brown.  The MPD Officers participated in, or failed to intervene in, AUPD's unlawful entry into Ms. Wheeler's apartment, in contravention of the Fourth Amendment.

156.    Defendants' conduct occurred under color of law and constituted callous indifference to and reckless disregard of Ms. Wheeler's rights under the Fourth Amendment.

## COUNT V:  VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE SEIZURE
### Against All Defendants

157.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

158.    Plaintiff asserts this count under 42 U.S.C. § 1983 against all Defendants.

159.    AUPD Officers Barrett, Vena, Joyner, and Gomez were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law within the meaning of Section 1983 because they are commissioned by the D.C. government to exercise police powers.

160.    MPD Officers Kinzer, Smith, and Davis were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law.

161.    Defendant AU and Defendant Brown were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law within the meaning of

Filed Under Seal

Section 1983 because they directed, and had the authority to direct, persons acting under color of state law.

162.    AU is a person within the meaning of Section 1983, *see Monell v. Department of Social Services*, 436 U.S. 658 (1978), because Defendant Brown had the authority to make policy, and made policy, on behalf of AU when he directed Defendant Officers to seize Ms. Wheeler.

163.    When the AUPD and MPD Officers decided to remain in Ms. Wheeler's room on September 26, 2019 and restrict Ms. Wheeler to that room, they effectively seized Ms. Wheeler under color of law.

164.    The officers repeatedly told Ms. Wheeler she could not leave her 330 square foot apartment, ejected her friends, and physically blocked Ms. Wheeler from accessing the only door to the apartment.  They also limited Ms. Wheeler's activity while confined to her room by telling her, among other things, that she could not use her laptop to do her schoolwork.  On information and belief, the majority of the officers wore uniforms and carried weapons.

165.    The MPD Officers actively supported the AUPD Officers.  MPD Officers Smith and Davis remained in the room with AUPD Officers for periods of time, while Officer Kinzer stood guard in the hallway, stopping Ms. Wheeler's friends from seeing her.  Despite communicating their belief throughout the evening that involuntarily hospitalizing Ms. Wheeler would be unlawful, at no time during the seizure of Ms. Wheeler did any MPD Officer intervene to prevent Ms. Wheeler's constitutional rights from being violated.

166.    The seizure occurred under instructions from and with the full knowledge of AU and Brown, as evidenced by multiple phone calls made by the AUPD Officers to Brown during the seizure, and the presence of AU Director of Residence Life, Lisa Freeman, in her official capacity, who told Ms. Wheeler that she had "no choice" but to further surrender her rights.

**Filed Under Seal**

167.    The Officers did not seize Ms. Wheeler for the purpose of any investigation, ask investigative questions, or use the seizure of Ms. Wheeler to pursue further investigation.

168.    At no time did the AUPD and MPD Officers have a warrant or probable cause to arrest or detain Ms. Wheeler, nor did they have a reasonable belief that Ms. Wheeler was a danger to herself or others.

169.    Additionally, the AUPD and MPD Officers did not have reasonable suspicion to support any seizure of Ms. Wheeler for purposes of a further investigation—particularly for the protracted length of time for which Ms. Wheeler was seized.

170.    There was no indication of any trouble, hazards, or illegal activity in Ms. Wheeler's room, and nothing observed by the officers while in Ms. Wheeler's room provided any basis to suspect that Ms. Wheeler had committed a crime, was otherwise dangerous to herself or others, or needed to be hospitalized at an in-patient psychiatric facility.

171.    Defendants' conduct occurred under color of law and constituted callous indifference to and reckless disregard of Ms. Wheeler's rights under the Fourth Amendment.

## COUNT VI:  VIOLATION OF THE FOURTH AMENDMENT – FALSE ARREST
### Against All Defendants

172.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

173.    Plaintiff asserts this count under 42 U.S.C. § 1983 against all Defendants.

174.    AUPD Officers Barrett, Vena, Joyner, and Gomez were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law within the meaning of Section 1983 because they are commissioned by the D.C. government to exercise police powers.

175.    MPD Officers Kinzer, Smith, and Davis were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law.

**Filed Under Seal**

176.    Defendant AU and Defendant Brown were, at all times relevant to the actions alleged herein, state actors and persons acting under color of state law within the meaning of Section 1983 because they directed, and had the authority to direct, persons acting under color of state law.

177.    AU is a person within the meaning of Section 1983, *see Monell v. Department of Social Services,* 436 U.S. 658 (1978), and Defendant Brown had the authority to make policy, and made policy, on behalf of AU when he directed Defendant Officers to enter Ms. Wheeler's apartment to arrest Ms. Wheeler.

178.    AUPD and MPD Officers, acting under color of law, arrested Ms. Wheeler without a warrant or probable cause.  Specifically, the AUPD and MPD Officers forcibly took custody of Ms. Wheeler and transported her to an in-patient psychiatric facility to seek her involuntary hospitalization, even though they did not reasonably believe that Ms. Wheeler posed a danger to herself or others.  In so doing, the officers tackled Ms. Wheeler off of her bed, placed her into handcuffs while naked, and carried her through the halls of her apartment building in front of her friends, neighbors, and fellow students.

179.    The AUPD and MPD Officers took these actions under direction from Defendant Brown, who also did not reasonably believe that Ms. Wheeler was a danger to herself or others.

180.    By calling Defendant Brown—who had not personally observed Ms. Wheeler at all on September 26, 2019—to ask what to do before taking physical custody of Ms. Wheeler, AUPD and MPD Officers abdicated their independent judgment, did not act upon their independent determination of probable cause, and did not properly take into account what they had observed at Ms. Wheeler's apartment to decide whether to take physical custody of Ms. Wheeler.

181.    While the AUPD and MPD Officers Davis and Smith forcibly removed Ms. Wheeler from her apartment, MPD Officer Kinzer remained in the hallway where he could monitor Ms. Wheeler's friends.  Despite having raised concerns about the legality of forcibly hospitalizing Ms. Wheeler throughout the evening, Officer Kinzer never communicated those concerns to Captain Barrett, whom Officer Kinzer knew had ultimate decision-making authority, and declined to intervene as the other Officers violated her constitutional rights.

182.    Defendants' conduct occurred under color of law and constituted callous indifference to and reckless disregard of Ms. Wheeler's rights under the Fourth Amendment.

## COUNT VII:  FALSE IMPRISONMENT – DISTRICT OF COLUMBIA COMMON LAW
### Against All Defendants

183.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

184.    Plaintiff asserts this count under District of Columbia common law against all Defendants.

185.    AUPD and MPD Officers falsely imprisoned Ms. Wheeler by restricting her movement to her 330 square foot apartment for approximately three hours against her will, with no valid basis or warrant.

186.    AUPD and MPD Officers further falsely imprisoned Ms. Wheeler by forcibly restraining her in handcuffs and carrying her out of her apartment against her will, with no valid basis or warrant.

187.    The lengthy imprisonment of Ms. Wheeler in her room, coupled with the forcible manner in which she was tackled, handcuffed while naked, and carried out of her apartment—all without any valid basis—was an outrageous and willful violation of law.

**Filed Under Seal**

188.    At all relevant times, the AUPD Officers were employees of AU acting within the scope of their employment.

189.    At all relevant times, AUPD Officers acted on instructions from Defendants AU and Brown and subject to the influence and persuasion of AU and Brown.

190.    By calling Brown multiple times during the three-hour imprisonment of Ms. Wheeler and by asking for Brown's instructions before further imprisoning Ms. Wheeler in handcuffs and carrying her out of her apartment, the AUPD Officers abdicated the decision to imprison Ms. Wheeler to AU and Brown.

191.    At all relevant times, MPD Officers deferred to and supported the AUPD Officers. Accordingly, they also acted on the instructions, influence, and persuasion of AU and Brown and abdicated the decision to imprison Ms. Wheeler to AU and Brown.

192.    The instructions, influence, and persuasion of AU and Brown proximately caused the AUPD and MPD Officers' conduct and Ms. Wheeler's false imprisonment.

193.    As a result of this false imprisonment, Ms. Wheeler suffered substantial harm including, but not limited to, mental and emotional distress.

194.    Defendants' conduct was willful and outrageous.

195.    At all times, Defendants acted in concert and aided and abetted each other by encouraging Ms. Wheeler's confinement, and substantially assisted one another to keep Ms. Wheeler in her room.

**COUNT VIII:  ASSAULT – DISTRICT OF COLUMBIA COMMON LAW**
**Against All Defendants**

196.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

**Filed Under Seal**

197.    Plaintiff asserts this count under District of Columbia common law against all Defendants.

198.    The AUPD and MPD Officers intentionally attempted to and threatened to do physical harm to Ms. Wheeler when they closed the only door out of her apartment and approached her to tackle her off of her bed and handcuff her.

199.    The attempted and threatened use of force was not warranted during Ms. Wheeler's interactions with the officers.

200.    At all relevant times, the AUPD Officers were employees of AU acting within the scope of their employment.

201.    At all relevant times, the AUPD Officers acted on instructions from Defendants AU and Brown and subject to the influence and persuasion of AU and Brown.

202.    The instructions from, and influence and persuasion of, AU and Brown proximately caused the assault on Ms. Wheeler.

203.    As a result of this assault, Ms. Wheeler suffered substantial harm including, but not limited to, mental and emotional distress.

204.    Defendants' conduct was willful and outrageous.

205.    At all times, Defendants acted in concert and aided and abetted each other by encouraging the assault on Ms. Wheeler, and substantially assisted one another during the course of the assault.

### COUNT IX:  TRESPASS – DISTRICT OF COLUMBIA COMMON LAW
**Against All Defendants**

206.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

**Filed Under Seal**

207.    Plaintiff asserts this count under District of Columbia common law against all Defendants.

208.    The AUPD and MPD Officers purposefully intruded upon Ms. Wheeler's apartment by remaining in her apartment for approximately three hours for the sole purpose of coercing Ms. Wheeler to hospitalize herself at a psychiatric institution, all without her authorization as the only resident of her apartment.

209.    At all relevant times, the AUPD Officers were employees of AU acting within the scope of their employment.

210.    At all relevant times, the AUPD Officers acted on instructions from Defendants AU and Brown and subject to the influence and persuasion of AU and Brown.

211.    The instructions from, and influence and persuasion of, AU and Brown proximately caused the trespass upon Ms. Wheeler's home.

212.    As a result of this trespass, Ms. Wheeler suffered substantial harm including, but not limited to, mental and emotional distress.

213.    Defendants' conduct was willful and outrageous.

214.    At all times, Defendants acted in concert and aided and abetted each other by encouraging the trespass into Ms. Wheeler's apartment.

## RELIEF REQUESTED

215.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and grant the following:

216.    Declare that Defendant AU violated Plaintiff's rights under the ADA, Section 504 of the Rehabilitation Act, and the DCHRA, to be free from disability discrimination.

217.    Declare that all Defendants violated Plaintiff's rights under the Fourth Amendment to be free from unlawful entry, unlawful seizures, and unlawful arrests.

**Filed Under Seal**

218.    Declare that all Defendants violated Plaintiff's rights under District of Columbia law to be free from false imprisonment, assault, and trespass.

219.    Enjoin Defendant AU and its employees, agents, and any and all other persons acting on Defendant AU's behalf from further violations of the ADA, Section 504 of the Rehabilitation Act, the DCHRA, and the Fourth Amendment.

220.    Award such further injunctive relief as is sufficient to (i) restore Ms. Wheeler to her prior status absent AU's violations, including but not limited to removing any consequences of AU's violations to Ms. Wheeler's student and academic records, and (ii) ensure future compliance with the law by Defendant AU and its employees, agents, and any and all other persons acting on AU's behalf, including but not limited to any necessary changes to AU's existing policies and training.

221.    Award to Plaintiff her reasonable actual damages as compensation for injuries sustained as a result of (i) Defendant AU's violations of Section 504 of the Rehabilitation Act and the DCHRA, and (ii) all Defendants' violations of Plaintiff's rights under the Fourth Amendment and District of Columbia law.

222.    Award to Plaintiff reasonable damages to compensate for Plaintiff's pain and suffering sustained as a result of (i) Defendant AU's violations of Section 504 of the Rehabilitation Act and the DCHRA, and (ii) all Defendants' violations of Plaintiff's rights under the Fourth Amendment and District of Columbia law.

223.    Award to Plaintiff punitive damages for all Defendants' callous indifference to and reckless disregard of Plaintiff's rights under the Fourth Amendment, and all Defendants' willful and outrageous conduct under District of Columbia law.

224.    Award to Plaintiff her costs and reasonable attorneys' fees.

**Filed Under Seal**

225.    Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

226.    Plaintiff requests a trial by jury on any and all issues raised by this Complaint which are so triable as of right.


March 1, 2021                                        Respectfully submitted,


/s/ Kaitlin R. Banner
Kaitlin R. Banner (D.C. Bar No. 1000436)
Tristin Brown (D.C. Bar No. 1671642)
Dennis A. Corkery (D.C. Bar No. 1016991)
Margaret Hart (D.C. Bar No. 1030528)
WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street, N.W., Suite 400
Washington, DC 20005
Phone: (202) 319-1000
Fax: (203) 319-1010
kaitlin_banner@washlaw.org
tristin_brown@washlaw.org
dennis_corkery@washlaw.org
margaret_hart@washlaw.org

/s/ Debra R. Belott
Debra R. Belott (D.C. Bar No. 993507)
Ariel Volpe (D.C. Bar No. 888324780)[*]
Cortney Robinson (D.C. Bar No. 1656074)[*]
Eric Cheung Hall (D.C. Bar No. 1617715)[*]
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
Phone: (202) 879-3689
Fax: (202) 626-1700
dbelott@jonesday.com
avolpe@jonesday.com
crobinson@jonesday.com
echall@jonesday.com

Counsel for Plaintiff Gianna Wheeler

---

[*] D.D.C. Bar application pending.

**Filed Under Seal**