**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GIANNA WHEELER,

　　　　　*Plaintiff*,

　　v.                                                          Civil Action No. 1:20-cv-02735-CRC

AMERICAN UNIVERSITY, *et al.*,

　　　　　*Defendants*.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS RICHARD DAVIS, STEPHEN KINZER, AND DEBORAH SMITH'S MOTION FOR SUMMARY JUDGMENT**

On September 26, 2020, American University (AU) officials concluded that based on her conduct, Plaintiff Gianna Wheeler, who suffers from a major depressive disorder and anxiety, posed a danger to herself and others because of that illness.  As a result, they instituted a plan by which three of AU's special police officers (SPOs) would attempt to convince Plaintiff to voluntarily commit herself to a mental health facility for observation and diagnosis and, if that effort failed, they would take her involuntarily to a mental health facility.  Before commencing the plan, AU officials requested the assistance of the Metropolitan Police Department (MPD).

Three MPD officers including Sergeant Richard Davis, Officer Stephen Kinzer, and Officer Deborah Smith, (collectively MPD officers) were dispatched to the apartment building where Plaintiff resided and were met by the three SPOs.  Upon arrival, the MPD officers were informed that AU leased some of the apartments in the building and, in turn, subleased them to AU students as AU housing, including the studio apartment occupied by Plaintiff.  The AU officers also informed the MPD officers of Plaintiff's conduct which led to the AU officers'

conclusion that she posed a danger to herself or to others, including threatening conduct directed to strangers and a suicidal ideation.

The three AU SPOs and Officer Smith entered Plaintiff's room, but could not convince her to voluntarily go to a mental health facility.  Ultimately, the AU SPOs, Officer Smith, and Sgt. Davis forcibly removed Plaintiff from the room and placed her in an AU vehicle.  The AU SPOs then transferred Plaintiff to the psychiatric unit of Washington Hospital Center (WHC), where she was ultimately committed for six days.  This length of commitment, pursuant to District of Columbia law, required a finding by a psychologist or psychiatrist that Plaintiff suffered from a mental illness that caused her to be a danger to herself or others.  This finding, in turn, had to be approved by a judge of the Superior Court of the District of Columbia.

Plaintiff now brings suit against the three AU SPOs, other AU officials, AU itself, and the three MPD officers.  Despite the apparent findings of the mental health professionals at WHC and the approval of the judge that Plaintiff posed a danger to herself or to others, Plaintiff alleges that all of the defendants lacked probable cause to believe that she posed a danger to herself or to others.  Plaintiff brings a variety of constitutional and common law claims against the defendants, asserting that they unlawfully entered her room, falsely imprisoned her, and unlawfully assaulted and arrested her.

Fortunately for Sgt. Richard Davis, Officer Steven Kinzer, and Officer Deborah Smith, they were wearing Body Worn Cameras (BWCs).  The video captured by those cameras indisputably demonstrates that Officer Kinzer did not participate in the conduct that Plaintiff alleges amounted to a violation of her constitutional and common law rights.  Moreover, the video indisputably demonstrates that, based upon the representations made to them by the AU SPOs, upon which they could reasonably rely, Officers Kinzer and Smith, and Sgt. Davis, had

probable cause to believe that Plaintiff suffered from a mental illness that caused her to be a danger to herself or to others.  In the alternative, the video reveals that they acted reasonably pursuant to the community caretaking exception to the Fourth Amendment.  Consequently, Officers Kinzer and Smith and Sgt. Davis are entitled to summary judgment as to all claims against them.

## CASE BACKGROUND

### I.      **Statutory Framework**

To place the allegations of Plaintiff's Amended Complaint in context, the MPD officers provide a summary of the statutory scheme involving involuntary mental health commitments. A police officer may seize a mentally ill person for purposes of emergency observation and diagnosis under the following circumstances:

> An accredited officer or agent of the Department of Mental Health of the District of Columbia, or an officer authorized to make arrests in the District of Columbia, or a physician or qualified psychologist of the person in question, who has reason to believe that a person is mentally ill and, because of the illness, is likely to injure himself or others if he is not immediately detained may, without a warrant, take the person into custody, transport him to a public or private hospital, or to the Department, and make application for his admission thereto for purposes of emergency observation and diagnosis. The application shall reveal the circumstances under which the person was taken into custody and the reasons therefor.

D.C. Code § 21-521.

Once at the hospital, the person may be involuntarily admitted provided that a psychologist or psychiatrist certifies that he or she is:

> (2) of the opinion that the person has symptoms of a mental illness and, because of the mental illness, is likely to injure himself or others unless the person is immediately detained; and (3) is of the opinion that hospitalization is the least restrictive form of treatment available to prevent the person from injuring himself or others.

D.C. Code § 21-522.

The individual so hospitalized may not remain involuntarily committed for more than 48 hours unless the treating doctor files a written petition with the Court for continuing hospitalization not to exceed seven days and that petition is approved by the Court.  D.C. Code § § 21-523, 521-24.  An extension of involuntary commitment beyond seven days requires an evidentiary hearing in Superior Court.  D.C. Code § 21-526.

II.    **Allegations in Plaintiff's Amended Complaint**

Despite its 226 paragraphs spanning over 42 pages, Plaintiff's Amended Complaint can be succinctly distilled.  As to the MPD officers, Plaintiff alleges the following:  On September 26, 2019, AU officials instructed the AU Police Department to remove Plaintiff from her apartment and take her to a psychiatric facility.  Am. Compl. [29] ¶ 47.  The AU Police Department then contacted MPD to request that MPD officers "be present in case any actions took place within the jurisdiction of the MPD."  *Id*. ¶ 48.  As a result, three SPOs employed by AU, along with MPD Officer Stephen Kizner, Officer Deborah Smith, Sgt. Richard Davis arrived at the apartment building in which Plaintiff resided.  *Id*.

The AU SPOs then obtained the access key to Plaintiff's apartment from a front desk clerk.  *Id.* ¶ 48.  An AU SPO and MPD Officer Smith went up to Plaintiff's apartment, unlocked the door, and entered without Plaintiff's consent.  *Id.* ¶¶ 1, 52-54.  When they entered, Plaintiff was laying down on her bed, wearing only a t-shirt, studying with her laptop open, and talking to her aunt on the phone" and was "calm and collected."  *Id.* ¶ 53.  An SPO allegedly accused Plaintiff of assaulting a student and told her that she had to go to an impatient psychiatric facility. *Id.* ¶¶ 59-60.

During the next three hours, "the AU SPOs persistently pressured Ms. Wheeler into surrendering her rights by agreeing to hospitalize herself at a psychiatric institution, and for most of

the evening, MPD Officers stood by in support of the AUPD Officers." *Id.* ¶ 64.  Finally, after

spending over three hours trying to convince Plaintiff to leave voluntarily, Plaintiff claims:

> [A] total of five officers, from both AUPD and MPD, tackled Ms.
> Wheeler, while she was naked, from her bed to the floor, and
> handcuffed her. MPD Officer Smith called for Ms. Wheeler to be
> handcuffed, shouted instructions on how to subdue her, and held her
> feet to prevent her from standing. AUPD Officers then bundled Ms.
> Wheeler into a blanket, and at least four officers (three from AUPD
> and at least one from MPD) carried Ms. Wheeler to the elevator.

*Id.* ¶ 77.  Plaintiff was then taken out of the apartment building and forced by AU officers into a

vehicle and she was then transported to Washington Hospital Center where she remained for six

days. *Id.* ¶¶ 80, 82, 85

Based on these allegations, Plaintiff brings three Fourth Amendment claims against the

MPD officers:  (1) unlawful entry, by entering "Ms. Wheeler's home at the Frequency

apartments . . . without a warrant, without her consent, and without a reasonable belief that she

was a danger to herself or others."  *Id.* ¶ 151 (Count IV); (2) unreasonable seizure because

"When the AUPD and MPD Officers decided to remain in Ms. Wheeler's room on September

26, 2019 and restrict Ms. Wheeler to that room, they effectively seized Ms. Wheeler under color

of law." *Id.* ¶ 163 (Count V); and (3) false arrest because they "forcibly took custody of Ms.

Wheeler and transported her to an in-patient psychiatric facility to seek her involuntary

hospitalization, even though they did not reasonably believe that Ms. Wheeler posed a danger to

herself or others."  *Id.* ¶ 178 (Count VI).

Plaintiff also alleges that the MPD officers are liable for the common law torts of false

imprisonment (Count VII), assault (Count VIII), and trespass (Count IX).

## LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "[s]hall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of identifying evidence that demonstrates that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once a movant has made this initial showing, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). In other words, "once the movant has supported a summary judgment motion by evidence of particular events, the court may properly look to the nonmovant for rebuttal evidence either 'from persons familiar with the events,'" or require "the nonmovant to 'otherwise cast more than metaphysical doubt on the credibility of the testimony.'" *Doe v. Gates*, 981 F.2d 1316, 1323 (D.C. Cir. 1993) (quoting *Bias v. Advance Int'l, Inc.*, 905 F.2d 1558, 1561 (D.C. Cir. 1990)). A trial court should enter summary judgment against a nonmoving party who fails to make a showing sufficient to establish the existence of an element essential to his case, and on which the party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

A party may move "for summary judgment *at any time*" including at the beginning of a case before discovery has commenced. Fed. R. Civ. P. 56(c) (Emphasis added); *see also Parker v. Hoglander*, No. CV 15-926 (JDB), 2016 WL 3527014, at *3 (D.D.C. June 23, 2016).

6

## ARGUMENT

As a preliminary matter, the MPD officers base their Motion for Summary Judgment on the video captured by their Body Worn Cameras (BWC). Because the video clearly depicts the actions of the officers, the Court should reach the merits of the MPD officers' Motion based on its review of that video. *See Scott v. Harris*, 550 U.S. 372, 374-79 (2007). In *Scott,* a deputy sheriff alleged to have utilized excessive force in a Section 1983 case moved for summary judgment based on qualified immunity. The trial court, in denying the motion, found that there was a dispute as to the facts in that the plaintiff's version if believed could demonstrate excessive force. *Id*. at 376. The Supreme Court reversed the affirmance of the 11th Circuit and held that the deputy was entitled to qualified immunity. *Id.*

In reaching its decision, the Court noted that in the usual case where the litigants' version of the facts differs substantially, summary judgment is inappropriate. *Id*. at 378. Nevertheless, the Court found that there was an "added wrinkle" in *Scott*—namely, a video that fully captured the events in question. *Id.* The Court reviewed the video and found that it contradicted the plaintiff's version. The Court held that, based on what the video showed, no reasonable juror could believe the plaintiff's version of the facts, and therefore the appellate court "should have viewed the facts in the light depicted by the videotape," not in the light of the plaintiff's version of the facts. *Id.* at 380-81.

Here, the allegations in Plaintiff's Amended Complaint are contradicted by the video and audio captured by the BWCs. Thus, as in *Scott,* the issue of summary judgment should be viewed in consideration of the facts of the case as revealed by the video.

I.      **Officer Kinzer Did Not Commit the Acts Alleged in Plaintiff's Amended Complaint.**

      A.      **Plaintiff's Fourth Amendment Claims Against Officer Kinzer**

      Plaintiff alleges that Officer Kinzer, along with Officer Smith and Sgt. Davis, violated her Fourth Amendment rights in three ways:  (1) by entering her apartment without a warrant and without consent, (2) by preventing her from leaving the apartment, and (3) by forcibly taking her into custody.  Am. Compl. [29] (Counts IV, V and VI).  The allegations against Officer Kinzer, however, are belied by the video footage taken by his BWC.  *See Kinzer* Video 1; Kinzer Video 2.[1]

      The two videos depict the following:  Officer Kinzer arrived on the scene in his scout car in response to an AU generated call regarding a "mental health consumer."  Statement of Undisputed Material Fact (SUMF) ¶ 1.  Officer Kinzer entered the building with MPD Officer Smith, and they remained in the building lobby and spoke to the receptionist.  *Id.* ¶ 2.  MPD Sgt. Davis arrived on the scene, followed by the AU officers, and a discussion ensued between all the officers.  *Id.* ¶ 3.  The AU officers enlisted the aid of Officer Smith to try to convince Plaintiff to go voluntarily to a psychiatric hospital for evaluation.  *Id.* ¶ 4.  Officer Smith and the AU officers then entered the elevator.  *Id.* ¶ 5.  Officer Kinzer then entered an elevator and exited on the floor in which Plaintiff resided.  *Id.* ¶ 6.  Although he could hear the conversation between Smith, the AU officers, and Plaintiff, Officer Kinzer remained down the hall from Plaintiff's room and did not interact with her.  *Id.* ¶ 7.  Eventually, Officer Kinzer left the scene.  *Id.* ¶ 8.

      He eventually returned and again remained well away from the room.  *Id.* ¶ 9.  The AU officers, with the assistance of Officer Smith and Sgt. Davis, then forcibly remove Plaintiff from

---

[1]      These videos were cited in Defendant Kinzer's original motion for summary judgment and mailed to chambers on January 13, 2020.  *See* Praecipe Regarding Exhibits [16].

the room and took her involuntarily to a transport vehicle. *Id.* ¶ 10. At no point did Officer

Kinzer participate in the removal of Plaintiff nor did he assist in any way in carrying her to the

AU transport vehicle. *Id.* ¶ 11.

Thus, it is beyond dispute that officers other than Officer Kinzer entered Plaintiff's room

and seized her (Count IV). Officer Kinzer never restricted Plaintiff's movements or prevented

her from leaving (Count V) and did not forcibly take her into custody (Count VI). He committed

no acts that would render him liable for a violation of Plaintiff's constitutional rights and thus he

is entitled to summary judgment as to these claims. *See Cherry v. District of Columbia*, 962 F.

Supp. 2d 105, (D.D.C. 2013) (*passim*) (defendant entitled to summary judgment where

allegations of Amended Complaint are belied by video).

### B.      Plaintiff's Common Law Claims Against Officer Kinzer

As a preliminary matter, should the Court grant summary judgment to Officer Kinzer (or

Officer Smith and Sgt. Davis for that matter) as to Plaintiff's federal claims, it must decide

whether to retain supplemental jurisdiction over the common law claims. *See* 28 U.S.C. § 1367.

In deciding whether to exercise supplemental jurisdiction, the "court must first determine

whether the state and federal claims derive from a common nucleus of operative fact." *Konah v.

District of Columbia,* 815 F. Supp. 2d 61, 78 (D.D.C. 2011) (citing *Women Prisoners of the D.C.

Dep't of Corr. v. District of Columbia,* 93 F.3d 910, 920 (D.C. Cir. 1996)). If so, "the court then

must decide whether to exercise its discretion to assert jurisdiction over the state claim." *Id.* at

78-79. In making this determination, the court must weigh factors of judicial economy,

convenience, fairness, and comity. *Edmondson & Gallagher v. Alban Towers Tenants Ass'n,* 48

F.3d 1260, 1265-66 (D.C. Cir. 1995). But if a common law claim raises a "novel or complex

issue of state law," the court may decline to exercise its supplemental jurisdiction. *Konah,* 815

F. Supp. 2d at 79.

Here, Plaintiff's federal and state claims derive from a common nucleus of operative facts—namely the events occurring from the AU officers's decision to take Plaintiff to a psychiatric facility either voluntarily or against her will.  Judicial economy, fairness, and convenience also weigh in favor of this Court retaining jurisdiction.  The issues related to the common law claims will be fully briefed by the parties and will be ripe for adjudication.  It would waste time and resources to remand the common law claims for adjudication in a different forum.  Moreover, as to the claims against the MPD officers, this case presents no novel or complex issues of state law.  As a result, the Court should exercise supplemental jurisdiction over Plaintiff's common law claims and resolve the case in its entirety.

### 1.      False Imprisonment

Officer Kinzer is entitled to summary judgment as to the common law claims against him.  Plaintiff alleges that the MPD officers committed false imprisonment by 1) preventing her from leaving her apartment for three hours, and 2) forcibly arresting her.  Am. Compl. [29] ¶¶ 185-86.  In the District, false imprisonment is defined as:  "(1) the detention or restraint of one against his or her will, and (2) the unlawfulness of the detention or restraint." *Enders v. District of Columbia*, 4 A.3d 457 (D.C. 2010) (quoting *Scott v. District of Columbia*, 101 F.3d 748 (D.C. 1985)) (internal quotes omitted).

As demonstrated by the video, Officer Kinzer never physically blocked Plaintiff nor verbally denied her requests to go to another off-campus location.  SUMF ¶¶ 7-9.  And at no point did he forcibly arrest Plaintiff or carry her out of her apartment. *Id.* ¶¶ 11, 12. Thus, Defendant Kinzer cannot be liable for false imprisonment.

### 2.     Assault

Next, Plaintiff alleges that the MPD officers committed an assault by "[threatening] to do physical harm to Ms. Wheeler when they closed the only door out of her apartment and approached her to tackle her off of her bed and handcuff her."  Am. Compl. [29] ¶ 198.  In the District, defendants are subject to liability for assault if "(a) they act intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact, and (b) the other party is thereby put in such imminent apprehension."  *Forras v. Rauf*, 39 F. Supp. 3d 45, 56 (D.D.C. 2014).

Here again, video footage of the encounter directly refutes Plaintiff's claims.  The footage shows that Defendant Kinzer was in the hallway when Plaintiff was forcibly removed from her room.  He did not "close the only door out of her apartment and approach her" to make an arrest and thus he is not liable for assault.

### 3.     Trespass

Finally, Plaintiff claims that the MPD officers committed trespass by "remaining in her apartment for approximately three hours . . . without her authorization[.]"  Am. Compl. [29] ¶ 262.  In the District, trespass is defined as "the intentional intrusion of a person or thing upon property that invades and disrupts the owner's exclusive possession of that property."  *Turpin v. Ray*, No. 19-2394 (RC), 2020 WL 1510412 at *18 (D.D.C. Mar. 30, 2020) (quoting *Robinson v. Farley*, 264 F. Supp. 3d 154, 163 (D.D.C. 2017)).  Trespass thus requires "(i) an unauthorized entry (ii) onto the plaintiff's property (iii) that interferes with the plaintiff's possessory interest."  *Id.* (quoting *Democracy Partners v. Project Veritas Action Fund,* 285 F. Supp. 3d 109, 118 (D.D.C. 2018)).

Defendant Kinzer cannot be liable for trespass, as Plaintiff alleges, because his conduct did not satisfy the critical element of trespass, namely he never entered Plaintiff's apartment. Rather, Defendant Kinzer remained in the hallway outside the apartment during the other officers' protracted encounter with Plaintiff.  SUMF ¶¶ 7-11.

## II.   The MPD Officers Are Entitled to Qualified Immunity as to Plaintiff's Fourth Amendment Claims.

Officers Kinzer and Smith, and Sgt. Davis, are entitled to qualified immunity as to Plaintiff's Fourth Amendment claims.[2] It is noteworthy that Plaintiff does not challenge the District's civil commitment statute as unconstitutional.  Rather, the linchpin of her three constitutional claims is that the MPD Officers lacked probable cause to believe that, because of her mental illness, Plaintiff was likely to injure herself or others if she was not immediately detained.  *See* D.C. Code § 21-522.  Thus, Plaintiff posits that the MPD officers lacked probable cause to (1) believe that exigent circumstances existed for the officers to enter the room without a warrant (Count V), (2) believe it was reasonable for the officers to seize Plaintiff in her room; and (3) arrest her by removing her from the room and taking her to the hospital.  Am. Compl. [29] ¶¶ 151, 168, 178.

An officer has probable cause to seize a person for a psychological evaluation when the facts and circumstances within their knowledge and of which they had reasonably trustworthy information are sufficient to warrant a prudent officer to believe that the person poses a danger to himself or others.  *Eg., Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009).  Probable cause depends on the totality of the circumstances and requires only a

---

[2]    As previously shown, the BWC videos demonstrate that Officer Kinzer did not commit the requisite acts alleged by Plaintiff to render him culpable for Plaintiff's Fourth Amendment unlawful entry claim (Count IV), Fourth Amendment unreasonable seizure claim (Count V), or Plaintiff's Fourth Amendment false arrest claim (Count VI).  Should the Court impute the acts of the other officers to Officer Kinzer, he is nevertheless entitled to qualified immunity for these acts.

probability or substantial chance not an actual showing of such activity. *District of Columbia, v. Wesby,* 138 S.Ct. 577, 586 (2018). Probable cause is not a high bar. *Id.*

Here, the BWC videos show that the MPD officers were provided the following information from the AU officers and an AU official:

1. Although the apartment building in which Plaintiff lived was owned by a private company, AU leased many of the apartments within the building to provide housing for its students and the university enjoyed the right to enter students' rooms. SUMF ¶ 12.

2. Plaintiff made veiled threats to students who were strangers to her. She told the students that AU was tracking her and that "I have a sharp object in my purse and I'm going to pull it out." The AU officer also told Officer Kinzer that Plaintiff cornered the student and placed her hand on her shoulder. SUMF ¶ 13.

3. Plaintiff communicated a suicidal ideation to a faculty member earlier that day. SUMF ¶ 14.

This information, taken together, provided the MPD officers with a reasonable belief that the officers had probable cause to enter the apartment and to conclude that Plaintiff posed a danger to herself or to others. *See Magwood v. Giddings,* 672 A.2d 1083, 1087 (D.C. 1996) (suicide ideation along with other factors gave government official probable cause to take individual to hospital for observation). Thus, the MPD officers are entitled to qualified immunity as to Plaintiff's Fourth Amendment claims.

Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). As a result, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) *(per curium)*; *see also James v. United States*, 48 F. Supp. 3d 58, 66 (D.D.C. 2014) (officer deemed to be entitled to qualified immunity based upon allegations of the Amended Complaint).

All but the "plainly incompetent or those who knowingly violate the law" are entitled to qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "An official sued under 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quotations and citation omitted). This requires a two-pronged analysis. "To defeat a defense of qualified immunity, a plaintiff must show not only [1] that an official 'violated a constitutional right,' but [2] also that 'the right was clearly established' at the time of the violation." *Fenwick v. Pudimott*, 778 F.3d 133, 137 (D.C. Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001)). The trial court has the discretion to decide which of the two prongs to tackle first. *Id.* (citation omitted).

A right is clearly established if it is "sufficiently clear that every reasonable officer would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quotations and citation omitted). Thus, as the Supreme Court has articulated:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply otherwise, the rule is not one that every reasonable official would know.

*District of Columbia v. Wesby,* 138 S.Ct. 577, 589-90 (2018) (internal citations omitted).

Here, Plaintiff cannot satisfy either prong of qualified immunity. First, as previously stated, the MPD officers were aware that Plaintiff's apartment was a part of AU's student residence stock and therefore, with the consent and invitation of University officials, could enter the room. Moreover, they were aware that Plaintiff had engaged in what can be fairly termed as

strange, troubling, and threatening behavior because she informed complete strangers that she was being "tracked" by the University and that she had a "sharp object" in her possession that she was about to take out.  SUMF ¶ 13.  Inexplicably, she "cornered "another student, which surely would be alarming.  *Id.*  This behavior, when coupled with Plaintiff's expression of suicidal ideation, certainly provided the MPD officers with sufficient information to warrant a prudent officer to believe that Plaintiff posed a danger to herself or others.  *See Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009) (evidence of suicidal ideation provided basis for probable cause); *Magwood v. Giddings,* 672 A.2d 1083, 1087 (D.C. 1996) (same); *Cf. Burruss v. Riley*, 192 F. Supp. 3d 655,662-63 (W.D. Va. 2016) (police lacked probable cause where no evidence of thoughts of suicide or other significant factors). Consequently, the MPD officers are entitled to qualified immunity because they did not violate Plaintiff's Fourth Amendment rights.  Moreover, given cases such as *Cloaninger* and *Magwood*, there does not appear to be controlling authority, or a robust consensus of cases of persuasive authority, that would have placed the MPD officers on notice that their conduct was clearly wrong.

Additionally, the MPD officers could rely upon the representations made to them by the AU officers concerning Plaintiff's conduct earlier in the day as opposed to their personal observations.  A police officer may rely on a fellow officer's assessment of circumstances sufficient to warrant a suspect's arrest.  *See, e.g., United States v. Hensley,* 469 U.S. 221, 232, (1985) (upholding a police officer's reliance on a flyer or bulletin issued by another police department); *Daniels v. United States,* 393 F.2d 359, 361 (D.C. Cir. 1968) ("There is no requirement that the arresting officer have sufficient firsthand knowledge to constitute probable cause.  It is enough that the police officer initiating the chain of communication either had

firsthand knowledge or received his information from some person—normally the putative

victim or an eye-witness—who it seems reasonable to believe is telling the truth."); *Brandon v.*

*City of New York,* 705 F. Supp. 2d 261, 270-71 (S.D.N.Y. 2010) (concluding that police officers

who relied on a fellow officer's signal to arrest the plaintiff were entitled to qualified immunity).

The MPD Officers were therefore not obligated to make an independent determination of

probable cause.

Finally, Plaintiff's allegations that she was calm and not in distress when the officers

entered her room does not defeat probable cause. Am. Compl. [29] ¶ 118. An individual need

not demonstrate symptoms of mental distress at the moment of seizure as long as other factors

provide a basis for probable cause. *Mucha v. Jackson*, 786 F.3d 1064. 1067 (7th Cir. 2015

(Posner, J.).

### III.   The MPD Officers' Actions Are Protected by Qualified Immunity Pursuant to the Community Caretaking Exception to the Fourth Amendment.

The community caretaking exception to the Fourth Amendment was first described by the

Supreme Court in *Cady v. Dombrowski*, 413 U.S. 433 (1973). In *Cady*, police officers searched

a disabled car without a warrant because they reasonably believed that there was a gun in the

car's trunk and the car was vulnerable to vandals. *Id.* at 448. The Court held that the search was

constitutionally permissible because it was a reasonable exercise of the officers' "community

caretaking functions," explaining that officers are often called on to act in ways "totally divorced

from the detection, investigation, or acquisition of evidence relating to the violation of a criminal

statute. *Id*. at 441. Thus, the Court held that police conduct in furtherance of such functions

does not offend the Fourth Amendment so long as it is executed in a reasonable manner pursuant

to either "state law or sound police procedure." *Id*. at 446-48.

Some circuits have limited the reach of the community caretaking exception to situations involving automobiles. *See e.g.*, *Ray v. Twp. of Warren*, 626 F.3d 170, 177 (3d Cir. 2010). Other circuits have extended the exception to searches of homes. *See e.g.*, *United States v. Quezada*, 448 F.3d 1005, 1007-08 (8th Cir. 2006). The D.C. Circuit has not decided whether the exception is limited to automobile searches. *See Corrigan v. District of Columbia*, 841 F.3d 1022, 1035 (D.C. Cir. 2016).

Recently the First Circuit has applied the community caretaking exception to circumstances comparable to the facts here. *See Caniglia v. Strom*, 953 F.3d 112 (1st Cir. 2020), *cert. granted* 141 S. Ct. 870 (2020).[3] In *Caniglia*, the Court held that police officers' seizure of a detainee for a psychiatric evaluation was justified under the community caretaking exception to warrant requirement. *Id*. at 127-28. The Court further held that the officer's entry into a home to seize firearms was also protected by the exception. *Id*. at 132-33.

In reaching its decision in *Caniglia*, the Court initially discussed the scope of the community caretaking exception. In so doing the Court recognized the "special role" that police officers play in our society in that they are "expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing, and provide an infinite variety of services to preserve and protect community safety." *Id*. at 124 (*quoting Rodriguez v. City of San Jose*, 930 F.3d 1123, 1137-41 (9th Cir. 2019), *cert. denied* 141 S.Ct. 610 (2020)). The Court found that:

> At its core, the community caretaking doctrine is designed to give police elbow room to take appropriate action when unforeseen circumstances present some transient hazard that requires immediate attention. Understanding the core purpose of the doctrine leads inexorably to the conclusion that it should not be limited to the

---

[3]     The Supreme Court heard oral argument on March 24, 2021, and presumably will render its decision before the close of the current term.

> motor vehicle context. Threats to individual and community safety are not confined to the highways. Given the doctrine's core purpose, its gradual expansion since *Cady*, and the practical realities of policing, we think it plain that the community caretaking doctrine may, under the right circumstances, have purchase outside the motor vehicle context. We so hold.

*Id*. at 124.

The Court went on to note that a police officer must have a solid non-investigatory reason for engaging in the community caretaking activity.  *Id*. at 126.  Further, the Court stated that "[t]he acid test in most cases will be whether decisions made and methods employed in pursuance of the community caretaking function are 'within the realm of reason.'"  *Id*. (citations omitted).

Applying the above principles to the facts surrounding the plaintiff's seizure by the officers to take him for psychiatric evaluation, the Court in *Caniglia* held that:

> no rational factfinder could determine that the defendant officers strayed beyond the realm of reason by deeming the plaintiff at risk of imminently harming himself or others. Consequently, the officers' seizure of the plaintiff was a reasonable exercise of their community caretaking responsibilities. Thus, that seizure did not offend the Fourth Amendment.

*Id.* at 130-31.

Here, the Court should embrace the reasoning of *Caniglia* and rule that police activities, such as a seizure for purposes of psychiatric evaluation, are protected by the community caretaking exception to the Fourth Amendment, if the conduct falls within the parameters of reasonableness.  Further, the facts make clear that Officers Kinzer and Smith, and Sgt. Davis, cannot be deemed to have acted unreasonably.  As previously demonstrated, the MPD Officers became aware that Plaintiff made veiled threats to students who were strangers to her.  SUMF ¶ 13.  They were informed that Plaintiff told students that AU was tracking her and that "I have a

sharp object in my purse and I'm going to pull it out." *Id.* They were also informed that Plaintiff cornered the student and placed her hand on her shoulder. SUMF ¶ 13. Perhaps more importantly, they were informed that Plaintiff had communicated a suicidal ideation to a faculty member earlier that day. SUMF ¶ 14. Given this information, it was not unreasonable for the MPD Officers to decide to assist the AU officers in seizing Plaintiff for purposes of taking her for a psychiatric evaluation. Their conduct thus is protected by the community caretaking exception to the Fourth Amendment.

Because the conduct of the MPD officers is protected by the community caretaking exception, they cannot be deemed to have violated the Fourth Amendment and therefore they are entitled to qualified immunity. *See Castagna v. Jean*, 955 F.3d 211, 220 (1st Cir. 2020) (officers entitled to qualified immunity where conduct fell within the community caretaking exception). Furthermore, even should the Court determine that the MPD officers are not entitled to the protections of the exception, they are nevertheless entitled to qualified immunity. At the time of the seizure, there was no consensus of authority that would have placed the officers on notice that their actions were not protected by the exception. Therefore, they are also protected by the second (clearly established) prong of qualified immunity. *Id*. at 223 (officers entitled to qualified immunity because it was not clearly established that their conduct fell outside of the scope of the community caretaking exception).

IV.   **The MPD Officers' Reasonable Belief That There Was Probable Cause to Believe That Plaintiff Posed a Danger to Herself or Others Defeats Plaintiff's Common Law Claims.**

As to common law false arrest, probable cause for an arrest and detention constitutes a valid defense. *Gabrou v. May Dep't Stores Co.,* 462 A.2d 1102, 1104 (D.C. 1983). However, a defendant need not show probable cause in a constitutional sense; it is sufficient that the arresting officer have a good faith, reasonable belief in the validity of the arrest and detention.

*Id.*  In sum, "it will suffice if the officer can demonstrate that (1) he or she believed, in good faith, that his [or her] conduct was lawful, and (2) this belief was reasonable." *Etheredge v. District of Columbia,* 635 A.2d 908, 918 (D.C. 1993); *see also Minch v. District of Columbia,* 952 A.2d 929, 937 (D.C. 2008) ("The Metropolitan Police Department is immune from claims for both false arrest and false imprisonment if it can affirmatively demonstrate either that probable cause existed to arrest *or* that the arresting officer believed, reasonably and in good faith, that probable cause existed.").  In evaluating an officer's claim that he or she acted in good faith in making an arrest, the Court must consider the evidence from the perspective of the arresting officer, not the plaintiff.  *Etheredge,* 635 A.2d at 918.

Thus, constitutional and common law claims of false arrest are generally analyzed as though they comprise a single cause of action.  *Amobi v. District of Columbia Dep't of Corrections,* 755 F.3d 989, 989 (D.C. Cir. 2014); *Scott v. District of Columbia,* 101 F.3d 748, 753-54 (D.C. Cir. 1996) (the elements of both claims are "substantially identical"); *District of Columbia v. Minor,* 740 A.2d 523, 529 (D.C. 1999).  As previously discussed, the MPD officers had probable cause to believe that Plaintiff posed a danger to herself and others and they are therefore entitled to summary judgment as to the false imprisonment claims.

Similarly, as previously stated, the tort of trespass requires an "unauthorized entry." *Robinson v. Farley*, 264 F. Supp. 3d 154, 163 (D.D.C. 2017)).  Here the entry into Plaintiff's apartment cannot be deemed unauthorized because the entry was at the behest of AU who leased the apartment from the apartment owner for student housing and who enjoyed the right to enter student housing.  SUMF ¶ 12.

Finally, "[a] police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the [officer]

reasonably believes to be necessary." *Scales v. District of Columbia,* 973 A.2d 722, 730 (D.C. 2009). Here, as discussed above, the officers had probable cause to seize Plaintiff, and when she resisted, they were privileged to use force to effect the seizure. *See Rogala v. District of Columbia,* 161 F.3d 44, 57(D.C. Cir. 1998); *see also Armbruster v. Frost*, 962 F. Supp. 2d 105, 116-17 (D.D.C. 2013). Thus, the MPD officers cannot be liable for assault.

## CONCLUSION

For the foregoing reasons, the Court should grant Sgt. Richard Davis, Officer Stephen Kinzer, and Officer Deborah Smith's motion for summary judgment.

Date:  April 5, 2021                    Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Alicia M. Cullen*
ALICIA M. CULLEN [1015227]
Chief, Civil Litigation Division, Section III

*/s/ Robert A. DeBerardinis, Jr*.
ROBERT A. DEBERARDINIS, JR. [335976]
Senior Assistant Attorney General
Civil Litigation Division
400 6th Street NW
Washington, D.C. 20001
Phone:  202-724-6642
Fax:  202-741-8895
Email: robert.deberardinis@dc.gov
*Counsel for Defendants Richard Davis, Stephen Kinzer, and Deborah Smith*