**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **GIANNA WHEELER**, <br><br> Plaintiff, <br><br> v. <br><br> **AMERICAN UNIVERSITY et al.**, <br><br> Defendants. | Case No. 20-cv-02735 (CRC) |

<u>**MEMORANDUM OPINION**</u>

University administrators and campus police face few harder tasks than responding to a student experiencing a mental-health crisis. The paramount challenge is assessing whether the student poses a danger to herself or other members of the school community. If imminent harm is likely, the law permits police to seize the student involuntarily for an emergency medical evaluation. But these intrusive mental-health seizures must be carried out in a manner that respects the student's rights, including those under federal disability discrimination laws and the Fourth Amendment of the Constitution. This case illustrates the competing interests, and difficult legal issues, that can arise in these unfortunate situations.

The case centers on a chain of events that took place on September 26, 2019, involving plaintiff Gianna Wheeler, an American University undergraduate. Early that afternoon, the AU police department received a complaint from a student that she had been accosted by an unfamiliar female student in a campus lab. The complainant described hostile and erratic behavior on the part of the other student, including unwanted touching, a perceived threat by the student to produce a sharp object from her bag, and a suggestion of future aggression against the complainant. AU police classified the interaction as an assault, and AU's Dean of Students, Jeffrey Brown, identified the other student as Ms. Wheeler from a surveillance image.

Later that afternoon, an AU professor also alerted school administrators to an encounter she had just had with Wheeler.  The professor opined in an email that Wheeler "seemed to be in the midst of a manic episode or some other sort of mental health issue."  She added that Wheeler mentioned "having harmed herself by cutting and also experiencing suicidal ideations in the past, but it didn't seem like she was suicidal right now."

Wheeler's past psychological issues were known to the school and AU police.  Wheeler herself acknowledges that she once asked AU police to take her to the hospital after experiencing anxiety attacks.  And AU police Captain Kevin Barrett, who led the response in this case, attests that he knew Wheeler "was a consumer of mental health services" at AU, but the extent of his personal involvement in any of Wheeler's prior mental-health episodes remains unclear.

Following the reports from earlier in the day, AU administrators convened a meeting, which concluded with a decision to place Wheeler on interim suspension effective immediately.  They also asked AU police to conduct a "welfare check" on Wheeler.  And Dean Brown's notes from the meeting reflect that AU police would act on an "FD-12," a reference to the procedure for an involuntary mental-health seizure.

The AU police, led by Captain Barrett, arrived at Wheeler's off-campus apartment around 7:00 p.m.  They were joined by three officers from the District of Columbia's Metropolitan Police Department ("MPD").  After a quick knock on the door, Barrett and an MPD officer immediately entered Wheeler's room with the key they had obtained from the front-desk clerk.  Body-worn camera footage from several of the MPD officers captured some, but not all, of the ensuing encounter, which lasted some three hours.  As recounted more fully below, Wheeler appeared calm when the officers entered, studying on her laptop and talking on her cell phone.  The officers explained why they were there, but Wheeler repeatedly asked them to leave

and later told them she didn't wish to hurt herself or anyone else.  Wheeler became increasingly agitated as the evening wore on.  The officers eventually summoned an EMT team, which examined Wheeler and reported her "mental status" as "normal."  They nonetheless remained on the scene.  Soon after the EMTs departed, the officers decided to forcibly remove Wheeler from her apartment and drive her to the hospital.  The footage of the seizure is jarring.

A psychological examination at the hospital determined that Wheeler did in fact pose a danger to herself or others—due in some measure, perhaps, to the trauma of the seizure.  The hospital thus successfully petitioned a D.C. Superior Court judge to authorize continued hospitalization for seven days.  Wheeler was released on day six.

Wheeler subsequently filed suit against AU, Dean Brown, and all the officers involved in her seizure.  She brings disability discrimination claims under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the D.C. Human Rights Act ("DCHRA").  Wheeler alleges that she suffers from a mental-health disability, that AU suspended her because of that disability, and that the University assumed she was a threat based solely on her disability.  She also brings Fourth Amendment and common-law tort claims based on the officers' unilateral entry into her apartment and the subsequent seizure.

Rather than answer or move to dismiss Wheeler's amended complaint, the defendants moved for pre-discovery summary judgment.  They support their motions with the body-worn video footage, the police reports concerning the alleged assault earlier in the day, the professor's email describing her encounter with Wheeler, records regarding Wheeler's academic and mental-health history, and several other exhibits.  The AU and MPD defendants incorporate this evidence into two sets of undisputed material facts supporting their summary judgment motions.  These facts, the defendants submit, eliminate any genuine dispute over whether the University

properly suspended Wheeler and whether the officers lawfully executed a mental-health seizure, or at least are entitled to qualified immunity on the latter question.  Wheeler opposes summary judgment.  She contests many of the defendants' asserted facts and offers additional facts of her own, including statements by the officers captured in the video, which, in her view, undermine the defendants' rationale for the seizure.  She has also filed affidavits under Federal Rule of Civil Procedure 56(d) identifying factual issues that she would like to pursue in discovery in order to oppose the defendants' summary judgment motions more fully.

The Court will deny the defendants' motions for summary judgment without prejudice and permit Wheeler to conduct discovery into areas where relevant factual gaps remain.  With respect to her discrimination claims, Wheeler is entitled to explore AU's student-discipline policies, how school administrators applied those policies in deciding to impose the interim suspension, and whether AU has meted out similar punishment to non-disabled students based on comparable allegations of misconduct.

As for the claims stemming from Wheeler's involuntary seizure, the key legal question is whether the officers are entitled to qualified immunity, while viewing the facts of the present record, and what discovery could show, in the light most favorable to Wheeler.  The standard is probable cause, based on the facts known to the officers at the scene; for mental-health seizures, probable cause requires a showing of "a probability or substantial chance" that Wheeler posed an imminent risk of harm to herself or others.  Wheeler's reported behavior and statements earlier in the day, coupled with her past mental-health struggles (to the extent they were known by the officers), tend to support a finding of probable cause.  But the inquiry must be guided as well by what the officers observed during their three hours at Wheeler's apartment.  And on that score, Wheeler's calm demeanor when initially confronted by the officers, her disavowal of any

immediate dangerous intentions, and her "normal" mental state evaluation by the EMTs could lead a jury to conclude that the officers lacked probable cause. The ultimate legal question thus turns on a factual determination.

Yet, the factual record is incomplete, and discovery could fill some of the gaps. For instance, it remains unclear what the officers (especially Captain Barrett) collectively knew about Wheeler's mental-health history. And much of the evening's events, including Wheeler's evaluation by the EMTs and an hour's worth of the encounter in her room, were not captured on video. Dean Brown's role in the ultimate mental-health seizure—an allegedly important one—is also not entirely clear.

The Court will therefore reserve most of its summary judgment determinations pending discovery, with two exceptions. First, the Court will grant summary judgment for all defendants on Wheeler's unlawful entry and trespass claims because case law at the time did not clearly prohibit police officers from unilaterally entering a person's home to conduct a welfare check based on reports of behavior like that reportedly exhibited by Wheeler earlier in the day. The officers are thus entitled to qualified immunity on the unlawful entry claim and cannot be liable for trespass. Second, one of the officers (Joseph Joyner) is entitled to summary judgment on Wheeler's claim for false arrest and common-law assault because the undisputed record establishes that he left the scene well before Wheeler's seizure, so he did not participate in those acts, nor could he have observed them for any type of bystander liability to apply.

The Court will elaborate on its conclusions below. Along the way, it will resolve skirmishes between the parties over several antecedent procedural and legal issues. It will also lay out the applicable legal standards and discuss the merits of Wheeler's remaining claims. The Court offers this guidance in an effort to cabin discovery and sharpen any renewed summary

judgment briefing, as well as to further any discussions the parties might undertake to resolve this sensitive matter without the need for protracted and intrusive litigation.

## I.    Background

The Court draws the following background from Wheeler's amended complaint, the video footage, and the other evidence offered by the defendants.  The Court will attempt to note differences in the parties' interpretation of the evidence.  As will be explained, however, the Court will follow standard practice in drawing all inferences in Wheeler's favor in deciding whether summary judgment is appropriate.

Gianna Wheeler attends AU on a full scholarship.  Am. Compl. ¶¶ 1, 20.  She arrived on campus in the fall of 2017 and is currently a senior.  See id. ¶ 23.  She has succeeded academically, both in high school and at AU.  But she has also struggled with mental-health issues.  She has major depressive disorder and anxiety, id. ¶¶ 1, 20–21, and following the seizure in this case, she was diagnosed by a physician with "bipolar disorder type 1."  Id. ¶ 3.

Wheeler's condition brought her into contact with the AU police department on several occasions prior to the encounter in this case.  In the second semester of her freshman year, for example, AUPD responded to a residence hall to perform a welfare check on Wheeler.  Although she acknowledged having had occasional suicidal ideations, it was determined that she was not an immediate threat to herself or others at that time.  AU Statement of Material Facts ("AU SUMF") ¶ 52.[1]  A few days later, AU records indicate that University police received a call that

---

[1] The Court refers to the parties' statements of undisputed facts by citing the other side's final response.  Therefore, references to "AU SUMF" cite Wheeler's response to AU's Statement of Material Facts Not in Dispute, ECF No. 48-1.  Likewise, "MPD SUMF" refers to Wheeler's response to the MPD Officers' Statement of Undisputed Material Facts, ECF No. 38-2.  And "Pl. SUMF-AU" refers to AU's response to Wheeler's Additional Statement Undisputed Material

Wheeler was expressing suicidal ideations while visiting her sister at Belmont University in Tennessee; the reports reflect that AUPD coordinated with Belmont to have its officers check on Wheeler.  See AU SUMF ¶¶ 63–64; AU Exs. 15 & 17; but see AU SUMF ¶¶ 63–64 (plaintiff's responses) (disputing these facts because she "has had no opportunity to test the authenticity, reliability or credibility of" these reports).

And in February 2019, after reporting an unauthorized entry into her dorm room, Wheeler met with two AU administrators and Captain Kevin Barrett to discuss how the incident was handled.  AU SUMF ¶¶ 79–80, 85.  An AU report indicates that Wheeler also stated she planned to go to the hospital to adjust her medications, but she declined an invitation from AUPD to escort her.  Id. ¶ 85.  Later, however, Wheeler recognized that she was experiencing a mental-health event and asked to be transported to the hospital.  Id. ¶ 86 (plaintiff's response); id. ¶ 87 (noting an AU report stated Wheeler had not eaten all day and had been throwing up most of the evening).

A.  The Events of September 26, 2019

As noted above, several key episodes transpired over the course of the day, starting with an interaction between Wheeler and another student around noon and culminating in a three-hour encounter between Wheeler and seven police officers that evening.

1.  Report of Wheeler's confrontation with another student

Around noon on September 26, 2019, Wheeler went to a lab in search of a science professor.  According to Wheeler, the professor had helped her switch lab sections "so that she could avoid students who had been bullying her."  Am. Compl. ¶ 32.  AU and Wheeler

---

Facts, ECF No. 59.  Finally, "Pl. SUMF-MPD" refers to the MPD Officers' response to Wheeler's Additional Statement of Undisputed Material Facts, ECF No. 49-2.

vigorously dispute what happened next, but Wheeler does not dispute the fact that AUPD received a report about her behavior during an interaction with another student in the lab.  AU SUMF ¶ 108.  Because that report—regardless of its accuracy—formed at least part of the basis for AUPD's actions later in the evening, the Court will recount it; however, Wheeler contests the report's version of events in several respects.

When searching for the professor, Wheeler engaged with another student.  About an hour later, the other student's mother reported that interaction as an assault to AUPD, and the student herself also provided a hand-written statement to AU police officer Joseph Joyner.  See AU SUMF ¶¶ 108–09, 127; AU Exs. 27–28.  That report and witness statement did not specifically identify Wheeler, but Dean of Students Jeffrey Brown later identified her from images captured by surveillance cameras in the lab building.  AU SUMF ¶¶ 128–29; AU Ex. 32.

In the statement, the student recounted Wheeler saying that the University was "following her emails" and "tracking her," and then asking to see the student's emails to confirm AU was not tracking the student as well.  AU Exs. 27–28.  The student added that Wheeler directed threatening comments at her, including that Wheeler was going to grab "a sharp" from her bag.  AU Exs. 27–28.  The student continued that Wheeler "started walking closer" to her, which "put [her] in a corner against a wall," and that Wheeler then "put her hand on [the student's] shoulder" and told her to find the professor.  AU Exs. 27–28.  The student pulled up the professor's contact information on a laptop, and Wheeler took a photograph of the screen.  AU Ex. 28.  Wheeler remained in the area, according to the statement, loudly talking about students who had bullied her and implying that the student was friendly with those individuals.  Id.  Lastly, the student stated that Wheeler said, "[r]emember I know where to find you," before

finally leaving.  Id.  At some point during the encounter, the student texted "help me messages" to other students in the lab.  Id.

### 2.    Wheeler's discussion with an AU professor

After that interaction, Wheeler could not locate the professor she was looking for, but she did briefly speak with another faculty member, Professor Karen Knee.  Am. Compl. ¶ 38.  At 1:45 p.m., Professor Knee emailed an AU administrator stating that Wheeler appeared to be "in the midst of a manic episode or some other sort of mental health issue."  AU Ex. 33 (stating Wheeler "mostly made sense but was not normal"); Am. Compl. ¶ 38.  The email continued that Wheeler "mentioned having harmed herself by cutting" and "experiencing suicidal ideation in the past," but that "it didn't seem like she was suicidal right now."  AU Ex. 33; Am. Compl. ¶ 38.

### 3.    AU's placement of Wheeler on interim suspension and decision to execute an "FD-12"

At 3:45 p.m.—about 90 minutes after learning about the incident with the other student and following Professor Knee's email—AU administrators, including Dean Brown, met and placed Wheeler on interim suspension, effective immediately.  Am. Compl. ¶ 40; AU SUMF ¶¶ 134–36.  AU maintains that it took this decision based on the concerning campus police report, University policy, and the Student Code of Conduct.  AU SUMF ¶ 135.  The interim suspension meant that Wheeler was completely barred from campus until she underwent a psychological evaluation, provided medical records to an AU-selected psychologist, and authorized that psychologist to share the evaluation results with AU and Dean Brown.  See Am. Compl. ¶¶ 44–46.  Of the defendants in this case, only Dean Brown participated in this meeting; the AUPD Police Chief also attended, but not any of the AU officers who went to Wheeler's apartment later in the day.  See AU SUMF ¶ 134.

Dean Brown's notes from the meeting reflect that AUPD would "not proceed[] with criminal action" against Wheeler, but instead would attempt a welfare check at Wheeler's apartment "and act on [an] FD-12."  See AU Ex. 4 at 11; AU SUMF ¶ 135 (plaintiff's response); see also Am Compl. ¶ 41.  An FD-12 is the shorthand for the process to execute an involuntary mental-health seizure.  D.C. law permits "an officer authorized to make arrests in the District of Columbia," among others, to take a person into custody without a warrant and transport them to a hospital for "emergency observation and diagnosis," if the officer "has reason to believe that a person . . . is likely to injure [her]self or others if [s]he is not immediately detained."  D.C. Code § 21-521.  The FD-12 application must describe why an individual is "in imminent danger of harming . . . herself or others."  AU SUMF ¶ 135 (plaintiff's response); see also MPD General Order 308.04, Interacting with Mental Health Consumers at 6, https://go.mpdconline.com/GO/GO_308_04.pdf (Feb. 9, 2015).[2]

Wheeler alleges that AU made the decision to execute an FD-12 based on "limited information" and without speaking to or observing her, such that AU "could not possibly have formed a reasonable belief that Ms. Wheeler was a danger to herself or others."  Am. Compl. ¶ 42.  And an AU "CARE Report,"[3] apparently authored by Dean Brown, while noting the

_____

[2] The Court takes judicial notice of this MPD General Order, which is available on a government website.  See Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs., 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies."); Cannon v. District of Columbia, 717 F.3d 200, 205 & n.2 (D.C. Cir. 2013).

[3] According to AU, a "CARE Report" is part of a confidential reporting tool, which any member of the University community may use to report concerns they may have about a student who might need help or support.  AU SUMF ¶ 23; but see id. (plaintiff's response, noting she has had no discovery on or access to the "Care Network").

assault, reflects that "No" was selected in response to the question "Has the student threatened to harm self?"  AU Ex. 4 at 3; Pl. SUMF-AU ¶ 173.

### 4.    Execution of the mental-health seizure

About three hours after the interim suspension and almost seven hours after Wheeler's interaction with the other student on campus, officers arrived at Wheeler's off-campus apartment.  Wheeler lived in the Frequency Apartments, a privately-owned building with a mix of AU student residents and residents with no connection to the University.  Am. Compl. ¶¶ 19, 31.  Wheeler leased her apartment through AU.  Id. ¶ 31.

Three MPD Officers—Richard Davis, Deborah Smith, and Stephen Kinzer—got there first, though it is unclear how exactly MPD became involved or why AU or AUPD summoned MPD.  But they knew that they would be checking on a "mental health consumer."  MPD SUMF ¶ 1.  The MPD Officers waited briefly until AU special police officers Kevin Barrett (the Captain), Michael Vena, Joseph Joyner, and Matthew Gomez arrived.  At around 7:00 p.m., the officers obtained the key to Wheeler's apartment from the front-desk clerk, and Smith and Barrett made their way up to Wheeler's room.  Am. Compl. ¶ 52.  Smith (the only female officer) offered to go in first with Barrett, suggesting that Wheeler might be "more receptive" to her.  See Smith Tape 3 at 22:15–30.[4]

Immediately after a quick knock, Barrett unlocked and opened Wheeler's door.  See Smith Tape 3 at 23:31–39.  The video shows Wheeler laying on her bed, wearing a t-shirt, id.

---

[4] The time stamps for the body-camera footage citations refer to the elapsed hours, minutes, and seconds of the video as indicated at the bottom of the frame, and not the time stamps at the top right of the frame.

23:42–24:00, and apparently studying with her laptop open and talking to her aunt on the phone. See Am. Compl. ¶ 53.

Over the course of a few minutes, Smith and Barrett slowly moved closer to Wheeler. See Smith Tape 3 at 23:31–26:49; id. 26:17–21 (Smith stating that they are "not going to get out of the room").  Meanwhile, Wheeler asked that the officers not enter her room, telling them "everything's fine, can you please leave."  Id. 25:39–26:01.  At this point, Wheeler, though she says she was frightened by the officers, remained calm and seated on her bed.  See id. 23:31–26:49; see also Am. Compl. ¶ 58.  But a few minutes after they opened the door, and as the officers moved closer amid her requests for them to leave, Wheeler began to cry, before quickly recomposing herself.  Smith Tape 3 at 26:49–27:35.

Shortly after that, Wheeler's aunt (on speaker phone) asked why the officers were there. Barrett replied that they wanted to check on Wheeler's wellbeing based on concerns brought to their attention earlier in the day due to her behavior.  Smith Tape 3 at 27:27–38.  The aunt cautioned the officers that Wheeler "gets very upset" with police officers.  Id. 27:38–43.  Barrett stated that they were "interested in helping her get to the hospital," prompting Wheeler to cry briefly once again.  Id. 27:44–55.  He also reiterated that reports of Wheeler's behavior from earlier in the day raised concerns, so the officers wanted to make sure she was okay.  Id. 28:04–18.

Almost six minutes after the officers entered the apartment, the video shows Wheeler moving across her bed to a window, cracking the window slightly ajar, and returning to her previous seated position.  Smith Tape 3 at 28:48–29:00.  At the same time, Wheeler stated that she did not consent to being touched by the officers.  Id. 28:47–52.  Officer Smith immediately moved in front of the opened window.  See also Kinzer Tape 2 at 25:10–30, 26:10–21 (officers

confirming Wheeler was still sitting in the bed in the same place and that she could not fit through the window).

By this point, both Barrett and Smith had communicated to Wheeler that AU wanted to take her to a hospital for evaluation.  Throughout the video, Wheeler repeatedly asked the officers to leave and resisted going to the hospital.  She declared that if the officers touched her or tried to take her, she would "not leave quietly, peacefully, nothing."  See Smith Tape 3 at 34:58–35:05.  Further, Wheeler denied and bristled at the accusation that she assaulted someone on campus.  Id. 30:05–31:09.

Nineteen minutes into the encounter, Smith exited Wheeler's room to speak with the other MPD Officers.  Officer Davis then stated to Officer Smith and AU Officer Vena that, based on what they had been told, it sounded like the situation should have resulted in a criminal complaint, rather than an FD-12.  Smith Tape 3 at 42:30–40; see also Kinzer Tape 1 at 40:53–42:12.  Indeed, the video footage shows that throughout the evening, the MPD Officers expressed doubts that AUPD had a basis to execute an FD-12.  Pl. SUMF-MPD ¶ 25.  The MPD Officers, however, did not share these doubts with AUPD Captain Barrett.  See id. ¶ 30.

Eventually, the MPD Officers decided to ask Wheeler whether she intended to harm herself or others.  Smith re-entered the room and asked Wheeler those questions, and Wheeler calmly answered no to both.  Smith then told the other MPD Officers that Wheeler seemed "of sound mind to say that."  See Smith Tape 3 at 56:28–58:10.  AUPD nevertheless remained in the room for a few more hours, with Smith entering and exiting at various points throughout the night.  Because the MPD Officers were not in the apartment the entire time, their video footage does not show the entire interaction inside.  Additionally, after what appears to have been about

an hour, the MPD Officers left the scene for approximately 50 minutes in the middle of the interaction.  Pl. SUMF-MPD ¶ 34.

As the evening progressed, and the officers remained in or just outside the apartment, the video shows Wheeler becoming increasingly agitated.  For example, she states at one point that she will take her clothes off, see Smith Tape 2 at 10:00–30, and as the complaint acknowledges, she generally "became louder and more panicked."  Am. Compl. ¶ 68.  Wheeler alleges that "the pressure of the situation began to overwhelm" her, and that she threatened to disrobe to prevent the officers from taking her to the hospital.  Id.  But even as her mood changed, Officer Davis stated that Wheeler "seem[ed] fine now" and was just angered by the officers' presence in her room, which he found "understandable."  See Kinzer Tape 1 at 48:36–48.

Toward the end of the encounter, at about 9:24 p.m., EMTs arrived on the scene.  Davis Tape 2 at 21:10–50; Smith Tape 2 at 42:47–44:05.  Wheeler says that she fully cooperated with their evaluation.  See Am. Compl. ¶ 70.  Although the evaluation is not captured on video, the EMTs' reports stated that Wheeler was sitting on her bed and had mentioned writing a paper.  The reports concluded that Wheeler was "alert and oriented" and that her "mental" and "neurological" status was "Normal Baseline for Patient."  See Pl. Ex.1 (EMS Records); Am. Compl. ¶ 70; see also Smith Tape 2 at 49:55–51:08 (Wheeler stating, "the EMTs just said that I don't need to go to the hospital").  Wheeler further alleges that Barrett urged the EMTs to take her to the hospital, but that they refused and left the scene after determining she did not require further medical care.  Am. Compl. ¶¶ 72–73.

Soon after the EMTs departed—and it was probably clear that Wheeler would not go to the hospital voluntarily—the officers took her involuntarily.  Wheeler can be heard telling the

14

officers that if she was suspended and kicked off campus, she could stay with a friend off campus.  See Smith Tape 2 at 51:30–55.

Then, on Barrett's signal, Smith said "go," and she and the AU Officers forcibly took Wheeler to the ground and handcuffed her hands behind her back.  They wrapped her in a blanket, carried her to the elevator and out of the building, and placed her into an AUPD car.  All the while, Wheeler attempted to resist by flailing her body, spitting on the officers, and yelling a series of profanities.  See generally Smith Tape 2 at 51:54–1:01:42; Davis Tape 2 at 31:46–41:50.  At approximately 10:15 p.m., AUPD drove Wheeler to the hospital.  Am. Compl. ¶ 82. When asked by an MPD officer whether AUPD would charge Wheeler, Barrett confirmed that he would instead catalogue the incident as an FD-12 and get a warrant later.  Smith Tape 2 at 1:01:41–50; Pl. SUMF-AU ¶ 218 (not disputed that AUPD performed an FD-12).

B.  Subsequent Events

Upon Wheeler's arrival at the hospital, a doctor examined her, noted that she was aggressive and combative, and concluded that she "exhibited symptoms of a mental illness and was likely to injure self and/[or] others if not immediately hospitalized."  AU SUMF ¶¶ 160–61 (citing AU Ex. 40); but see id. (Wheeler responding that this conclusion came after she "had been antagonized for hours on end by up to seven police officers" and then forcibly removed from her apartment).  Based on this assessment, the hospital petitioned the D.C. Superior Court to authorize continued hospitalization for up to seven days.  AU Ex. 39.  A Superior Court Judge granted the petition, AU Ex. 41; AU SUMF ¶ 162, and Wheeler remained in the hospital for six days.  Am. Compl. ¶ 85.  Wheeler alleges that she secured her release only because an appointed public defender successfully advocated on her behalf.  Id.

Following her release from the hospital, Wheeler's interim suspension remained in place, so she could not participate in any classes or on-campus events.  Am. Compl. ¶ 86.  A few weeks later, on October 28, 2019, AU held a disciplinary hearing on the alleged assault in the lab.  The other student involved in the incident chose not to participate in the hearing.  Id. ¶¶ 87–88.  Wheeler was found "not responsible" for each Student Conduct Code violation alleged against her.  Id. ¶ 88.

       C.   Procedural Background

Wheeler filed this lawsuit in September 2020 and amended her complaint in March 2021.  See ECF Nos. 1, 29.  She names two sets of defendants:  (1) the three MPD Officers and (2) the AU defendants, which include the University itself, Dean Brown, and the AUPD Officers.  Rather than move to dismiss or answer the amended complaint, both sets of defendants filed motions for summary judgment.  Defendants principally rely on the several hours of body-worn camera footage from MPD Officers Davis, Kinzer, and Smith.  Additionally, the AU Defendants submit a few dozen other exhibits, which broadly include details of Wheeler's mental-health history, documents related to the events of September 26, 2019, other AUPD incident reports, Wheeler's academic transcript, the University's housing agreement and Student Code of Conduct, and various affidavits.  There has been no discovery to date.  The Court held a hearing on the motions on November 2, 2021.

## II.   Legal Standards

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if a reasonable factfinder could find for the non-moving party, and a fact is "material" if it can affect the outcome of litigation.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  When evaluating a summary judgment motion, the Court

reviews the underlying facts in the nonmovant's favor and grants the nonmovant all reasonable

inferences.  Id. at 255.  "If material facts are at issue, or, though undisputed, are susceptible to

divergent inferences, summary judgment is not available."  Moore v. Hartman, 571 F.3d 62, 66

(D.C. Cir. 2009).

Further, although "a party may file a motion for summary judgment at any time," Fed. R.

Civ. P. 56(b), "pre-discovery summary judgment motions are usually premature and hence

disfavored."  See Bourbeau v. Jonathan Woodner Co., 600 F. Supp. 2d 1, 3 (D.D.C. 2009)

(collecting cases).  As the D.C. Circuit has often stated, "summary judgment ordinarily 'is proper

only after the plaintiff has been given adequate time for discovery.'"  See e.g., Americable Int'l,

Inc. v. Dep't of Navy, 129 F.3d 1271, 1274 (D.C. Cir. 1997) (quoting First Chi. Int'l v. United

Exch. Co., 836 F.2d 1375, 1380 (D.C. Cir. 1988)).

### III.  Analysis

The Court will begin with Wheeler's statutory claims under the ADA, Rehabilitation Act,

and DCHRA against AU for discrimination on the basis of her alleged disability.  It will then

turn to the Fourth Amendment claims under 42 U.S.C. § 1983 against all defendants for unlawful

entry, unreasonable seizure, and false arrest.  The last brief stop will be Wheeler's common-law

claims of false imprisonment, assault, and trespass.

### A.  Counts 1–3:  Plaintiff's Statutory Claims for Disability Discrimination

To start, Wheeler brings claims against AU under Title III of the ADA, Section 504 of

the Rehabilitation Act, and the DCHRA.  Title III of the ADA provides that "[n]o individual

shall be discriminated against on the basis of disability in the full and equal enjoyment of the

goods, services, facilities, privileges, advantages, or accommodations of any place of public

accommodation." 42 U.S.C. § 12182(a).  Similarly, Section 504 of the Rehabilitation Act, codified in 29 U.S.C. § 794(a), provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  And the DCHRA prohibits educational institutions from denying, restricting, abridging, or conditioning the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason based upon the disability of any individual.  See D.C. Code § 2-1402.41(1).

Under each statute, a plaintiff must allege:  (1) that she is "qualified under the Acts"; (2) that she is "excluded from participation in or has been denied the benefits, services, programs, or other activities for which" the defendants are "responsible" or that she was "otherwise discriminated against"; and (3) "the exclusion, denial, or discrimination was by reason of [plaintiff's] disability."  See Reid-Witt on behalf of C.W. v. District of Columbia, 486 F. Supp. 3d 1, 7 (D.D.C. 2020) (cleaned up).  The ADA and Rehabilitation Act are "virtually identical," see Harrison v. Rubin, 174 F.3d 249, 253 (D.C. Cir. 1999), although the ADA's causation standard "is slightly less strict than the Rehabilitation Act's standard because [the ADA] does not require that the discrimination be 'solely' because of" an individual's disability. See Reid-Witt, 486 F. Supp. 3d at 10–11.  Meanwhile, "[c]laims under the DCHRA . . . are subject to the same standards as ADA claims, so the analysis merges."  Id. at 10 (citing A.M. v. Bridges Pub. Charter Sch., No. 17-cv-177, 2019 WL 1932579, at *2 n.7 (D.D.C. May 1, 2019)). The upshot is that the analysis for these claims are essentially the same, save for a slight difference regarding causation.

Wheeler's theory of liability boils down to the following:  She is a qualified individual under all three statutes because she has diagnoses of major depressive disorder, anxiety, and possibly bipolar disorder.  See Am. Compl. ¶¶ 1, 20; AU SUMF ¶¶ 65, 161.  Those disabilities have substantially limited her major life activities—namely learning, concentrating, and thinking—as reflected by her suicidal ideations and, for example, her need to take a medical leave of absence from AU in 2018.  See, e.g., AU SUMF ¶¶ 15, 51, 61.[5]  According to Wheeler, AU excluded her from participation and denied her the benefit of its programs, services, and activities when the University "placed her on interim suspension (denying her participation in academics), removed her from her dorm room (denying her housing), and barred her from campus until the conclusion of her disciplinary proceedings (denying her access to facilities and recreational activities)."  Pl. Opp'n to AU Defs. Mot. Summ. J. ("Pl. Opp'n-AU MSJ") at 23.  Plus, she contends that AU conditioned her return to campus on a satisfactory psychological evaluation.  See Am. Compl. ¶ 46.  Finally, Wheeler argues that AU did all this because it "assumed," since she was disabled, that "she was a threat, and took action based on that fact alone."  Pl. Opp'n-AU MSJ at 26.  She alleges on "information and belief" that non-disabled students are treated more favorably.  See, e.g., Am. Compl. ¶ 46.

Wheeler has established that discovery is warranted on her discrimination claims because she has made a sufficient preliminary showing on each element and has identified other relevant information that she might ascertain in discovery to support her allegations.  Particularly relevant here, Wheeler seeks to discover whether AU would have treated a non-disabled student the same

---

[5] See also, e.g., AU Ex. 4 at 18 (professor report noting that Wheeler "did not appear to be herself in class" and left the "classroom for extended period" because "she was feeling extremely anxious and felt she could not sit").

way and to probe the reasons for the University's actions.  See Rule 56(d) Aff. of Debra R. Belott in Opp'n to AU Defs. Mot. Summ. J. ("Rule 56(d) Aff.-AU MSJ") ¶¶ 10–16, 21.  She also seeks to gather more information about the meeting at which AU decided to place her on interim suspension, and to confront AU on what she says are its conflicting explanations for taking the various actions it did.  See, e.g., id. ¶¶ 11–14.

At this juncture, the Court will not wade into any nuanced differences between the causation standards under the ADA and DCHRA on the one hand, and the Rehabilitation Act on the other.  It suffices to say that the ADA and DCHRA claims will (almost certainly) rise and fall together; however, because the Rehabilitation Act imposes a slightly stricter causation standard, it is possible that Wheeler could meet her summary judgment burden under the ADA and DCHRA but not the Rehabilitation Act.

AU advances several arguments for why the Court should grant summary judgment in its favor now without allowing Wheeler to take any discovery.  These arguments are either premature or miss the mark.

First, AU contends that Wheeler is not disabled under the statutes because she has not shown that her depression and anxiety impact the major life activities of learning, concentrating, and thinking.  AU Defs. Mot. Summ. J. ("AU MSJ") at 17.  The University asserts that Wheeler's "demonstrated track record of academic success," which is "much stronger than the average student," contradicts her allegations that her depression and anxiety substantially limited her ability to learn.  AU MSJ at 20–21; see Singh v. George Washington Univ. Sch. of Med. & Health Sci., 597 F. Supp. 2d 89, 93–95 (D.D.C. 2009) (concluding, after discovery, that plaintiff's dyslexia and "mild disorder of processing speed" did not substantially limit major life activities, based on "the academic success she has enjoyed throughout her life").

This argument falls short.  For one, mental-health conditions like depression can easily constitute a disability.  See, e.g., Harvard v. Inch, 411 F. Supp. 3d 1220, 1240 (N.D. Fla. 2019); 28 C.F.R. § 36.105(d)(2)(iii)(K) ("Major depressive disorder . . . substantially limits brain function."); id. § 36.105(d)(2)(iii) (noting "it should easily be concluded" that major depressive disorder "substantially limit[s] . . . major life activities").  "A mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself."  See Peters v. Baldwin Union Free Sch. Dist., 320 F.3d 164, 168 (2d Cir. 2003).  Likewise, Wheeler points to her suicidal ideations, as well as other limitations like academic leaves of absence.  Those conditions alone provide Wheeler enough to survive summary judgment on this element.

As for Wheeler's academic success, "the [disability] definition is met even if the difficulties are not insurmountable."  Bragdon v. Abbott, 524 U.S. 624, 641 (1998).  An individual may "achieve some measure of success despite her disability."  Peters v. Univ. of Cincinnati Coll. of Med., No. 1:10-CV-906, 2012 WL 3878601, at *6 (S.D. Ohio Sept. 6, 2012) (rejecting notion that "academic success" precludes a finding of disability, which "flies in the face" of the 2008 ADA amendments); Bartlett v. N.Y. State Bd. of Law Examiners, No. 93 CIV. 4986, 2001 WL 930792, at *37 (S.D.N.Y. Aug. 15, 2001) (Sotomayor, J.) (rejecting reliance on outcomes alone, since disabled individuals may be "extremely bright and hardworking" and "use[] alternative routes to achieve academic success").  That may be the case for Wheeler; discovery will tell.  In any event, given the undisputed fact that she experienced suicidal ideations and took academic leaves of absence, the extent to which her academic success undermines a showing of disability would seem to be a question for a jury.

Second, AU argues that it did not deny Wheeler any benefit, since she is still a full-time student at the University.  But the University did place her on interim suspension, which

completely barred her from campus, and her return was conditioned on a satisfactory psychological evaluation and her agreement to provide her medical records to the school.  See Am. Compl. ¶¶ 40, 44–46; AU SUMF ¶¶ 134–35.  These types of temporary and conditional removals from campus activities can constitute an exclusion of educational benefits under the statutes.  See R.W. v. Bd. of Regents of the Univ. Sys. of Ga., 114 F. Supp. 3d 1260, 1285 (N.D. Ga. 2015) (removing plaintiff from student housing "and then conditioning his ability to live in campus housing" on his "participation in individual counseling" established exclusion from participation in a benefit); Cragg v. Dist. Bd. of Trs. of Miami-Dade Coll., No. 17-20300, 2018 WL 8334585, at *7 (S.D. Fla. Nov. 30, 2018) (similar, for conditioning enrollment on plaintiff's "submission to a psychological evaluation").

Third, AU insists that it "followed the written policies and procedures . . . during [Wheeler's] interim suspension."  AU MSJ at 23.  That may be so.  Understandably, however, Wheeler seeks discovery on those policies and procedures and their application.  Rule 56(d) Aff.-AU MSJ ¶ 10.  She also wants to learn what more may have occurred during the meeting at which AU decided to place her on interim suspension.  And, she seeks discovery on "how AU treated other students in circumstances similar to hers."  See Rule 56(d) Aff.-AU MSJ ¶¶ 11–14, 21.  This discovery is relevant to Wheeler's discrimination claims.  If it turns out that the University simply followed its "facially neutral policy," and that policy does not have "the effect of discriminating against the disabled," or if Wheeler otherwise fails to carry her summary judgment burden, then that might warrant summary judgment in favor of AU.  See DeBord v. Bd. of Educ. of Ferguson-Florissant Sch. Dist., 126 F.3d 1102, 1105–06 (8th Cir. 1997).  But as it stands, AU's argument is premature; whether AU followed a neutral and evenly applied policy is a matter for post-discovery summary judgment.

Moreover, the parties' competing narratives surrounding the suspension create a genuine dispute of material fact whether AU's "actions were taken because of Plaintiff's diagnosis rather than [her] current behavior."  See R.W., 114 F. Supp. 3d at 1286.  Again, there are factual gaps concerning the meeting at which AU placed Wheeler on interim suspension, the University's policies, and how AU would have treated a non-disabled student under similar circumstances.  See Rule 56(d) Aff.-AU MSJ ¶¶ 11–16, 21.  The decision to place Wheeler on interim suspension strikes the Court as the most tangible action that could, depending on discovery, provide a basis for her discrimination claims.  Wheeler is entitled to try to show in discovery that, given a similar report of an alleged assault, AU would not have responded this way to a similar situation involving a non-disabled student.

Lastly, AU asserts a public-safety defense, but an assessment of that would be similarly premature; it will become relevant only if Wheeler can meet her burden of showing discrimination.  Relatedly, discovery perhaps could show that AU suspended Wheeler solely for her alleged behavior earlier in the day, rather than any disability.  While Wheeler's conduct may have stemmed from a mental-health episode, "[f]ederal law . . . does not prohibit" conduct-based disciplinary actions "so long as the individual is not being punished for the disability itself."  See Syed v. Nw. Univ., No. 21-cv-00267, 2021 WL 1812891, at *5 (N.D. Ill. May 6, 2021); see also Brumfield v. City of Chicago, 735 F.3d 619, 630–31 (7th Cir. 2013) (similar in employment discrimination context) (collecting cases).  But the above-mentioned gaps in the current record preclude this conclusion, at least for now.[6]

---

[6] AU argues that Wheeler never requested a reasonable accommodation.  But as Wheeler concedes, she "has not brought a failure-to-accommodate claim," Pl. Opp'n-AU MSJ at 23 n.4, so no such claim is a part of this case.

In sum, Wheeler is entitled to at least some discovery.  There are numerous material factual disputes and relevant questions to be answered through depositions and other fact finding.  Almost everything AU relies on is based on its own production of exhibits.  A fuller picture is necessary before the Court can appropriately adjudicate a motion for summary judgment.  Thus, the Court denies AU's motion for summary judgment without prejudice as to Wheeler's discrimination claims.

B.  Counts 4–6:  Plaintiff's Fourth Amendment § 1983 Claims

The Court will kick off its analysis of Wheeler's constitutional claims with the threshold issues of § 1983's "under color of law" requirement, the qualified immunity standard, and whether the AU Officers are even entitled to assert that immunity as a defense (they can).  Another contested issue is whether the video footage changes the standard of review (it does not).  The Court will then dive into the merits of Wheeler's Fourth Amendment claims, concluding that the unlawful entry claim fails while the unreasonable seizure and false arrest claims can proceed to discovery.  The Court will also assess various other disputed legal issues.  Finally, it will explain why Wheeler can move forward with discovery on her claims under Monell v. Department of Social Services, 436 U.S. 658 (1978), and against Dean Brown.

*1. The "Under Color of Law" and Qualified Immunity Standards*

Wheeler brings her Fourth Amendment claims under 42 U.S.C. § 1983, which provides a cause of action against persons "acting under color of state law" who violate an individual's rights under federal law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  To commit an act "under color of law," "an individual must be 'clothed with the authority of state law.'"  Maniaci v. Georgetown Univ., 510 F. Supp. 2d 50, 68 (D.D.C. 2007) (quoting United States v. Classic, 313

U.S. 299, 326 (1941)).  There is no question that the MPD Officers qualify as state actors under these principles.

Whether the AU Officers acted under color of state law turns on D.C. law.  In the District, "[a] special policeman shall have the same powers as a law enforcement officer to arrest without warrant for offenses committed within premises to which his jurisdiction extends."  D.C. Code § 23-582(a).  Further, under D.C. Code § 21-521, "an officer authorized to make arrests" in the District can execute a mental-health seizure of a person believed to be "mentally ill and, because of the illness, is likely to injure [her]self or others."  The AU Officers characterize themselves as special police officers and rely on this authority to justify the warrantless seizure here.  See AU MSJ at 34 & n.22.  And courts have held that "special police officers act as agents or instrumentalities of the state in conducting searches and seizures incident to their power to arrest, and thus are subject to the restrictions of the Fourth Amendment."  Woodward & Lothrop v. Hillary, 598 A.2d 1142, 1145 (D.C. 1991); see also McGovern v. George Washington Univ., 245 F. Supp. 3d 167, 179–82 (D.D.C. 2017) (same for university-employed special police officers); Maniaci, 510 F. Supp. 2d at 68–70 (same).

AU then suggests that because its officers are subject to suit under § 1983, they are necessarily entitled to assert qualified immunity.  See AU Reply at 23.  That is mistaken.  "[A] party is not entitled to assert qualified immunity simply because he is amenable to suit under § 1983."  McCullum v. Tepe, 693 F.3d 696, 700 (6th Cir. 2012); see also, e.g., Sanchez v. Oliver, 995 F.3d 461, 466 (5th Cir. 2021); Gregg v. Ham, 678 F.3d 333, 339–40 (4th Cir. 2012); Domina v. Van Pelt, 235 F.3d 1091, 1096 (8th Cir. 2000).  Indeed, the question whether university-employed special police can even assert qualified immunity is a complicated one.

First, some table setting on immunity.  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Mullenix v. Luna, 577 U.S. 7, 11 (2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  Qualified immunity thus "gives government officials breathing room to make reasonable but mistaken judgments."  Messerschmidt v. Millender, 565 U.S. 535, 546 (2012) (citation omitted).  The "clearly established" prong of this doctrine "means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (citation omitted).  While this prong does "not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate."  Mullenix, 577 U.S. at 12 (citation omitted).  A legal principle also qualifies as clearly established if it is supported by "a robust 'consensus of cases of persuasive authority.'"  Wesby, 138 S. Ct. at 589–90 (citations omitted).  This standard thus protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

Once again, there is no question that the MPD Officers may assert a qualified immunity defense, but the answer for the AU Officers is not as simple.  Neither side offers a case from this district or the D.C. Circuit that decides whether university-employed special police officers can assert qualified immunity.  See McGovern, 245 F. Supp. 3d at 183; AU MSJ at 37.  And though they spar on this issue, neither side engages (at least not too deeply) in the relevant analysis outlined by the Supreme Court in Filarsky v. Delia, 566 U.S. 377 (2012), or Richardson v. McKnight, 521 U.S. 399 (1997).  When a private party seeks qualified immunity from a § 1983 suit, those precedents direct courts to determine:  (1) whether there is a "'firmly rooted' tradition

of immunity applicable" to similarly situated parties at common law, Richardson, 521 U.S. at

403–04; Filarsky, 566 U.S. at 384 (looking to "the 'general principles of tort immunities and

defenses' applicable at common law" (quoting Imbler v. Pachtman, 424 U.S. 409, 418 (1976));

and (2) whether immunity would be consistent with "the reasons [courts] have afforded

protection from suit under § 1983." Filarsky, 566 U.S. at 384.

  The first inquiry weighs in favor of university special police having access to a qualified

immunity defense. Courts have extended qualified immunity to individuals "commissioned as

special police officers" of cities, when "acting in their capacity as public police officers." See,

e.g., United Pet Supply, Inc. v. City of Chattanooga, 768 F.3d 464, 479 (6th Cir. 2014); but see

id. at 471 (noting that, unlike here, the private company for whom the individuals worked

"contracted with the City" directly). Filarsky, too, noted that "the line between public and

private policing was frequently hazy" at common law, and individuals "publicly appointed as

special policemen" were "as fully protected as any other officer." 566 U.S. 387–88 (cleaned up).

For its part, AU points out that at least in Maryland special police officers have access to public

official immunity under state law. See AU MSJ at 37; Callahan v. Bowers, 748 A.2d 499, 505–

06 (Md. Ct. App. 2000), vacated on other grounds, 754 A.2d 388 (Md. 2000) (per curiam). But

one state's law does not make a "'firmly rooted' tradition" at common law. See Richardson, 521

U.S. at 404–05. Nonetheless, the Court finds persuasive the analysis from other cases providing

qualified immunity to special policemen.

  As to the second prong of this inquiry, permitting qualified immunity here would be

largely consistent with affording immunity to a city police officer. Chief among the concerns on

the second prong are avoiding "'unwarranted timidity' in performance of public duties, ensuring

that talented candidates are not deterred from public service, and preventing the harmful

distractions from carrying out the work of government that can often accompany damages suits." Filarsky, 566 U.S. at 389–90 (quoting Richardson, 521 U.S. at 409–11). As special police officers, the AU police have "the same powers as a law enforcement officer . . . within premises to which [their] jurisdiction extends." D.C. Code § 23-582(a). As a result, AU police officers perform law-enforcement functions that implicate concerns about "unwarranted timidity." Even if they might sometimes be solely enforcing "internal private university policy," see McGovern, 245 F. Supp. 3d at 183, the line between a mere violation of that policy and criminal activity will be "frequently hazy." Filarsky, 566 U.S. at 387–88; Mot. Hr'g Tr. at 48 (Nov. 2, 2021) (AU's counsel representing that if there were a suspected cocaine dealer in University-leased apartments, then AUPD would have jurisdiction based both on their police powers and a violation of university policy).

Accordingly, the Court concludes that the AU Officers can assert a qualified immunity defense. This holding has particular relevance for Wheeler's unlawful entry claim, because, as will be explained, the Court finds that she cannot show a "clearly established" violation.

### 2. The Video Footage

The next question is whether the video footage in the record changes the standard of review that the Court should apply, and in turn, whether the video compels pre-discovery summary judgment. It does not.

"In qualified immunity cases" at summary judgment, courts "usually" adopt "the plaintiff's version of the facts." Scott v. Harris, 550 U.S. 372, 378 (2007). However, if a video "blatantly contradict[s]" or "utterly discredit[s]" a plaintiff's story, revealing it as a "visible fiction," then a court must view the video as it is and disregard plaintiff's version of events. Id. at 380–81. Here, the defendants assert that the video conclusively proves their version of events

such that summary judgment should be entered in their favor.  Wheeler has a very different take on the video and the inferences to be drawn from it.

The Court will follow the "usual" approach at summary judgment.  "Contrary to Defendant[s'] claim, the video evidence in this case does not clearly contradict [Wheeler's] version of events," and, at this early stage and without further details, a reasonable jury could conclude that it does not "support Defendant[s'] assertion[s]" about Wheeler's behavior.  See Godawa v. Byrd, 798 F.3d 457, 463 (6th Cir. 2015).  The video at least "can be interpreted in multiple ways," and it "do[es] not show all relevant facts," Latits v. Phillips, 878 F.3d 541, 547 (6th Cir. 2007); approximately one hour of the interaction is not captured, and the MPD Officers with the body cameras were not in Wheeler's apartment the whole time.  Therefore, the Court still must view the facts "in the light most favorable to the non-moving party."  See id.; see also Tabares v. City of Huntington Beach, 988 F.3d 1119, 1123 n.4 (9th Cir. 2021); Gant v. Hartman, 924 F.3d 445, 449–50 (7th Cir. 2019); Mills v. City of Harrisburg, 589 F. Supp. 2d 544, 552 n.5 (M.D. Pa. 2008); accord Robinson v. Pezzat, 818 F.3d 1, 10 (D.C. Cir. 2016) (noting evidence like a video that "'quite clearly' demonstrates the falsity of the plaintiff's statement[] rarely exists" (citation omitted)).

Here, a jury could draw reasonable inferences in plaintiff's favor based on the video and find that it supports her version of the facts, not defendants' version.  That said, the Court now turns to whether, under that version of the facts at this stage and considering what Wheeler could uncover in discovery, her Fourth Amendment claims can proceed.

### 3.    *Merits of the Underlying Fourth Amendment Claims*

The Fourth Amendment provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const.

amend. IV.  Wheeler brings three claims under the Fourth Amendment:  unlawful entry, unreasonable seizure, and false arrest.

       a.  <u>Unlawful Entry</u>

The right to be in one's own home "and there be free from unreasonable governmental intrusion" sits at the "very core" of the Fourth Amendment.  See <u>Florida v. Jardines</u>, 569 U.S. 1, 6 (2013) (quoting <u>Silverman v. United States</u>, 365 U.S. 505, 511 (1961)).  It is firmly established "that searches and seizures inside a home without a warrant are presumptively unreasonable," <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980), and that "physical entry of the home is the chief evil against which" the Amendment protects.  <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 748 (1984) (citation omitted).  Yet, "the Fourth Amendment does not prohibit all unwelcome intrusions 'on private property'—only 'unreasonable' ones."  <u>Caniglia v. Strom</u>, 141 S. Ct. 1596, 1599 (2021) (citation omitted).  The Supreme Court has thus "recognized a few permissible invasions of the home," like a search executed pursuant to a warrant, when exigent circumstances exist, or simply "approaching a home and knocking on the front door."  <u>Id.</u>  But the Court has repeatedly "declined to expand" the "exceptions to the warrant requirement to permit warrantless entry into the home."  <u>Collins v. Virginia</u>, 138 S. Ct. 1663, 1672 (2018).

On the other hand, when welfare checks and seizures of "a person for mental health reasons" are involved, lower courts have coalesced around the principle that a probable cause standard "analogous" to the Fourth Amendment applies for "determining the validity of the government's seizure."  See <u>Pino v. Higgs</u>, 75 F.3d 1461, 1468–69 (10th Cir. 1996) (collecting cases).  And some courts had concluded that "the involuntary seizure" of a person believed to be "suicidal or otherwise pose[] an imminent risk of harm to himself or others" falls "squarely within . . . 'the heartland of the community caretaking exception.'"  See <u>Caniglia v. Strom</u>, 953

F.3d 112, 124–25 (1st Cir. 2020) (citations omitted), vacated & remanded, 141 S. Ct. 1596

(2021).  "Community caretaking" is essentially "a catchall for the wide range of responsibilities

that police officers must discharge aside from their criminal enforcement activities."  See id. at

123.

The defendants' primary justifications for their actions here are that they had probable

cause to conduct a welfare check and to carry out an involuntary seizure under D.C. law, see

D.C. Code § 21-521, and, relatedly, that they were acting within the scope of this so-called

community caretaking exception to the warrant requirement.

In 2019—when the events at issue in this case occurred—the law surrounding whether

these principles allowed warrantless entries into the home was unsettled.  See Caniglia, 953 F.3d

at 124 (noting a circuit split and that the community caretaking "doctrine's reach . . . is ill-

defined and admits of some differences among the" lower courts).  More recently, the Supreme

Court has clarified that the community caretaking doctrine does not permit a warrantless entry

into the home, explaining that it "goes beyond" any previously recognized exception to the

warrant requirement.  See Caniglia, 141 S. Ct. at 1599–60.  Nonetheless, before that decision,

lower courts had extended the community caretaking principle to the home.  See, e.g., Caniglia,

953 F.3d at 124–27; United States v. Smith, 820 F.3d 356, 361 (8th Cir. 2016); United States v.

York, 895 F.2d 1026, 1030 (5th Cir. 1990).  For its part, the D.C. Circuit had held that, if the

community caretaking doctrine applied to the home, it "justified a warrantless search" only when

"police officers were presented with circumstances requiring immediate action if they were to

fulfill their caretaking function, and the ensuing searches were characterized by brevity and

circumspection."  Corrigan v. District of Columbia, 841 F.3d 1022, 1034 (D.C. Cir. 2016).

All this undermines Wheeler's ability to show that her Fourth Amendment right relevant to her unlawful entry claim was "clearly established" for qualified immunity purposes.  At the motion hearing, plaintiff's counsel acknowledged that "certainly" the officers "were entitled to perform a welfare check."  Hr'g Tr. at 40.  But she clarified that the unlawful entry claim is premised on the fact that the officers "didn't wait for Ms. Wheeler to open the door."  Id.  In other words, the unlawful entry claim challenges Captain Barrett's and Officer Smith's immediate entry into Wheeler's apartment.  Id. at 40–41; Am. Compl. ¶ 151 (alleging "AUPD and MPD Officers entered Ms. Wheeler's home . . . without a warrant [and] without her consent").  The officers' subsequent three-hour stay and involuntarily seizure of Wheeler goes to her other Fourth Amendment claims.

Given the case law in the lower courts permitting warrantless entry into the home for community caretaking purposes—at least at the time of this alleged violation—Wheeler cannot show that any unlawful entry violation was clearly established in 2019.  See, e.g., Caniglia, 953 F.3d at 124–27; Smith, 820 F.3d at 361; York, 895 F.2d at 1030.  A reasonable officer could have viewed Barrett's and Smith's immediate entry and initial steps into Wheeler's room, while trying to talk to her, as "the sort of '*minor* government interference' that" the law at the time "condoned."  See Corrigan, 841 F.3d at 1037 (quoting Hawkins v. United States, 113 A.3d 216, 222 (D.C. 2015)).  And, as Wheeler's counsel acknowledged at the hearing, there were grounds for a welfare check.  Hr'g Tr. at 40.  Indeed, the concerning reports of Wheeler's behavior from earlier in the day clearly provided the University cause to check on her wellbeing; a reasonable view of the situation, even in the light most favorable to Wheeler, is that a student might have had a mental-health episode or otherwise exhibited erratic and *possibly* dangerous behavior earlier in the day.

32

Wheeler has not submitted anything to show that she could overcome this conclusion in discovery.  Whether or not she was actually having suicidal ideations that day and whether or not there was an actual assault, the reports that the University received reasonably led it to perform a welfare check.

To be clear, this ruling is narrowly focused on the unlawful entry claim.  During the relevant time here, as reflected in Corrigan, the community caretaking doctrine still erected meaningful guardrails around the home, such that the defendants cannot necessarily extend the logic of the Court's dismissal of the unlawful entry claim to the other Fourth Amendment claims.

In Corrigan, a National Suicide Hotline volunteer notified MPD about an Army veteran diagnosed with PTSD who might have been attempting suicide.  See Corrigan, 841 F.3d at 1025–28.  After an initial "sweep" of the home revealed "no dangerous or illegal items," MPD engaged in a more extensive five-hour search.  See id. at 1027.  The D.C. Circuit held that "[n]o reasonable officer could understand" the five-hour warrantless search for "hazardous materials" that occurred "to be the sort of 'minor government interference'" permitted by the doctrine.  Id. at 1036–37.  The Circuit thus concluded that, even if the initial sweep was justified and the officers were entitled to qualified immunity as to that first search, the second, more extensive search was clearly unconstitutional.  See id. at 1025, 1035–37.  Similarly here, the Court reaches different conclusions as to the initial entry and the subsequent three-hour stay, at least at this stage.

In sum, the Court will grant defendants' summary judgment motions specifically as to the unlawful entry claim.  The officers had grounds to perform an initial welfare check, and their entry into Wheeler's apartment—based on the law at the time—does not amount to a clearly established constitutional violation.

b.  Unreasonable Seizure and False Arrest

The Court will analyze Wheeler's unreasonable seizure and false arrest claims together. Both claims converge on the officers' mental-health seizure of Wheeler, including their presence in (or just outside) Wheeler's apartment for three hours and their decision to involuntarily take her into custody.

As mentioned, "a seizure of a person for an emergency mental health evaluation raises concerns that are closely analogous to those implicated by a criminal arrest, and both are equally intrusive."  See Pino, 75 F.3d at 1468.  Accordingly, courts have held that it is "clearly established law that in the context of a mental health seizure an officer must have probable cause to believe that the person seized poses a danger to herself or others."  Rudolph v. Babinec, 939 F.3d 742, 747 (6th Cir. 2019) (per curiam) (cleaned up); Bailey v. Kennedy, 349 F.3d 731, 741 (4th Cir. 2003).  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  Devenpeck v. Alford, 543 U.S. 146, 152 (2004).  For mental-health seizures, probable cause requires a showing of "only a 'probability or substantial chance' of dangerous behavior."  Fisher v. Harden, 398 F.3d 837, 843 (6th Cir. 2005) (citation omitted).  Meanwhile, a person's denial that they want to harm themselves or others "does not by itself eliminate . . . probable cause."  Rudolph, 939 F.3d at 747.

The case law on mental-health seizures also clearly establishes the importance of officers' on-the-scene observations and underscores, absent an emergency, the need for further inquiry when responding to reports of alleged concerning behavior.  See Rudolph, 939 F.3d at 747, 749–50; Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 170–71 (4th Cir. 2016); Fisher, 398 F.3d at 843–44; Bailey, 349 F.3d at 741–42; Burruss v. Riley, 192 F. Supp. 3d 655, 664

(W.D. Va. 2016).  For good reason.  As the Fourth Circuit has explained, officers cannot "simply

assume[] a threat without exploring whether the situation reflected some misunderstanding, a

bizarre but non-dangerous incident, or something more problematic.  Further inquiry is useful

in . . . situations where officers are not presented with emergency circumstances or a 'substantial

likelihood' of harmful behavior."  Goines, 822 F.3d at 170–71.  Thus, it is "clearly established"

that officers "may not detain someone for an emergency mental evaluation" based on an initial

report of concerning behavior, "where the officers were able to observe the person alleged to be

suicidal [or a danger to others] and observed nothing indicating" that to be the case.  See Bailey,

349 F.3d at 741.

Whether there is a "clearly established" violation of Wheeler's right to be free from an

unreasonable mental-health seizure turns on a factual determination.  Although the video

provides a fuller factual record compared to the usual case that has had no discovery, there are

still material gaps.

Drawing all reasonable inferences from the video in Wheeler's favor, as well as

inferences from any gaps in the record to be built out in discovery, a jury could adopt the

following facts:  When the officers arrived, they saw Wheeler calmly studying on her bed and

talking to her aunt on the phone.  Wheeler responded "no" when asked—about 30 minutes after

the initial entry—whether she intended to harm herself or others.  And she appears to have

remained seated in essentially the same position on her bed throughout nearly the entire three-

hour encounter, though much of the interaction was not recorded.  At points she expressed

frustration at the officers' presence and became agitated about the situation she was in.  But she

had been told early on that they were there to take her to the hospital, to which, unlike on prior

occasions, Wheeler did not consent.  Expressing frustration by itself does not mean someone is a

danger to themselves or others due to a mental illness, as an FD-12 would require.  Even in the moment just before the seizure, Wheeler explains—in a fairly level manner given that officers have been in her room for three hours—that if she was being kicked off campus, she had friends with whom she could stay.  See Smith Tape 2 at 51:30–55.  Moreover, the EMTs' determination that Wheeler's "mental" and "neurological" status were "normal" bolsters her arguments that she did not pose an imminent danger.  See Pl. Ex. 1.

At this stage, based on that version of the facts, a jury could conclude that at some point during this three-hour encounter it was plainly unreasonable for the officers to remain in Wheeler's apartment.  That is, a reasonable jury could conclude that reports about Wheeler's behavior earlier in the day and her prior mental-health history, even if they supported a welfare *check*, could not continue to sustain probable cause for a mental-health *seizure* in light of the objective facts and circumstances at the scene.  But issues for discovery remain, including fact finding on the unrecorded interactions between both AU and MPD officers that evening.

In support of its position that there was a substantial chance of dangerous behavior at the time of the seizure, AU points to Wheeler's "continuous and escalating erratic and disturbing behavior, including cursing and exposing herself."  AU MSJ at 34–35; AU Reply at 21–22 (asserting Wheler "disrobed, cursed, kicked, and spat at officers").  The University's statement of undisputed facts also asserts that Wheeler did all this "over the course of three hours."  AU SUMF ¶¶ 153 (citing Smith Tape 2 at 52:00).  The problem for AU is that this behavior occurred while the officers took Wheeler to the ground, handcuffed her, wrapped in her a blanket, and carried her out—at the end of the three-hour encounter.  See Smith Tape 2 at 51:55.  And on this limited record, it would appear that only the MPD Officers (and the EMTs) engaged in further

inquiry as to Wheeler's mental health on the scene, which appears not to have shown anything to support probable cause for a mental-health seizure.

The AU officers also lean on Wheeler's prior mental-health history, but that leads to another matter for discovery: precisely what information the officers (especially Captain Barrett) had going into the encounter and how that might bear on the assessment of the on-the-scene circumstances. For example, Barrett states in his affidavit that his decision to involuntarily take Wheeler to the hospital was informed by his "training and experience in crisis intervention and mental health-related incidents" and his "knowledge of her documented history of suicidal thoughts and ideations." Ex. 31 ¶ 19. Wheeler, for her part, seeks to test and ferret out the details of this statement in discovery. Rule 56(d) Aff.-AU MSJ ¶ 5.

Relatedly, the MPD Officers argue that that the so-called collective knowledge doctrine absolves them of liability for any constitutional violation. As Judge Moss detailed in United States v. Gorham, this doctrine permits "an officer who lacks 'direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion or probable cause,'" to "act on 'a directive or request from another officer or agency.'" 317 F. Supp. 3d 459, 470 (D.D.C. 2018) (citations omitted). The Supreme Court has described the doctrine as a "common sense" rule that "enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction," while "minimiz[ing] the volume of information concerning suspects that must be transmitted." United States v. Hensley, 469 U.S. 221, 231 (1985). In short, the doctrine directs courts "to substitute the knowledge of the *instructing officer or officers* for the knowledge of the *acting officer*; it does not permit [courts] to aggregate bits and pieces of information from among myriad officers, nor does it apply outside the context of communicated alerts or instructions." United States v. Massenburg, 654 F.3d 480, 493 (4th Cir. 2011).

The MPD Officers raised this issue for the first time in their reply brief, after AU filed its summary judgment brief, which included more detail about Wheeler's mental-health history and past suicidal ideations.  See, e.g., AU MSJ at 6–7; AU Ex. 27 (Barrett Supplemental Case Report).  Then, in a surrebuttal brief, the MPD Officers clarified that Barrett specifically, "who was the officer on the scene in charge of the effort to take Plaintiff either voluntarily or involuntarily to the hospital, possessed the information" supporting probable cause.  See MPD Surrebuttal at 3 (relying on AU Ex. 27, Barrett's Supplemental Case Report).  That information included Wheeler's "mental health history, her serious threatening encounter with another student that day," and Professor Knee's email.  MPD Surrebuttal at 3.  The Court has already covered all of this information, except Wheeler's prior mental-health history, which Barrett did not directly communicate to the MPD Officers; however, MPD Officers were told Wheeler was a "mental health consumer."  MPD SUMF ¶ 1.

In Gorham, Judge Moss endorsed the Fourth Circuit's analysis of the collective knowledge doctrine, concluding that the doctrine does not extend "to encompass cases in which no actual communication or direction occurs between the officer conducting the search or seizure and the officer in possession of the information giving rise to the required reasonable suspicion and where the relevant facts are merely aggregated after the fact."  See Gorham, 317 F. Supp. 3d at 473 (relying on Massenburg, 654 F.3d 480).  Drawing on this authority, Wheeler argues the collective knowledge doctrine is inapplicable here because there was no actual communication of "the information the AUPD officers possessed at the time they arrived."  Pl. Surreply at 2–3.  In her view, the MPD Officers seek an "impermissible, post hoc aggregation" of information.  Id.

But the Court does not take MPD to be seeking to aggregate "the knowledge of several officers . . . to create probable cause"; rather, MPD seeks to rely on Barrett's "conclusion" that

there were grounds for a mental-health seizure, which "was conveyed" to the MPD Officers.  See United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1228 n.5 (10th Cir. 2008) (distinguishing between different approaches to collective knowledge).  And there was *some* communication among officers, who were essentially acting as a team—AUPD, apparently led by Barrett, requested MPD's assistance to check on a "mental health consumer" and to take her to the hospital.  The collective knowledge doctrine does not require MPD to have "direct personal knowledge of *all* the facts necessary to give rise to . . . probable cause"; it only requires "a directive or request from another officer or agency," here Captain Barrett.  See Gorham, 317 F. Supp. 3d at 470.  Thus, the Court need only inquire whether Barrett had probable cause.

This is another issue for discovery.  Wheeler's mental-health history may well have heightened the cause for concern arising out of the events earlier in the day on September 26, 2019.  As discussed, Wheeler's history and the reports from earlier in the day were grounds for a welfare check.  But Wheeler's prior suicidal ideations—one at least seven months prior, and others even further back in time—do not by themselves supply probable cause to believe Wheeler presented an "imminent danger of harming . . . herself or others," see MPD General Order 308.04 at 6, supra, or needed to be "immediately detained" for an "emergency observation."  D.C. Code § 21-521.  Discovery might reveal further relevant information as to why prior interactions between AUPD and Wheeler turned out differently than this one.  And further information about which of those prior occurrences Captain Barrett knew about or was involved in seems particularly relevant.  See, e.g., Hr'g Tr. at 37 (AU counsel stating he "can't answer [these questions] at this time.").

Next, the parties debate the relevance of the doubts expressed by various officers throughout the night as to whether there was a basis for a mental-health seizure.  The test here is

an objective one, meaning that an officer's "evil intentions" do "not make a Fourth Amendment violation out of an objectively reasonable" seizure; "nor will an officer's good intentions make an objectively unreasonable" seizure constitutional.  See Graham v. Connor, 490 U.S. 386, 397 (1989).  "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind."  Maryland v. Macon, 472 U.S. 463, 470–71 (1985). The officers' statements are therefore relevant insofar as they reflect the objective circumstances—for instance, Wheeler's behavior on the scene—not to show any good or bad intentions or whether they subjectively thought that their actions were lawful or not.

Accordingly, the parties need not dwell in discovery on the officers' subjective thoughts, including their opinions as to the lawfulness of executing an FD-12, except as context for "the facts and circumstances confronting [the officers] at the time."  See Macon, 472 U.S. at 470–71. In other words, any comments about the circumstances the officers observed may be considered.[7]

The parties also spar over the relevance of the D.C. Superior Court's after-the-fact authorization of Wheeler's continued detention at the hospital.  Wheeler has the better of that argument, because a dispute of fact exists about the extent to which the officers' involuntary seizure of Wheeler may have triggered the findings in the examining doctor's report after she

---

[7] See, e.g., Pl. SUMF-MPD ¶ 23 (not disputed that Smith stated Wheeler "seem[ed] of sound mind to say" that she did not intend to harm herself or others) (alteration in original), ¶ 29 (same for Davis's statement that Wheeler "seem[ed] fine now" and was "just more angry that" the officers were there) (alteration in original), ¶ 33 (same for Davis's statement that Wheeler was not expressing suicidal ideations); AU SUMF ¶ 138 (plaintiff's response, citing Officer Joyner's statements that the other student Wheeler allegedly assaulted "live[d] off campus" in a different building, and that day was the "[f]irst time" the two had interacted).

arrived at the hospital.  See Rule 56(d) Aff.-AU MSJ ¶ 38; Pl. SUMF-AU ¶ 221; Rule 56(d) Aff.

of Debra R. Belott in Opp'n to MPD Defs. Mot. Summ. J. ("Rule 56(d) Aff.-MPD MSJ") ¶ 19;

Pl. SUMF-MPD ¶ 52.  The Court also notes that probable cause must be assessed "at the time of

the arrest."  Devenpeck, 543 U.S. at 152; Macon, 472 U.S. at 470–71.  So the post-hoc findings

of the doctor and the Superior Court judge would appear marginally relevant, unless they

corroborate factors that were objectively apparent to the officers on the scene before they

physically removed Wheeler from her apartment.

     As to whether the officers are nonetheless entitled to qualified immunity even if Wheeler

could make out a constitutional violation, the Court has already noted that the contours of

probable cause in this context have been clearly established.  To support her claim that she can

overcome qualified immunity, Wheeler cites several cases where officers executed mental-health

seizures in response to reports about potentially dangerous situations.  In each case, courts denied

qualified immunity because officers' on-the-scene observations did not indicate the person at

issue was suicidal or a danger to themselves or others (or at least a reasonable jury could have

seen it that way).  See Rudolph, 939 F.3d at 748–49 (report from ex-husband and texts from a

son that plaintiff had a pistol and was intoxicated); Bailey, 349 F.3d at 739–41 (report from

neighbor that plaintiff was home alone, intoxicated, and suicidal); Burruss, 192 F. Supp. 3d at

659–60, 663–64 (report from employer requesting a welfare check of plaintiff, who had troubles

with his wife, had switched depression medications, and had a gun in the trunk of his car).

     These cases are part of a "consensus of persuasive authority," Youngbey v. March, 676

F.3d 1114, 1117 (D.C. Cir. 2012) (per curiam), which makes "sufficiently clear that a reasonable

official would understand" that what occurred here—at least on the present facts—violated

Wheeler's Fourth Amendment rights.  See Corrigan, 841 F.3d at 1035 (citation omitted).  They

also hew to the principle that "the wide berth for reasonableness" under the Fourth Amendment is afforded to "officers involved [in] circumstances in which they must make split second judgments," but at the same time, qualified immunity does not permit "officers [to] ignore what they learn as their own investigation progresses."  See id. at 1037–38; see also Rudolph, 939 F.3d at 749–50; Goines, 822 F.3d at 170–71; Fisher, 398 F.3d at 843–45; Bailey, 349 F.3d at 741–42.  In short, "[t]he contours of probable cause were sufficiently clear that the unlawfulness of seizing someone" in this context could "have been apparent to reasonable officers," given the present, limited record and drawing all reasonable inferences in Wheeler's favor.  See Bailey, 349 F.3d at 741–42.  If, after discovery, Wheeler can continue to demonstrate that a jury could reasonably conclude that nothing at the scene of the welfare check suggested that Wheeler likely presented a danger to herself or others, then it is "clearly established that probable cause was lacking."  See id. at 741.

It bears repeating that whether there is a "clearly established" violation here turns on the facts, which are incomplete without discovery.  Wheeler, for her part, seeks to discover relevant information to maintain her claims—including on the one-hour gap in video footage and the interaction with the EMTs—and generally to discern the purported basis for probable cause and test the bases of the defendants' affidavits.  See, e.g., Rule 56(d) Aff.-MPD MSJ ¶¶ 11–12, 14; Rule 56(d) Aff.-AU MSJ ¶¶ 5, 23, 25.  Or perhaps further factual development on the other side could reveal more of an unstable situation than is apparent on this record, which could be informed partly by Wheeler's mental-health history, or clarify how AUPD "ensure[d] that she was not a danger to herself or to others."  AU MSJ at 35.  The upshot is that at least some discovery is needed to adequately adjudicate summary judgment.

The handful of cases cited by defendants to support of their claim of qualified immunity do not alter the Court's conclusion.  They fit the mold of other cases but simply fall on the other side of the line, where officers' on-the-scene observations corroborated an earlier report of potential dangerousness.  In <u>Mucha v. Jackson</u>, for instance, police received a report that the plaintiff, a police sergeant, "in a not very veiled manner, threaten[ed] to shoot people in police command," and thus he could not go back to his job because of this "public safety issue."  786 F.3d 1064, 1065–66 (7th Cir. 2015).  When police arrived that evening to interview the plaintiff, he stated that he "did not have 'any intent [to] hurt[] himself or anyone else,'" but simultaneously said he had "thoughts of suicide and hurting other people."  <u>Id.</u> at 1066.  These on-the-scene statements, though contradictory, corroborated the report.  <u>See id.</u> at 1068 (holding the mental-health seizure did not violate clearly established law because "danger signals," including "what [plaintiff] had told [police] when they interviewed him," provided some basis to "trigger[] the emergency detention statute").

And in <u>Cloaninger ex rel. Estate of Cloaninger v. McDevitt</u>, police responded to a suicide threat, and based on prior interactions, officers "believed [the subject] had firearms in the house."  555 F.3d 324, 332–33 (4th Cir. 2009).  The subject also "had taken prescription medication, an adverse reaction to that medication made him feel 'flighty,' and [he] compounded the effects . . . by drinking alcohol."  <u>Id.</u> at 332.  After phone calls with a Veterans Administration hospital, he was told that help was on the way to take him to a nearby hospital. <u>Id.</u> at 328.  Police arrived, and after failed attempts to communicate and interact with the subject on the scene, an officer discussed emergency commitment with a nurse at the hospital and contacted a County magistrate "who agreed to enter an emergency commitment order."  <u>Id.</u> at 332–33.  "The officers physically seized [the subject] only after collecting all this information

and professional advice." Id. at 333.  The court held that "the circumstances facing the defendants were exigent," and thus the officers acted reasonably.  See id. at 334.

Notably, these cases still rely on officers' on-the-scene observations and reflect further inquiries into the situations presented.  But in this case, there is no reliance on exigent circumstances, and the on-the-scene circumstances reflected in the present record do not reveal that the officers walked into an "unstable" situation like in Cloaninger, 555 F.3d at 334, where the officers obtained an emergency commitment order from a magistrate *before* the seizure.  Id. at 333.  Nor does the present record reveal that, during the welfare check, Wheeler presented "danger signals" of potential violence against others similar to those in Mucha.  786 F.3d at 1066–68 (noting plaintiff's expressions of "thoughts of suicide and hurting other people").[8]

Accordingly, Wheeler can proceed to discovery on her unreasonable seizure and false arrest claims.  The Court will deny defendants' motions as to these claims without prejudice.

### 4.    MPD Officer Kinzer and AU Officer Joyner

The Court briefly addresses the defendants' arguments regarding MPD Officer Kinzer and AU Officer Joyner.

First, MPD argues that Officer Kinzer did not personally commit the acts alleged in the amended complaint, so at the very least *he* should be dismissed from this case.  The Court disagrees.  Even though Kinzer did not personally commit the alleged acts (and therefore, holding him directly liable would be an uphill battle for Wheeler), he could be held liable for

---

[8] The defendants' reliance on Magwood v. Giddings, 672 A.2d 1083 (D.C. 1996) also misses the mark.  That case involved a mental-health specialist who *personally* heard the plaintiff say that "she had made plans for her sons' future care," "she had recently begun reading books on suicide," "she wanted to go to sleep and not wake up," and "she did not 'feel like going on.'"  Id. at 1087.  The facts of this case, at least currently, are inapposite.

failing to intervene to prevent any violations by the other officers.  See Moore v. District of
Columbia, 79 F. Supp. 3d 121, 134–35 (D.D.C. 2015).  To establish such bystander liability, a
plaintiff must show that an officer:  "(1) knows that a fellow officer is violating an individual's
constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to
act."  Id.  MPD does not really dispute this basic principle.  Rather, it says "[c]onsideration of
th[is] issue . . . would be premature until after the Court rules on the claim of all three officers
that they possessed probable cause for the seizure."  See MPD Reply at 17.  The Court made that
ruling, at least preliminarily insofar as it is without prejudice.

Wheeler has offered enough to get to discovery on her claims against Officer Kinzer.  He
was on the scene for much of the night in the hallway just outside Wheeler's apartment.  Kinzer
was therefore able to observe the other officers interacting with Wheeler, even if he did not
personally enter the room or take her into custody.  Discovery will tease out whether he can be
held liable either for his own actions (which, again, seems less likely) or for failing to intervene.
For instance, Wheeler seeks to discover whether other officers deferred to Kinzer's judgments
and whether he had a reasonable opportunity to intervene to prevent any violation.  Rule 56(d)
Aff.-MPD MSJ ¶¶ 27, 31.[9]  Accordingly, the Court will return to these issues if and when the
defendants renew their motions for summary judgment after discovery.

---

[9] The Court notes, however, that bystander liability still lays out an *objective* standard.
See Sanchez v. City of Chicago, 700 F.3d 919, 926–27 n.3 (7th Cir. 2012).  A plaintiff must
establish that another officer subjected her to a constitutional violation, that Kinzer "observed"
the violation, "had a reasonable opportunity to stop" the violation, "and failed to intervene."  Id.
If after discovery, Wheeler can maintain a showing that a jury could find a constitutional
violation, it seems plain that Kinzer observed it; this basis for liability, therefore, would turn on
Kinzer's opportunity to stop any alleged violation.

Second, the AU Defendants argue that AU Officer Joyner left the scene at approximately 7:50 p.m. and did not return; they therefore similarly argue that he "ha[d] no personal involvement or knowledge" of later events and "[t]here is no basis for any claims against Officer Joyner." AU MSJ at 31 n.20. Wheeler responds that Joyner can be held liable for his actions related to the entry and seizure, because he "was an integral part" of the conduct "and his report and evaluation of the incident" with the other student earlier in the day "precipitated [her] unlawful seizure." See Pl. Opp'n-AU MSJ at 32 n.6. Discovery, Wheeler contends, will further establish his involvement in this incident. See id.; Rule 56(d) Aff.-AU MSJ ¶¶ 29, 34. But she does not dispute that Joyner left the scene at 7:50 p.m. At this juncture, the Court will not dismiss Joyner from the case entirely, as he was on the scene for at least a portion of the night. But the Court will grant Joyner summary judgment on the false arrest and common-law assault claims, since he had left the scene and not returned by the end of the three-hour encounter.

### 5.   *Monell Liability and Claims Against Dean Brown*

The final order of business on the constitutional claims is Wheeler's claims against AU under Monell v. Department of Social Services, 436 U.S. 658 (1978), and against Dean Brown as an authorized decisionmaker who allegedly directed Wheeler's seizure. To state a Monell claim under § 1983, a plaintiff must allege (1) a constitutional violation, and (2) that a custom or policy caused the violation. See Warren v. District of Columbia, 353 F.3d 36, 38 (D.C. Cir. 2004); Maniaci, 510 F. Supp. 2d at 61. As relevant here, a plaintiff can satisfy Monell's second prong by alleging that an authorized policymaker "made a one-time decision that resulted in the alleged constitutional deprivation." See Irving v. District of Columbia, No. 19-3818 (RDM), 2021 WL 495041, at *5 (D.D.C. Feb. 9, 2021).

The amended complaint alleges that Dean "Brown had the authority to make policy, and made policy, on behalf of AU when he directed Defendant Officers" to take the actions they did. See Am. Compl. ¶¶ 150, 162, 177.  Dean Brown's affidavit confirms that he "convened [the] meeting" in the afternoon of September 26 in response to the alleged assault reports, at which AU administrators placed Wheeler on interim suspension, and that he "requested AUPD to do a welfare check."  AU Ex. 30 ¶¶ 12–13, 16.  And the amended complaint alleges that AUPD officers contacted Dean Brown multiple times throughout the evening, requesting further instructions, and that he ordered the ultimate seizure.  Am. Compl. ¶¶ 63, 77, 154, 190.  Wheeler states that discovery is needed on these matters, including Dean Brown's policy-making authority and his role in the key events.  See Rule 56(d) Aff.-AU MSJ ¶ 35.

All this is enough to get to discovery, on the theory that Dean Brown "made a one-time decision that resulted in the alleged constitutional deprivation."  See Irving, 2021 WL 495041, at *5.  Given his position as the Dean of Students and his direct involvement in the events at issue, it is plausible that he is an "authorized decisionmaker[]," rendering his "decision to adopt [a] particular course of action" an act of official policy.  See Singletary v. District of Columbia, 766 F.3d 66, 73 (D.C. Cir. 2014) (citation omitted); Maniaci, 510 F. Supp. 2d at 63–64 (university administrators were "final policymakers").  In such circumstances, the University would be "actually responsible" and § 1983 liability may attach.  Singletary, 766 F.3d at 73 (citation omitted).  Thus, the Court will allow the Monell claims to proceed to discovery.[10]

---

[10] The Court notes that normally Monell claims apply to local government and local officials.  See, e.g., Monell, 436 U.S. at 690–91 (discussing "municipalities and other local government units" and "[l]ocal governing bodies").  AU is a private institution, but it does not contest this issue.  Other courts in this district have analyzed § 1983 claims against D.C.'s private universities under Monell's framework.  See Maniaci, 510 F. Supp. 2d at 62 (noting "various circuits have applied Section 1983 and its limitations as set forth in *Monell* to private

For similar reasons, the Court will greenlight the claims against Dean Brown for now. "An official may be liable as a supervisor only if either (1) he . . . was personally involved in the constitutional deprivation, or (2) a sufficient causal connection exists 'between the supervisor's wrongful conduct and the constitutional violation.'" See Felarca v. Birgeneau, 891 F.3d 809, 819–20 (9th Cir. 2018) (citation omitted). While a "supervisor who merely fails to detect and prevent a subordinate's misconduct . . . cannot be liable for that misconduct," Wheeler alleges that Dean Brown played a direct, personal role in the alleged constitutional violations. See Elkins v. District of Columbia, 636 F. Supp. 2d 29, 33 (D.D.C. 2009) (quoting Int'l Action Ctr. v. United States, 365 F.3d 20, 28 (D.C. Cir. 2004) (Roberts, J.)); id. ("The supervisor must know about the conduct and facilitate, approve, or condone it"). According to Wheeler, Dean Brown "was in the police chain of command," and facilitated and directed the AU Officers' conduct. See Felarca, 891 F.3d at 820–21. She can pursue evidence of that in discovery.

    C.  Plaintiff's Common-Law Claims

Finally, Wheeler brings common-law claims for false imprisonment, assault, and trespass. These claims largely match up with the Fourth Amendment claims and involve the following facts, respectively: (a) the officers' three-hour stay in Wheeler's room, (b) their involuntarily taking Wheeler into custody by taking her to the ground, restraining her, and carrying her out of the apartment, and (c) the alleged unauthorized entry. The parties' brief arguments on these claims track those for the Fourth Amendment claims. This is unsurprising, as the false imprisonment claim turns on probable cause, see Minch v. District of Columbia, 952

_____

institutions such as Georgetown University where such private institutions employ quasi-state actors."); McGovern, 245 F. Supp. 3d at 188 (assuming Monell applied, but finding no constitutional violation). This Court will follow suit, for purposes of this ruling.

A.2d 929, 937 (D.C. 2008), and if there was probable cause, then an officer "has a qualified privilege to use reasonable force to effect an arrest."  See Etheredge v. District of Columbia, 635 A.2d 908, 916 (D.C. 1993); see also Rogala v. District of Columbia, 161 F.3d 44, 57 (D.C. Cir. 1998) ("[A]n officer may commit what at common law would be an assault unless 'the threatened use of force is clearly excessive.'" (citation omitted)).  Accordingly, for the same reasons as above, the Court will deny pre-discovery summary judgment for the defendants on Wheeler's false imprisonment and assault claims.

The trespass claim will also meet the same fate as the Fourth Amendment unlawful entry claim.  "[W]here officers lawfully enter a house, the entry will not constitute a trespass."  Garay v. Liriano, 943 F. Supp. 2d 1, 25 (D.D.C. 2013).  The Court has already concluded that the defendants are entitled to qualified immunity for their initial entry, so it will grant summary judgment for defendants on the trespass claim.

## IV.   Conclusion

For these reasons, the defendants' [32] and [39] motions for summary judgment are granted in part and denied without prejudice in part.  The Court will grant summary judgment for all defendants on the Fourth Amendment unlawful entry claim (Count 4) and the trespass claim (Count 9), as well as for Officer Joyner on the Fourth Amendment false arrest and common-law assault claims (Counts 6 and 8).  All other claims can proceed to discovery.  A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  January 5, 2022